Case 2:23-cv-09466-ODW-SSC    Document 70-7    Filed 03/25/25    Page 1 of 31    Page ID #:549

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024                                                    Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


DOUGLAS GALANTER,                    )
                                     )
                Plaintiff,           )
                                     )
        VS.                          ) Case No. 2:23-cv-09466-
                                     )         ODW (SSCx)
ACCESS FINANCE, INC. and LOS         )
ANGELES AUTO WHOLESALERS &           )
RECOVERY SERVICES, INC.,             )
                                     )
                Defendants.          )
_____)

**CERTIFIED COPY**


REMOTE DEPOSITION OF DOUGLAS GALANTER

MONDAY, NOVEMBER 18, 2024

1:32 P.M. – 4:28 P.M.


BY: J.D. COURT REPORTING, JOB REF. NO. 13465
Lisette Gatliff
CSR 12467

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024

Pages 2..5

```
                                    Page 2
1          UNITED STATES DISTRICT COURT
2          CENTRAL DISTRICT OF CALIFORNIA
3
    DOUGLAS GALANTER,            )
4                               )
              Plaintiff,        )
5                               )
         VS.                    ) Case No. 2:23-cv-09466-
6                               )         ODW (SSCx)
    ACCESS FINANCE, INC. and LOS )
7   ANGELES AUTO WHOLESALERS &   )
    RECOVERY SERVICES, INC.,     )
8                               )
              Defendants.       )
9   _____)
10
11
12          Remote deposition of DOUGLAS GALANTER, the
13   Plaintiff, taken on behalf of the Defendant, commencing
14   at 1:32 p.m. and ending at 4:28 p.m., on Monday,
15   November 18, 2024, remotely reported by Lisette Gatliff,
16   Certified Shorthand Reporter No. 12467, in La Habra,
17   California.
18
19
20
21
22
23
24
25
```

```
                                    Page 3
1          A P P E A R A N C E S:
2
3   FOR THE PLAINTIFF:
4       TRUEBLOOD LAW FIRM
        BY: Alec Trueblood
5       Attorney at Law
        10940 Wilshire Boulevard
6       Suite 1600
        Los Angeles, California 90024
7       (800)616-9325
8
9   FOR THE DEFENDANT:
10      LAW OFFICE OF DAVID CRAIG BERNSTEIN
        BY: David Craig Bernstein
11      Attorney at Law
        9454 Wilshire Boulevard
12      Suite M-5
        Beverly Hills, California 90212
13      (310)288-0854
14
15  ALSO PRESENT:
16      Juan Martinez
17
18
19
20
21
22
23
24
25
```

```
                                    Page 4
1               I N D E X
2
3   WITNESS           EXAMINATION          PAGE
4   DOUGLAS GALANTER    By Mr. Bernstein      6
5
6
7           E X H I B I T S
8   PLAINTIFF'S                            PAGE
9   1   Plaintiff's Objections to Notice of  116
        Deposition
10
11  DEFENDANT'S                            PAGE
12  A   Notice of Deposition                18
13  B   First Amended Complaint with three causes   41
        of action
14
15  C   Plaintiff's Initial Disclosures      45
16
17  D   Documents Bates stamped DG-1 to DG-110   56
18
19
20
21
22
23
24
25
```

```
                                    Page 5
1           I N D E X (Continued)
2
3
4           INFORMATION REQUESTED
5                None
6
7   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
8           PAGE      LINE
9            7        22
10           8        4, 14, 18, 23
11          12        22
12          17        11
13          43        24
14          44         5
15          60        21
16          61        21
17          62         2, 16, 21
18          63        16
19          64        21
20          66         5, 12
21          73         4
22         111         8, 13, 16
23
24
25
```

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024                                    Pages 6..9

Page 6

1       MONDAY, NOVEMBER 18, 2024
2       1:32 P.M. - 4:28 P.M.
3
4       DOUGLAS GALANTER,
5    having solemnly stated to tell the truth,
6    was examined and testified as follows:
7
8       EXAMINATION
9 BY MR. BERNSTEIN:
10   Q.  Good afternoon, Mr. Galanter.  I'm David
11 Bernstein.  As you know, I represent Los Angeles Auto
12 Wholesalers, et cetera.
13      Could you please state and spell your name for
14 the record.
15   A.  Douglas Galanter, G-A-L-A-N-T-E-R.
16   Q.  Do you have a middle name?
17   A.  Foster, F-O-S-T-E-R.
18   Q.  You've been a California-licensed attorney
19 since around 1980; is that right?
20   A.  Yes.
21   Q.  Would I be correct if I assume that you've
22 taken witnesses' depositions in the past on many
23 occasions?
24   A.  Yes.
25   Q.  And you've also defended many depositions?

Page 7

1   A.  Yes.
2   Q.  So do you agree that most of the typical
3 admonitions regarding perjury testimony, not speaking at
4 the same time, et cetera, can be -- we don't need to go
5 through those?
6   A.  I don't need those.
7   Q.  Have you ingested anything, eaten or drank
8 anything, that you believe would interfere with your
9 ability to give your best testimony here today?
10   A.  No.
11   Q.  You have no medical condition that would
12 interfere with your ability to give your best testimony?
13   A.  No.
14   Q.  Okay.  You understand that you're claiming
15 damages in this case from my client?
16   A.  Yes.
17   Q.  What is it that you want?
18   MR. TRUEBLOOD:  Objection.  You're asking the
19 witness for a contention, which is improper under
20 Rifkind v. Superior Court and other federal law.
21 BY MR. BERNSTEIN:
22   Q.  I'm asking you what you want.  You sued my
23 client.  Why?  What do you want?
24   MR. TRUEBLOOD:  I'll instruct the witness not to
25 answer.

Page 8

1   MR. BERNSTEIN:  On what grounds?
2   MR. TRUEBLOOD:  What I just stated.
3 BY MR. BERNSTEIN:
4   Q.  Do you believe you have an understanding of
5 what you're seeking in this lawsuit?
6   MR. TRUEBLOOD:  Same objection.
7   THE WITNESS:  Do I answer, or are you instructing
8 me?
9   MR. TRUEBLOOD:  I'm instructing you.
10   MR. BERNSTEIN:  You're instructing the witness not
11 to answer what his expectation is?
12   MR. TRUEBLOOD:  I just instructed him.
13 BY MR. BERNSTEIN:
14   Q.  Are you seeking emotional distress damages?
15   MR. TRUEBLOOD:  I'll instruct the witness not to
16 answer.
17 BY MR. BERNSTEIN:
18   Q.  Have you sustained emotional distress damages
19 as a result of anything LAW did?
20   MR. TRUEBLOOD:  I'll instruct the witness not to
21 answer.
22 BY MR. BERNSTEIN:
23   Q.  Are you claiming my client caused you to
24 suffer emotional distress?
25   MR. TRUEBLOOD:  I'll instruct the witness not to

Page 9

1 answer.
2 BY MR. BERNSTEIN:
3   Q.  Have you been to any doctor -- consulted with
4 any doctor of any kind in connection with the
5 repossession of the Honda?
6   A.  Do I answer that?
7   MR. TRUEBLOOD:  Yes.
8   THE WITNESS:  No.
9 BY MR. BERNSTEIN:
10   Q.  Do you have any physical symptoms that you
11 suffered as a result of the repossession of the Honda?
12   A.  Well, I was angry and upset.
13   Q.  Anything else?
14   A.  Of physical symptoms?
15   Q.  Any kind of symptoms.
16   A.  Well, my family members are very upset, but
17 that's -- that upset me more.
18   Q.  I'm just talking about your symptoms.  You
19 were angry; you were upset.  Anything else?
20   MR. TRUEBLOOD:  Are you talking about physical
21 symptoms?
22   MR. BERNSTEIN:  Any kind of symptoms.
23   MR. TRUEBLOOD:  Are you talking about emotional
24 distress?
25   MR. BERNSTEIN:  Any kind of symptoms.

Case 2:23-cv-09466-ODW-SSC   Document 70-7   Filed 03/25/25   Page 4 of 31   Page ID #:552

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024                                                    Pages 10..13

Page 10

1      MR. TRUEBLOOD:  Vague and ambiguous.
2  BY MR. BERNSTEIN:
3      **Q.  So describe for me your anger.  When did it**
4  **start?**
5      A.  On the day of the repossession of the vehicle.
6      **Q.  Are you still suffering anger?**
7      A.  To a degree, yes.
8      **Q.  How did the anger manifest itself on September**
9  **5, 2023?**
10     A.  I was very upset.
11     **Q.  Describe what you mean when you say you were**
12  **very upset.**
13     A.  I'm not sure how to describe it any more than
14  that.
15     **Q.  Well, this is my only opportunity to speak**
16  **with you before the trial in this case.  I'm trying to**
17  **understand what symptoms -- physical, emotional, of any**
18  **kind -- you attribute to the repossession of the**
19  **vehicle.  Other than what you've told me, is there**
20  **anything else?**
21     MR. TRUEBLOOD:  Compound.
22     THE WITNESS:  Well, I was upset when I found out
23  about the repossession.  I was upset that my daughter
24  was upset -- very upset and stressed out about it.  I
25  felt stressed out about it.  I don't know -- I don't

Page 11

1  know what else to say.  I was upset and I was angry
2  about it.  I don't know -- that's about it.  I don't
3  know how else to describe it.
4  BY MR. BERNSTEIN:
5      **Q.  What kind of law practice do you have?  Do you**
6  **have a specialty?**
7      A.  Business transactions, litigation,
8  international work.
9      **Q.  Has any of your work involved seeking damages**
10  **for emotional distress from a defendant?**
11     A.  On occasion.
12     **Q.  Have you heard the phrase "activities of daily**
13  **living" before?**
14     A.  I've heard that, yes.
15     **Q.  Did the repossession have any impact on your**
16  **activities of daily living?**
17     MR. TRUEBLOOD:  Vague and ambiguous.  Lack of
18  foundation.
19     THE WITNESS:  Well, being upset and stressed out
20  and angry about it impacted me, yes.
21  BY MR. BERNSTEIN:
22     **Q.  I'm asking how it impacted you, sir.**
23     A.  I felt upset, angry, and stressed out about
24  it.
25     **Q.  Anything else?**

Page 12

1      MR. TRUEBLOOD:  Anything else in terms of
2  emotional, or what?  Vague and ambiguous.
3      THE WITNESS:  I suppose it impacted my sleep.  I
4  was thinking about it.  I don't recall any other
5  specific symptoms other than what I've mentioned.
6  BY MR. BERNSTEIN:
7      **Q.  On September 5th, 2023, were there any other**
8  **circumstances in your life that was causing emotional**
9  **distress to you?**
10     A.  No.
11     **Q.  Was there a pending State Bar discipline**
12  **proceeding going on at that time?**
13     A.  No.
14     **Q.  Where did you live on September 5th, 2023?**
15     A.  800 West First Street, Apartment 2905, Los
16  Angeles, California 90012.
17     **Q.  Who lived at the Springpark address?**
18     A.  My daughter, Laurel, and her mother and my
19  former spouse, Jan Perry.
20     **Q.  Anybody else?**
21     A.  No.
22     **Q.  Are you claiming that you lost the use of your**
23  **vehicle?**
24     MR. TRUEBLOOD:  I'll instruct the witness not to
25  answer.  It's a contention question and improper under

Page 13

1  Rifkind v. Superior Court.
2  BY MR. BERNSTEIN:
3      **Q.  Did you lose the use of your vehicle as a**
4  **result of the repossession?**
5      MR. TRUEBLOOD:  You can answer.
6      THE WITNESS:  Yes.
7  BY MR. BERNSTEIN:
8      **Q.  Did you ever get it back?**
9      A.  Yes.
10     **Q.  When?**
11     A.  I don't remember the specific date, but it was
12  sometime, I believe, in late April 2024.
13     **Q.  And Access Finance returned the vehicle to**
14  **you?**
15     A.  Yes.
16     **Q.  Who was the primary driver or user of the**
17  **Honda in September of 2023?**
18     A.  I was.
19     **Q.  Why was it parked at Springpark when you lived**
20  **at a different address?**
21     A.  I was out of town, and occasionally I would
22  loan it to my daughter for her use.
23     **Q.  Is that why the vehicle was at Springpark on**
24  **that day?**
25     A.  I believe so, yes.

Case 2:23-cv-09466-ODW-SSC   Document 70-7   Filed 03/25/25   Page 5 of 31   Page ID #:553

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024

Pages 14..17

Page 14

1   Q.  Does your daughter have a car?
2   A.  No, she does not.
3   Q.  Does your wife, Jan, have a car?
4   A.  Yes, she does.
5   Q.  So starting in January 2022, can you tell me
6  the addresses you've resided at?
7   MR. TRUEBLOOD:  Objection.  Privacy.
8   THE WITNESS:  My video froze.  Oh, there it is.
9   Can I answer?
10   MR. BERNSTEIN:  I thought you were in deep
11  contemplation.
12   MR. TRUEBLOOD:  It's up to you, Doug.
13   THE WITNESS:  January 2022 I lived at the Promenade
14  East in Downtown Los Angeles, 121 South Hope Street.
15  BY MR. BERNSTEIN:
16   Q.  From when to when?
17   A.  Oh, I was there for 14 years.
18   Q.  Okay.  When did you stop residing there?
19   A.  May of 2022.
20   Q.  Where did you go?
21   A.  My present address.
22   Q.  Which is what you've just provided to me a few
23  minutes ago?
24   A.  Yes.
25   Q.  When did you buy the Honda?

Page 15

1   A.  I acquired the Honda back in August or
2  September of 2015.
3   Q.  In September of 2023 did you own or possess
4  any other vehicles that you could have driven?
5   A.  No.
6   Q.  Do you know how long the vehicle had been at
7  the Springpark address on September 5, 2023?
8   MR. TRUEBLOOD:  Vague and ambiguous.
9   THE WITNESS:  Yeah, I don't understand.  Sorry.
10  BY MR. BERNSTEIN:
11   Q.  Looking backwards in time from September 5,
12  2023, how long had the car been parked there, kept at
13  that address?
14   A.  I was out of town at the time for a few days,
15  so it would have been like three to four days probably.
16   Q.  Is there a parking lot at the location you
17  reside in at that time where you could have left the
18  car?
19   A.  Well, there's a parking -- there's a parking
20  garage at the building.
21   Q.  And you could have left the car there while
22  you traveled, correct?
23   A.  I could have.
24   Q.  Have you heard of a business called Hot
25  Pilates?

Page 16

1   A.  Yes.
2   Q.  What's your understanding of who owns Hot
3  Pilates, if anyone?
4   A.  It's owned by a woman.  I don't recall her
5  name sitting here right now.  It's a Pilates studio.
6   Q.  At that time, September 2023, did anyone --
7  did your wife or daughter work there?
8   A.  My daughter taught some classes there.
9   Q.  Did you incur any expense renting another
10  vehicle during the period of time the Honda was not
11  available to you?
12   A.  Yes.
13   Q.  How much?
14   MR. TRUEBLOOD:  How much in rental costs?
15  BY MR. BERNSTEIN:
16   Q.  Any expenses involving the inability to use
17  the vehicle?
18   A.  To the best of my recollection, the total
19  rental charges from the time of the repossession until
20  the time I got the car back were around $9,000 or so.
21   Q.  And who paid that?
22   A.  I did.  I'm still paying them.
23   Q.  What do you mean?
24   A.  Credit card balances.
25   Q.  Other than rental car expenses, did you incur

Page 17

1  any other expense in connection with the repossession?
2   A.  Not that I recall sitting here.
3   Q.  You've testified there's no doctor bills in
4  connection with the repossession, right?
5   A.  Correct.  There are none.
6   Q.  When did you hire Mr. Trueblood?
7   A.  I think it was sometime in late September,
8  early October 2023.
9   Q.  Did you know Mr. Trueblood before that time?
10   A.  No.
11   Q.  Do you have a contingency fee agreement?
12   MR. TRUEBLOOD:  Objection.  Instruct the witness
13  not to answer.  Attorney-client privilege.
14  Confidentiality under Business and Professions Code
15  6068.
16  BY MR. BERNSTEIN:
17   Q.  Have you paid any attorney's fees to your
18  lawyer in connection with this matter?
19   MR. TRUEBLOOD:  Same objections, same instructions.
20  Also irrelevant.
21  BY MR. BERNSTEIN:
22   Q.  Have you seen the notice of your deposition
23  for today?
24   A.  I have not.
25   Did you send it to me?

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024

Pages 18..21

Page 18

1    MR. TRUEBLOOD: I --
2    THE WITNESS: I don't know. I just got back from a
3  trip, so I may have missed it.
4  BY MR. BERNSTEIN:
5    **Q. I'm going to share my screen.**
6    A. Okay. I see it.
7    MR. BERNSTEIN: So here's the amended notice of
8  continuance of deposition. As you can see, it's set for
9  November 18th. I'm scrolling down because I want to get
10  to the request for production of documents. And I can
11  scroll up and down, however you -- whatever makes it
12  easier.
13      (Defendant's Exhibit A was marked for
14        identification and is attached hereto.)
15  BY MR. BERNSTEIN:
16    **Q. If you can look at it to see if you've seen it**
17  **before.**
18    A. I have not seen this before.
19    MR. TRUEBLOOD: For the record, we have a number of
20  written objections to these document demands. I would
21  suggest that you make those written objections part of
22  the record at this time.
23    MR. BERNSTEIN: I'm not seeing those objections.
24  You can mark whatever you'd like to when it's time for
25  direct or re-cross, whatever. Right now I want to go

Page 19

1  through these.
2  BY MR. BERNSTEIN:
3    **Q. Would you read Request for Production No. 1 to**
4  **yourself, sir.**
5    A. Yes, I've read it.
6    **Q. Do you have any documents responsive to that?**
7    MR. TRUEBLOOD: I'll instruct the witness not to
8  answer. Rifkind v. Superior Court. Asks for
9  contentions.
10  BY MR. BERNSTEIN:
11    **Q. Have you ever heard the phrase "breach of**
12  **peace"?**
13    A. Yes.
14    **Q. What's your understanding of what that means?**
15    MR. TRUEBLOOD: Objection. Irrelevance.
16    THE WITNESS: My understanding is that it involves
17  various -- it could be any number of crimes or criminal
18  activity, including, without limitation, trespass,
19  breaking and entering, those sorts of things.
20  BY MR. BERNSTEIN:
21    **Q. Has anyone told you that my client trespassed?**
22    MR. TRUEBLOOD: You can answer outside of the
23  attorney-client privilege.
24    THE WITNESS: Specifically using the word
25  "trespass," no. Not specifically that.

Page 20

1  BY MR. BERNSTEIN:
2    **Q. Has anyone told you that my client entered the**
3  **parking garage at Springpark unlawfully?**
4    A. Yes.
5    **Q. Who told you that?**
6    MR. TRUEBLOOD: I just want to get an objection in
7  here.
8    THE WITNESS: Sorry.
9    MR. TRUEBLOOD: Can you limit your questions in
10  this line, David, to exclude attorney-client
11  communications?
12    MR. BERNSTEIN: We're all lawyers here. I assume
13  that you understand my questions not to ask you to
14  testify regarding communications with Mr. Trueblood that
15  are, in fact, confidential? You understand that, Mr.--
16    THE WITNESS: Correct.
17    MR. TRUEBLOOD: Can you give me a running objection
18  that's on attorney-client privilege then?
19    MR. BERNSTEIN: Okay.
20    MR. TRUEBLOOD: That's a yes?
21    MR. BERNSTEIN: Okay means yes in my book.
22    MR. TRUEBLOOD: Okay.
23  BY MR. BERNSTEIN:
24    **Q. Mr. Galanter, you understand I don't want you**
25  **to testify about what your lawyer said to you and what**

Page 21

1  **you said to your lawyer that is confidential, correct?**
2    A. Correct. I am not disclosing any of those
3  communications.
4    **Q. All right. So who told you that my client had**
5  **unlawfully entered the parking garage?**
6    A. I am basing that upon conversations I had with
7  my daughter and with Jan Perry, my former wife, and one
8  or two other people residing at the same building, at
9  6755 Springpark Avenue, about what they -- what they
10  discovered at the parking garage.
11    **Q. So how many conversations did you have with**
12  **your daughter?**
13    A. Oh, I don't recall. A number of them.
14    **Q. What did she say about what occurred? What**
15  **did she tell you had occurred?**
16    A. That she came down to the garage and the car
17  was gone.
18    **Q. Anything else?**
19    A. Something about the gate not being able to be
20  opened or operated.
21    **Q. Anything else?**
22    A. Nothing specific I recall at this time.
23    **Q. Did you have written communications with your**
24  **daughter via e-mail, text, or other kinds of**
25  **communications that are documented or maintained?**

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024

Pages 22..25

Page 22

1    A.  We probably exchanged some text messages
2  around the time of the repossession, and we had
3  telephone calls.
4    Q.  Have you heard the name Cindy Gomez before?
5    A.  No.
6    Q.  Do you know who -- other than your wife and
7  your daughter, do you have the names of those other
8  persons that informed you that my client did something
9  wrong?
10    A.  No.
11    Q.  Do you know whether they were men or women?
12    A.  I'm trying to recall if I had -- who I had
13  direct communications with.  I don't recall specifically
14  any direct communications other than with Jan and
15  Laurel.
16    Q.  I thought I understood you to testify a few
17  moments ago that you talked to two other people -- or
18  other people?
19    A.  I seem to recall having a communication or a
20  conversation with -- her first name is Gina.  She lives
21  at the building.  Because she had seen the gate after
22  the repossession.
23    Q.  Do you know Gina's last name?
24    A.  I don't recall the last name.
25    Q.  Do you know what unit she lives in?

Page 23

1    A.  One of the ground floor units.  I can't
2  remember the number.
3    Q.  How did you come to speak to Gina regarding
4  this matter?
5    A.  Because she had been involved with trying to
6  get the gate working again after the repossession.
7    Q.  How did you come to speak with Gina about
8  that?
9    A.  I wanted -- when I got back to Los Angeles
10  after my trip back East, I wanted to find out what
11  happened.
12    Q.  Right.  So did you go and see Gina in person?
13    A.  I spoke to her in person sometime after that.
14    Q.  And did you also speak to her on the
15  telephone?
16    A.  No.
17    Q.  Did you text Gina?
18    A.  No.
19    Q.  Did you e-mail Gina?
20    A.  No.
21    Q.  Tell me everything that Gina told you
22  regarding the repossession?
23    A.  Only that after the car went missing, the
24  gate -- the parking gate mechanism was looked at, and
25  the mechanism housing was off and to one side.  It

Page 24

1  looked like there were fingerprints and dirt or dust all
2  over it.  And the gate was off the track and had to be
3  fixed.
4    Q.  Did Gina tell you anything else?
5    A.  Not that I recall.
6    Q.  The repossession occurred on September 5th,
7  2023.  Relative to that when did you speak to Gina?
8    A.  Probably within two or three weeks after that.
9    Q.  Do you believe that my client disabled the
10  gate in some way?
11    A.  Yes.
12    Q.  Why?
13    A.  Because the gate was operating perfectly fine
14  until around the time of the repossession, and then it
15  wasn't.
16    Q.  And how do you know that?
17    A.  Well, I was familiar with the gate, and the
18  gate was functioning perfectly for a long time.  Then I
19  spoke to Jan, I spoke to Laurel, and I had spoken to
20  Gina.  And after the car was taken, the gate was not
21  working.
22    Q.  When did you return from your trip?
23    A.  Probably -- I think it was around September 7
24  or 8, one of those two days.
25    Q.  Did someone tell you the gate was not working

Page 25

1  on September 5th and 6th?
2    A.  Yes.
3    Q.  Who?
4    A.  Jan told me that.
5    Q.  Anyone else?
6    A.  No.  Not around that time, no.
7    Q.  What about ever?
8    A.  Well, I spoke to Gina, as I testified.
9    Q.  Okay.  Did Gina tell you that the gate was
10  working perfectly fine until a particular day?
11    A.  She may have.  She probably did.  Everybody --
12  you know, we all knew the gate had been working just
13  fine before then.
14    Q.  How long had you been away?
15    A.  I think I was away about five days, four or
16  five days.
17    Q.  And when was the last time prior to departing
18  on your trip back East that you had visited the premises
19  and used the gate?
20    A.  Probably the day that I left.
21    Q.  Do you have a clicker in the car, or do you
22  keep it somewhere else?
23    A.  There's a gate opener in the car.
24    Q.  Going back to Exhibit A, which is the request
25  for production of documents, you testified you've never

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024                                          Pages 26..29

Page 26

1  seen this before. Have you produced any documents
2  today?
3      A.  Today? No.
4      Q.  Yes.
5      A.  Well, other than anything my attorney
6  produced. I haven't produced anything today.
7      Q.  Have you given any documents to your attorney
8  to produce at any time?
9      A.  Yes.
10     Q.  What did you give your attorney to produce?
11     A.  I think whatever he produced to you.
12  Photographs, correspondence, e-mails.
13     Q.  What were the photographs of?
14     A.  The gate and the gate mechanism, as I recall.
15     Q.  Do you know who took those?
16     A.  I think Jan took some of them. She may have
17  gotten some from Gina, the person I mentioned before. I
18  think she texted me a number of photographs.
19     Q.  Do you know who took the photos?
20     A.  Either Jan or Gina did.
21     Q.  Do you still have the text where they were
22  texted to you?
23     A.  I may. I'm not sure.
24     Q.  Did you understand that that was something to
25  be produced?

Page 27

1      MR. TRUEBLOOD: Objection. Not necessarily. But
2  we have produced texts between Ms. Perry and Mr.
3  Galanter.
4  BY MR. BERNSTEIN:
5      Q.  Do you remember my question? Do you
6  understand --
7      A.  Yeah, I understand. I understand.
8      Q.  Did you produce the texts sending you the
9  photos?
10     A.  I believe I sent everything I had to
11  Mr. Trueblood for --
12     Q.  Well, I'm specifically asking you about texts
13  from Jan --
14     A.  That would have included any texts, I believe.
15     Q.  I don't -- those have not been produced.
16     MR. TRUEBLOOD: They have been produced, actually.
17     MR. BERNSTEIN: Well, we'll go through them and
18  we'll see.
19  BY MR. BERNSTEIN:
20     Q.  So going now to Request for Production No. 2,
21  which refers to leases. Is there a lease between you
22  and the Springpark property management company or HOA?
23     MR. TRUEBLOOD: Hold on. We've objected to Request
24  No. 2, which is, quote, "All leases, agreements,
25  contracts, utility bills, e-mails, and text messages

Page 28

1  supporting your contention that you resided at the
2  premises," which was defined as Springpark Avenue, "on
3  the date the vehicle was repossessed."
4      You will see this when I put them as an
5  exhibit that we have stated we have no such documents.
6      MR. BERNSTEIN: Ms. Reporter, would you read back
7  my question, please.
8      (The record was read as follows:
9      "Q.  So going now to Request for
10     Production No. 2, which refers to leases.
11     Is there a lease between you and the
12     Springpark property management company
13     or HOA?")
14     THE WITNESS: No.
15  BY MR. BERNSTEIN:
16     Q.  Are there utility bills that you pay for a
17  Springpark apartment?
18     A.  No.
19     Q.  Do you contend that you resided at the
20  Springpark -- strike that. Withdrawn.
21     You testified that you did not reside at the
22  Springpark apartment on September 5 when the car was
23  repossessed, right?
24     A.  Correct. I did not reside there.
25     Q.  Did you ever reside there?

Page 29

1      A.  No.
2      Q.  Request for Production No. 3 asks for
3  documents supporting the claim that LAW Recovery broke
4  into the apartment house.
5      Let me ask this question: Other than what
6  you've already told me, are you able to identify any
7  documents -- like a video recording, audio recording, or
8  anything -- depicting my client breaking into the
9  garage?
10     A.  No, no.
11     Q.  Has anyone told you that there's a video
12  recording of my client breaking into the garage?
13     MR. TRUEBLOOD: Objection. Attorney-client
14  privilege.
15     MR. BERNSTEIN: I thought you wanted a running
16  objection to that.
17     MR. TRUEBLOOD: I'm going to make it clear.
18  Subject to that, of course he can answer.
19     MR. BERNSTEIN: Well, then we don't need a running
20  objection. You can make your objections.
21  BY MR. BERNSTEIN:
22     Q.  But, again, has anyone told you there's a
23  video recording depicting my client entering into the
24  premises?
25     A.  Not that I recall, no.

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024

Pages 30..33

Page 30

1    Q.  Have you ever seen a video recording depicting
2  my client entering the premises?
3    A.  No.
4    Q.  Has Jan ever told you they're aware of a video
5  recording depicting my client entering the premises?
6    A.  No.
7    Q.  Has Laurel ever told you that?
8    A.  No.
9    Q.  Has Gina ever told you that?
10    A.  No.
11    Q.  Has anyone else residing at the premises told
12  you that?
13    A.  No.
14    Q.  Other than Mr. Trueblood, has anyone ever told
15  you there's a video recording?
16    A.  I think I've answered that.
17    Q.  Okay.  Have you checked the surrounding areas
18  to see if there's video recordings from a Ring doorbell
19  or something at the area?
20    A.  As I recall -- I'm trying to remember.  I
21  think around the time I had called the sheriff's
22  department because -- when the car went missing on that
23  day, September 5, we weren't sure if it had been stolen
24  or otherwise taken, so we called the sheriff's
25  department.  I believe I asked whether there were any

Page 31

1  video cameras back there, but they didn't know.  And
2  I've never seen any.
3    Q.  Who did you ask if there were any video
4  cameras?
5    A.  The person I spoke to at the sheriff's
6  department.
7    Q.  How would they know whether there are video
8  cameras at the location?
9    A.  I don't know.
10    Q.  Was a police report made of your report of the
11  theft of the vehicle?
12    A.  No.
13    Q.  Do you have in your possession any documents
14  relating to your report to the sheriff's department?
15    A.  No.
16    Q.  Did you talk to the sheriff's department on
17  more than one occasion?
18    A.  No.
19    Q.  What did the person you spoke to at the
20  sheriff's department tell you?
21    A.  At some point in the conversation they told me
22  that their information was the car had been repossessed.
23    Q.  Did you talk to the sheriff or the LAPD?  Do
24  you know?
25    A.  Sheriff's department.

Page 32

1    Q.  Is Springpark outside the city of Los Angeles?
2    A.  I believe it is.
3    Q.  I asked you a series of questions regarding
4  video recordings depicting my client entering into the
5  parking garage, and you've answered.  What about
6  photographs?  Same questions.  Have you seen any photos
7  depicting my client entering into the parking garage?
8    A.  I have not, no.
9    Q.  Has anyone told you that they possess
10  photographs depicting my client entering into the
11  parking garage?
12    A.  Not that I recall.
13    Q.  Same questions for audio recordings.  Has
14  anyone told you that they possess audio recordings of my
15  client entering the parking garage?
16    A.  No.
17    Q.  Request No. 5 refers to evidence that you were
18  not in default of your car note for the Honda on
19  September 5th.  Would I be correct that you do not
20  dispute that you were in default on your car note on
21  September 5th?
22    A.  Correct.  I don't dispute that.
23    Q.  For how long had you been in default?
24    A.  I don't recall specifically.  Several months
25  probably.

Page 33

1    Q.  And during the period of time you were in
2  default of the car note for the Honda, you had multiple
3  conversations with Access Finance representatives,
4  correct?
5    A.  I don't believe so.
6    Q.  Do you believe that anyone tried to call your
7  daughter in connection with your car note?
8    A.  I believe they did --
9    Q.  Who?
10    A.  -- based upon what she told me.
11    Q.  Who?
12    A.  I don't have a name.
13    Q.  What did your daughter tell you regarding
14  telephone calls?
15    A.  That she had been called a number of times.
16    Q.  What else?
17    A.  And that whoever she spoke to, she told them
18  not to call her anymore.
19    Q.  Anything else?
20    A.  No, not that I recall.
21    Q.  Did she tell you whether it was a man or a
22  woman?
23    A.  I believe she said it was a man.
24    Q.  Did she tell you on how many occasions she had
25  been called?

Case 2:23-cv-09466-ODW-SSC   Document 70-7   Filed 03/25/25   Page 10 of 31   Page ID #:558

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024

Pages 34..37

Page 34

1    A.  No.  It was probably two to four times,
2  something like that.
3    Q.  So you understand the difference between an
4  estimate and a guess, correct?
5    A.  I do.  So that's my estimate.
6    Q.  What's that based on?
7    A.  Based on my conversations with her.
8    Q.  Okay.  Did you ever ask her to preserve her
9  telephone records of those calls?
10    A.  Did I ask to -- could you repeat the question?
11    Q.  Did you ask your daughter to preserve
12  telephone records of the telephone calls?
13    A.  I don't believe I asked her, no.
14    Q.  Do you know whether or not she did?
15    A.  I don't know.
16    Q.  You've never asked her if she has a record of
17  phone calls?
18    A.  I may have.  I don't recall specifically.
19    Q.  Did anybody else ever tell you that he or she
20  had received phone calls in connection with the Honda
21  and the default?
22    MR. TRUEBLOOD:  Objection.  Attorney-client
23  privilege.
24    THE WITNESS:  I'm sorry, the question is if anyone
25  other than Laurel told me --

Page 35

1  BY MR. BERNSTEIN:
2    Q.  Yes.
3    A.  -- that they had received phone calls?
4    Q.  Yes.
5    A.  Not that I recall.
6    Q.  You have no reason to believe that LAW
7  Recovery made those calls, right?
8    A.  I neither have a reason to believe that or not
9  a reason to believe that.  Oh, you know what?  I do
10  recall Laurel telling me about one phone call she
11  received where the person told her, We're just looking
12  for the car to pick it up.
13    Q.  You don't know if that came from Access
14  Finance or not, right?
15    A.  I don't know specifically.
16    Q.  And yet you sued LAW Recovery for allegedly
17  calling, right?
18    A.  Whatever is in the complaint.
19    Q.  Are you aware of any other person -- strike
20  that.  Withdrawn.
21    Has any other person other than counsel told
22  you that he or she had received telephone calls that
23  related to your default of the Honda car note?
24    A.  Other than what I've testified to so far, no.
25    Q.  Have you ever been involved in litigation

Page 36

1  involving the State or Federal Fair Debt Collection
2  Practices Act?
3    A.  You mean whether I've ever represented a
4  client in that kind of litigation?
5    Q.  Yes.
6    A.  Maybe about 10 or 15 years ago, one case.
7    Q.  And were you representing a person who, or a
8  company, who claimed the statutes had been violated, or
9  were you defending it?
10    A.  I was representing the plaintiff.
11    Q.  And you filed a lawsuit alleging violation of
12  the State and/or Federal Fair Debt Collection Practices
13  Act?
14    A.  You know, it's been a long time, but that's my
15  recollection.  One case.
16    Q.  What was the allegation in that case?
17    A.  Something to do with information that
18  plaintiff reported to a credit reporting bureau.  It's
19  been so long, I can't remember the details specifically.
20  But it involved something of that nature.
21    Q.  Did it involve an allegation that the
22  defendant in that case was a debt collector?
23    A.  I don't think so.
24    Q.  You testified about anger and being upset, and
25  you've testified about out-of-pocket expense for loss of

Page 37

1  use of the Honda.  I just want to make sure I understand
2  your testimony.  I think you testified -- correct me if
3  I'm mistaken -- that you incurred no other out-of-pocket
4  expense in connection with the repossession; right?
5    A.  I'm trying to think if any -- if I incurred
6  anything else that might have been related to that.  The
7  only other thing that I can think of is I had to
8  maintain auto insurance payments during that period of
9  time.  So there's that.
10    Q.  How much was that?
11    A.  I'd have to go back and look.  Probably in the
12  neighborhood of 250 to $300 a month perhaps.
13    Q.  For that one vehicle?
14    A.  Yeah.
15    Q.  Did Laurel pay for any of the expenses
16  relating to her use of the vehicle?
17    A.  Some.
18    Q.  What was your agreement with Laurel regarding
19  that?
20    A.  Well, she was my daughter, so I wasn't harshly
21  imposing conditions on her.  But she would pay for gas
22  and sometimes contribute to insurance payments.
23    Q.  Do you have an agreement with your daughter
24  regarding reimbursement of expenses for using the
25  vehicle?

Case 2:23-cv-09466-ODW-SSC   Document 70-7   Filed 03/25/25   Page 11 of 31   Page ID #:559

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024                                                Pages 38..41

Page 38

1   A. Not a formal agreement, no.
2      Q. She would pay for gas and insurance. What
3   about the car note?
4      A. No.
5      Q. So when you defaulted on the car note several
6   months prior to the repossession, did you ask Jan or
7   Laurel to help you pay for it?
8      A. No.
9      Q. Why not?
10     A. I just didn't. I chose not to.
11     Q. I'm asking why you chose not to.
12     A. Personal reasons.
13     Q. Did they know that you were in default?
14     A. I don't know.
15     Q. Well, did you tell them you were in default?
16     A. I'm not sure why this is relevant.
17     Q. Did you tell them that you were in default?
18     A. I may have. I don't recall specifically.
19     Q. Well, when you learned the car was missing and
20  you knew that you were in default by several months at
21  least on this car note, why do you believe it was
22  stolen?
23     A. Because it was missing. So first reaction was
24  it may have been stolen, we need to check on that.
25     Q. Have you ever talked to anyone at LAW

Page 39

1   Recovery?
2      A. No.
3      Q. Have you ever signed anything for LAW
4   Recovery?
5      A. No.
6      Q. Have you ever been to any LAW Recovery
7   premises?
8      A. No.
9      Q. Have you obtained any witness statements,
10  written witness statements, that refer to the
11  repossession?
12     A. No. No, I don't think so.
13     Q. Other than Jan, Laurel, and Gina, are you
14  aware of any other person who observed the repossession?
15  Pardon me. Let me withdraw that because I misspoke.
16     Other than Jan, Laurel, and Gina, has anyone
17  told you that they have information regarding the
18  repossession? I'm excluding Mr. Trueblood.
19     A. I'm not sure what you mean by information
20  concerning the repossession.
21     Q. I mean facts that refer to the repossession of
22  the Honda?
23     MR. TRUEBLOOD: Vague and ambiguous.
24     THE WITNESS: Well, that would -- I mean, I've had
25  a number of conversations with Mr. Shraga of Access

Page 40

1   Finance after the repossession where we discussed return
2   of the vehicle, et cetera. I guess that refers to --
3   that would refer somehow to repossession. But other
4   than that -- other than him, no.
5   BY MR. BERNSTEIN:
6      Q. You have text messages with Mr. Shraga?
7      A. No.
8      Q. E-mail?
9      A. I have e-mails with him concerning the
10  settlement that we entered into.
11     Q. Did Mr. Shraga and you discuss or talk about
12  LAW Recovery?
13     My client, by the way, is Los Angeles Auto
14  Wholesalers, but the abbreviated name is LAW Recovery,
15  just so the record is clear.
16     A. I believe in one of our conversations he
17  mentioned LAW Recovery as having possession of the
18  vehicle and that they would be bringing it to his office
19  so that I could pick it up. Other than that, I don't
20  remember any specific reference.
21     Q. So that was shortly after September 5th?
22     A. Oh, let me correct that. If I recall, he did
23  send me an e-mail giving me the contact -- the phone
24  number for LAW Recovery after the repossession.
25     Q. Okay. Did Mr. Shraga ever say anything

Page 41

1   regarding what LAW Recovery did or did not do in
2   connection with the repossession?
3      A. Other than they had the vehicle, I don't
4   recall anything else.
5      Q. Did you tell Mr. Shraga that you believed that
6   the car had been unlawfully repossessed?
7      A. I think I did in an e-mail.
8      Q. What did he say?
9      A. I think he responded and denied that, but I
10  don't recall specifically.
11     Q. Did you give that e-mail to Mr. Trueblood?
12     A. I believe I did.
13     Q. Okay.
14     MR. BERNSTEIN: I'm going to mark as Exhibit B the
15  first amended complaint with three causes of action.
16     (Defendant's Exhibit B was marked for
17     identification and was retained by
18     counsel.)
19  BY MR. BERNSTEIN:
20     Q. Do you see it there?
21     A. Yes.
22     Q. Have you read over the first amended
23  complaint?
24     A. I believe I did around the time it was filed.
25     Q. Okay. On paragraph 2 it says, "LAW Recovery

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024

Pages 42..45

Page 42

1 repossessed plaintiff's vehicle on or about September 5
2 by entering private property, which was secured by a
3 closed and locked security gate, without the owner's
4 permission."
5        Do you see that sentence?
6    A.   Yes.
7    Q.   Who is the owner, as far as you understand it?
8    A.   The owner of what?
9    Q.   The owner that's referred to here?
10   A.   Do you want my understanding?  Can I provide
11 that?
12   Q.   Well, you read this before --
13   A.   My understanding is the owner or owners of the
14 condo building.
15   Q.   Okay.  And how do you know they didn't give
16 permission?
17   A.   My understanding, from having knowledge of the
18 residents in that building and how they value privacy
19 and security, et cetera, et cetera -- they would have
20 never given permission to anyone just to come into the
21 garage to take a car.  So I believe that never happened
22 and would not have happened.
23   Q.   Well, how do you know the owner did not give
24 permission to enter the premises to effect a
25 repossession?

Page 43

1    A.   I would have been told about it.
2    Q.   By whom?
3    A.   By members of the condo board or the president
4 of the condo board.
5    Q.   Did you ever talk to members of the condo
6 board?
7    A.   Oh, Gina was on the condo board, so she knows.
8    Q.   Did you talk to anyone else on the condo
9 board?
10   A.   No.
11   Q.   Do you know the identities of anyone on the
12 condo board?
13   A.   I don't know their names.
14   Q.   So you don't know, do you, whether another
15 member of the condo board granted LAW Recovery
16 permission to go in and repossess the car, right?
17   A.   Let's put it this way:  It's extremely
18 doubtful to me that anyone would have done that, and I
19 doubt strongly that it ever happened.  But is it in the
20 realm of possibility?  Perhaps.  But I highly doubt it.
21   Q.   Well, we're all lawyers.  You're a lawyer.  We
22 deal in facts.  You've been involved in litigation since
23 1980.
24        Are you aware of a single fact showing that
25 the condo board did not give LAW Recovery permission to

Page 44

1 repossession the vehicle?
2        MR. TRUEBLOOD:  Instruct the witness not to answer.
3 Contention question.  Rifkind v. Superior Court.
4 BY MR. BERNSTEIN:
5    Q.   I'm asking for facts that lead to your
6 conclusion that the condo board did not grant permission
7 to LAW Recovery to repossess the car.
8        MR. TRUEBLOOD:  Instruct the witness not to answer.
9 Same objection.
10 BY MR. BERNSTEIN:
11   Q.   Do you know the identities of any of the condo
12 board members?
13   A.   Well, I believe I said Gina.
14   Q.   Do you know the identities of any others?
15   A.   I don't know their names.
16   Q.   Do you know how many there are?
17   A.   I don't know that either.
18   Q.   Have you ever e-mailed Gina?
19   A.   No.
20   Q.   Have you ever texted Gina?
21   A.   I don't believe so.
22   Q.   Did you ever communicate in writing, text,
23 e-mail, letter with any member of the HOA board?
24   A.   About anything?
25   Q.   About the repossession, sir.

Page 45

1    A.   No, I did not.
2    Q.   So would I be correct that when -- well,
3 withdrawn.
4        Did you read this complaint before it was
5 filed?
6    A.   I believe I testified to that, yes.
7    Q.   I'm sorry, I thought you said you read it, but
8 I didn't understand it was before it was filed.  That's
9 fine.
10       MR. BERNSTEIN:  Exhibit C is a pleading that's
11 entitled "Plaintiff's Initial Disclosures."
12       (Defendant's Exhibit C was marked for
13       identification and was retained by
14       counsel.)
15       THE WITNESS:  Before we get into this document,
16 could I take a five-minute restroom break?  Is that
17 okay?
18       MR. BERNSTEIN:  Yeah, of course.  That's okay.  Off
19 the record.
20       (Brief recess.)
21 BY MR. BERNSTEIN:
22   Q.   Without disclosing the contents of any
23 conversations you may have had with Mr. Trueblood, did
24 you speak with Mr. Trueblood during the break?
25   A.   No.

Page 46

1    Q.  Did you speak with anybody regarding the case?
2    A.  No.  There's no one here but me.
3    Q.  Okay.  Let's go back to sharing the screen.  I
4  was asking you about Exhibit C, which are plaintiff's
5  initial disclosures.
6    A.  Okay.
7    Q.  Have you seen this before?
8    A.  I think I did.  I think I have.
9    Q.  All right.  So I'm scrolling down.  There's a
10  category for witnesses, and your name appears, Laurel,
11  and number 3 is Cindy Gomez.  I asked you who that was
12  earlier.  Does reading this refresh your recollection
13  who Cindy Gomez is?
14    A.  I believe she's an employee at Hot Pilates.
15    Q.  Did you ever speak with her?
16    A.  I have not.  Well, I have to say I may have
17  been introduced to her at one time.  But I can't put the
18  name with the person I met.
19    Q.  Do you see on line 14 it says, quote, "This
20  witness has knowledge of prohibited third-party phone
21  calls"?
22    A.  Yes.
23    Q.  Do you know what that referred to?
24    A.  I believe it refers to some phone calls that
25  were made directly to Hot Pilates looking to speak to

Page 47

1  Laurel.
2    Q.  And how do you know -- pardon me.
3        To speak with Laurel you said?
4    A.  Yes.
5    Q.  And how do you know that?
6    A.  Laurel informed me about it.
7    Q.  What did Laurel tell you regarding these phone
8  calls?
9    A.  That someone was calling there looking for her
10  and also looking for me.
11    Q.  So just to make sure I understand this --
12    A.  Let me finish.  And that her manager there,
13  who I believe was Cindy Gomez -- one of the managers of
14  the Hot Pilates had spoken to this person and taken a
15  message from this person on one or more occasions.
16    Q.  And did anyone tell you what the message was?
17    A.  That they were calling and looking for Laurel
18  and also, I believe, looking for me.
19    Q.  And did anyone tell you anything more about
20  what the message was -- or messages were?
21    A.  No.  I don't recall.
22    Q.  So your understanding as you sit here today is
23  that Cindy told Laurel, and then Laurel told you, that
24  somebody had been calling about looking for you or
25  Laurel?

Page 48

1    A.  Yes.
2    Q.  Did Laurel tell you anything else, why they
3  were calling, for instance?
4    A.  I don't recall anything more than what I
5  testified to.
6    Q.  And you're not aware of any fact -- strike
7  that.
8        No one's told you that it was LAW Recovery who
9  made these calls, right?
10    A.  I don't believe so.
11    Q.  And you're not aware of any information that
12  leads you to believe that LAW Recovery made the calls as
13  opposed to Access Finance, correct?
14    A.  Sitting here today, not specifically.  I don't
15  recall anything specific.
16    Q.  What's your best recollection of when the
17  calls were received by Cindy Gomez?
18    A.  Well, to the best of my recollection it would
19  have been around the July or August time frame, sometime
20  within those two months.  I don't remember anything more
21  specific than that.
22    Q.  Have you told me everything you recall
23  regarding Cindy Gomez's knowledge regarding the
24  repossession or the calls?
25    A.  I believe so.

Page 49

1    Q.  Moving to witness four, Jan Galanter, we've
2  identified who she is.  I understand that.  And then it
3  says, "This witness has knowledge of the breach of the
4  peace."
5        Other than what you've told me already, did
6  Jan Galanter tell you she had information regarding the
7  repossession?
8        MR. TRUEBLOOD:  Vague and ambiguous.
9        THE WITNESS:  Like I said, she personally inspected
10  the parking gate in the garage after the repossession.
11  She also spoke with certain people in the building.  She
12  spoke with Gina.  She also sent me photographs of the
13  gate mechanism and the gate.  So she had spoken to some
14  people and witnessed -- she didn't witness the actual
15  repossession, but she witnessed the aftermath, I guess,
16  the scene.
17  BY MR. BERNSTEIN:
18    Q.  You're not aware of anyone who witnessed the
19  actual repossession other than the repossession agent,
20  right?
21    A.  That's correct.  I'm not aware.
22    Q.  Who did Jan Perry talk to other than Gina
23  regarding the repossession?
24        MR. TRUEBLOOD:  Calls for speculation.
25  ///

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024

Pages 50..53

Page 50

1  BY MR. BERNSTEIN:
2      Q.  You just testified she talked to people.
3      A.  I think she may have spoken to another -- a
4  male resident of the building who helped Gina look at
5  the gate.  I don't recall his name specifically.
6      Q.  Did you know about that conversation when the
7  initial disclosures were provided?
8      A.  I'm not sure, because I've had a number of
9  conversations with Jan over the ensuing time period.
10     Q.  So what's your understanding of the time that
11 the repossession occurred?
12     A.  My understanding was it was on September --
13 probably on September 5, 2023.
14     Q.  I'm asking about the time of day.
15     A.  Oh, time of day?
16     Q.  Yes.
17     A.  My understanding is that it happened sometime
18 around -- anywhere from noon until 1:00 p.m., around
19 that time.
20     Q.  In the middle of the day?
21     A.  Yes.
22     Q.  And what do you base that understanding on?
23     A.  Principally speaking to Laurel about it since
24 I wasn't there.
25     Q.  Other than speaking to Laurel, is there any

Page 51

1  reason you believe it was the middle of the day?
2      A.  I believe I saw some documents produced by LAW
3  Recovery with some sort of log of communications.  But
4  primarily speaking to Laurel about what she believed had
5  occurred.
6      Q.  Going down to the witnesses, and there's a
7  reference to Access Finance employees.  Number 5.
8  There's a reference to Shane Lawler at the Bureau of
9  Security and Investigative Services.  Do you see where
10 I'm referring to?
11     A.  Yes.
12     Q.  Did you ever speak to Mr. Lawler?
13     A.  I did.
14     Q.  How many occasions?
15     A.  I think I spoke to him at least once.  It
16 might have been two times.
17     Q.  The first time you spoke with Mr. Lawler, was
18 that over the telephone?
19     A.  Yes.
20     Q.  Who gave you the number?
21     A.  Oh, he called me.
22     Q.  What did he say?
23     A.  He was following up on a complaint that I had
24 filed with the Bureau of Security and Investigative
25 Services.

Page 52

1      Q.  What did he say when he spoke with you on that
2  occasion?
3      A.  I don't recall that many details about it, but
4  he did ask me some questions to clarify what I had
5  reported had happened.  So we had a discussion -- some
6  discussion about that.  It might have been ten minutes,
7  five or ten minutes, something like that.
8      Q.  Did you take notes?
9      A.  I don't know.
10     Q.  What do you mean?  I don't understand your
11 answer nine?
12     A.  No.  He was on the other end of the phone, so
13 I don't know if he was actually taking notes.
14     Q.  I see.  I'm asking if you took notes.
15     A.  Oh, if I took notes?  No.
16     Q.  Do you remember the day you spoke with him?
17     A.  I do not sitting here right now.
18     Q.  Do you remember anything other than what you
19 just told me about your conversation with Mr. Lawler?
20     A.  He did say -- when we ended the conversation.
21 He said he was going to follow up with LAW Recovery.
22     Q.  Do you remember anything else other than what
23 you've told me about your conversation?
24     A.  That's about it.
25     Q.  You spoke with him again; is that right?

Page 53

1      A.  I believe I did.
2      Q.  When was the date of the first call?
3      A.  It would have been sometime probably in mid to
4  late October of 2023.
5      Q.  And the second call, when was that?
6      A.  It might have been a couple weeks after that.
7      Q.  And what was discussed at the second call?
8      A.  As I recall, it was just that he was
9  continuing to follow up, and he said something about LAW
10 Recovery was denying any wrongdoing.  So following up
11 with that.
12     Q.  Did you discuss anything further during that
13 call?
14     A.  I don't recall anything else.
15     Q.  Did you take notes from that call?
16     A.  I may have just written his name down and his
17 phone number.  That's about it.
18     Q.  You just wrote a name and phone number and
19 nothing else about your conversation?
20     A.  Well, I did send -- yeah, I did send him an
21 e-mail with some documents.  I think I might have sent
22 him photographs of the gate also.
23     Q.  Do you still have that e-mail?
24     A.  I believe I sent that all to Mr. Trueblood.
25     Q.  Okay.  And that was the last time you've

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024                                          Pages 54..57

Page 54

1  spoken with Mr. Lawler?
2      A.  Yeah.  I haven't spoken with him for quite
3  some time.
4      Q.  And you haven't spoken with anyone else at the
5  Bureau, correct, regarding the repossession?
6      A.  Not a phone conversation, no.
7      Q.  Does that mean you communicated with them in
8  some other fashion?
9      A.  As I recall -- sorry I can't recall more
10 specifics about this, but I think I did receive
11 communication from Mr. Lawler sometime after the last
12 phone call that he was referring us to their
13 investigation unit.  And then I think I received an
14 e-mail from someone at that unit, which I can't remember
15 his name.  But they were going to follow up with it.
16 But that was several -- a couple months ago at least.
17 So --
18     Q.  I don't have that e-mail.  Did you give it to
19 Mr. Trueblood?
20     A.  I believe I did.  I don't recall.  If I
21 didn't, that was my oversight.  I apologize for that.
22     Q.  But you'll send it now to Mr. Trueblood?
23     MR. TRUEBLOOD:  I don't believe it's been
24 requested.
25     MR. BERNSTEIN:  I think it has been requested

Page 55

1  repeatedly.
2  BY MR. BERNSTEIN:
3      Q.  Do you object to sending that e-mail to
4  Mr. Trueblood?
5      A.  It's up to Mr. Trueblood.  I'm happy --
6      MR. TRUEBLOOD:  If you make a proper request for
7  it, I'm sure we'll produce it.
8      MR. BERNSTEIN:  I'm asking Mr. Galanter.
9  BY MR. BERNSTEIN:
10     Q.  You don't object to producing the e-mail,
11 right?
12     MR. TRUEBLOOD:  You can't ask him in advance for a
13 document demand that hasn't been drafted yet.  Whether
14 he's going to object, that's my territory.
15     MR. BERNSTEIN:  It has been drafted.  I'm just
16 trying to understand whether Mr. Galanter doesn't want
17 to produce it for some reason.
18     THE WITNESS:  I don't have any particular reason
19 for not producing it.
20 BY MR. BERNSTEIN:
21     Q.  Okay.  But you don't know whether or not a
22 citation was issued to my client, correct?
23     A.  I do not know, no.  That's correct.
24     MR. BERNSTEIN:  Okay.  Exhibit D is evidence that
25 was produced at 7:15 p.m. last Friday by counsel,

Page 56

1  Mr. Trueblood.  It's Bates stamped DG-1 through DG-110.
2      And I have some questions.
3      (Defendant's Exhibit D was marked for
4      identification and was retained by
5      counsel.)
6      MR. TRUEBLOOD:  Just for the record, it was first
7  produced October 7th, 2024.  Then I was notified a few
8  days ago by you that you couldn't read the file -- you
9  had not read the file.  And then when you tried to view
10 it, you could not see the Bates numbers, so I reproduced
11 this with Bates numbers on Friday.
12     MR. BERNSTEIN:  We disagree about that.  What you
13 sent me was ten pages and said incorrectly that it was
14 110 pages.  The first time I received it was Friday
15 evening at 7:15 p.m.
16 BY MR. BERNSTEIN:
17     Q.  But moving ahead, let's look at the first
18 document on the top.  It's an e-mail -- page 1 of
19 Exhibit D is an e-mail from Mr. Galanter dated September
20 12th.
21     Do you see that?
22     A.  Yes.
23     Q.  Do you recognize it as an e-mail that you
24 wrote?
25     A.  It's a different format or font, but it looks

Page 57

1  like what I wrote, yeah.
2      Q.  Is your e-mail address
3  dgalanter@galanterassociates.com?
4      A.  Yes, it is.
5      Q.  All right.  And you wrote to Mr. Shraga it
6  looks like on September 12th at 11:55 a.m.  How did you
7  learn Mr. Shraga's contact information?
8      A.  I had it from our prior dealings.
9      Q.  Regarding the Honda?
10     A.  Yes.
11     Q.  When you say "prior dealings," were those
12 dealings before September 5, 2023?
13     A.  Yes.
14     Q.  Was that in connection with you informing
15 Mr. Shraga that you were in default and would send some
16 money on the car note?
17     A.  Well, among other things.
18     Q.  What were the other things?
19     A.  We had corresponded from time to time about
20 the loan prior to that, so I had his contact
21 information.
22     Q.  And was that the first communication to Access
23 Finance that occurred in writing after the repossession?
24     A.  I believe so, yes.
25     Q.  Doing down to page DG-9, it looks like a

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024

Pages 58..61

Page 58

1 printout of an online complaint summary dated October
2 30th, 2023.
3        Do you see that?
4    A.  Yes.
5    Q.  All right.  Is that something that you wrote?
6    A.  It looks like a summary of the complaint I
7 submitted to the Bureau of Investigative Services.
8    Q.  Have you ever seen this document before?
9    A.  I believe so, yeah.  I think it's something
10 that -- after I submitted the complaint, it was -- I was
11 able to save a copy of it.
12    Q.  So do you recall when you submitted the
13 complaint?
14    A.  I think the date at the top was October 30,
15 2023.
16    Q.  Right.  Is that the date --
17    A.  I think that would have been the date, yeah.
18    Q.  All right.  Had you already retained
19 Mr. Trueblood on this date?
20    A.  I believe so.
21    Q.  And next to the description there's a
22 paragraph.  Is that information that you typed into the
23 online complaint system?
24    A.  Yes.
25    Q.  And did you write there, "In the process of

Page 59

1 repossessing my vehicle, its employees breached the
2 peace by breaking into and entering a secured, gated,
3 private garage in the dead of night, damaged the gate
4 mechanism, and causing other related damage"?  Those are
5 your words?
6    A.  Those were my words.
7    Q.  So what's your understanding -- is this wrong
8 when it refers to the "dead of night"?
9    A.  Only the "dead of night" was wrong.  I was
10 incorrect on that.
11    Q.  What were you basing that on?
12    A.  Conversations with Laurel and Jan about the
13 circumstances.  I had understood at the time that it had
14 happened sometime at night or very early in the morning.
15 But I subsequently clarified with Laurel that it would
16 have occurred around 12:30, 1:00 p.m. that day.  So that
17 was my mistake.
18    Q.  What were you basing this representation to
19 the Bureau, that it happened in the dead of night, on?
20    A.  Well, as I said, my initial conversations with
21 Laurel and Jan.
22    Q.  They said it was at night?
23    A.  They thought it was very early in the morning
24 at some point.  Anyway, it was -- I subsequently
25 clarified that I got a better understanding of the

Page 60

1 circumstances, and so --
2    Q.  Did you notify the Bureau that you had
3 reported an inaccurate fact?
4    A.  I don't recall doing that.  Everything else is
5 accurate.
6    Q.  Well, when you reported to the Bureau that LAW
7 Recovery, quote, "breached the peace by breaking into
8 and entering a secured, gated, private garage in the
9 dead of night, damaged the gate mechanism, and causing
10 other related damage," closed quote, how is it -- let me
11 ask this question:  Other than what you've already told
12 me today, are you aware of any other fact that my client
13 broke into a secured, gated, private garage at the
14 premises?
15        MR. TRUEBLOOD:  Instruct him not to answer.  Calls
16 for contention.  Rifkin v. Superior Court.
17        MR. BERNSTEIN:  We're going to have to go back to
18 the Court to get rulings on the state case applicability
19 and whether my questions are proper or improper.
20 BY MR. BERNSTEIN:
21    Q.  Sir, you wrote this.  I'm asking if, other
22 than what you told me about, there's any evidentiary
23 support for this.
24    A.  I --
25        MR. TRUEBLOOD:  Hold on.  Instruct the witness not

Page 61

1 to answer.  Rifkind v. Superior Court.
2 BY MR. BERNSTEIN:
3    Q.  All right.  Why did you write "LAW Recovery
4 breached the peace" here?
5    A.  I testified to that.
6    Q.  Already, right?
7    A.  I've testified to that already.
8    Q.  Yeah.
9        And there's nothing else that you've left out,
10 right?  You've told me everything?
11    A.  I testified to everything within my personal
12 knowledge.
13    Q.  Well, I'm asking what you were told over and
14 above your personal knowledge.
15        MR. TRUEBLOOD:  It's vague and ambiguous as to what
16 you're asking.  What are you asking?
17        MR. BERNSTEIN:  I'm asking -- the record speaks for
18 itself.  I'm asking about Mr. Galanter's representation
19 that LAW Recovery breached the peace.
20 BY MR. BERNSTEIN:
21    Q.  I'm just asking if you've now told me
22 everything that you have knowledge about supporting your
23 claim that they breached the peace.
24        MR. TRUEBLOOD:  Instruct the witness not to answer.
25 Rifkind v. Superior Court.

Case 2:23-cv-09466-ODW-SSC    Document 70-7    Filed 03/25/25    Page 17 of 31    Page ID #:565

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024                                    Pages 62..65

Page 62

1  BY MR. BERNSTEIN:
2      Q.  Mr. Galanter, do you believe my client
3  breached the peace?
4      MR. TRUEBLOOD:  Instruct the witness not to answer.
5  Calls for contention and a legal conclusion.
6  BY MR. BERNSTEIN:
7      Q.  Mr. Galanter, when you wrote the phrase
8  "breached the peace," did you believe that you
9  understood what the meaning of "breached the peace" is?
10     A.  Can I answer?
11     MR. TRUEBLOOD:  Yes.
12     THE WITNESS:  Yes.
13  BY MR. BERNSTEIN:
14     Q.  What's your understanding?
15     A.  Breaking and entering and trespassing.
16     Q.  All right.  Have you now told me everything
17  supporting your claim that my client trespassed?
18     MR. TRUEBLOOD:  Instruct the witness not to answer.
19  Rifkind v. Superior Court.  Contention question.
20  BY MR. BERNSTEIN:
21     Q.  Why do you believe my client trespassed other
22  than what you've already told me?
23     MR. TRUEBLOOD:  Instruct the witness not to answer.
24  Contention question.  Rifkind v. Superior Court.
25  ///

Page 63

1  BY MR. BERNSTEIN:
2      Q.  Do you have an understanding of the word
3  "trespass," sir?
4      A.  Yes.
5      Q.  What's your understanding?
6      A.  Entering into someone's property without their
7  permission or consent.
8      Q.  Do you believe LAW Recovery did that?  Yes or
9  no?
10     A.  Yes.
11     Q.  Why?
12     A.  I've testified to that.
13     Q.  You've told me everything?
14     A.  Everything within my personal knowledge I've
15  testified to.
16     Q.  What about information provided to you by
17  other witnesses or people such as Jan, Laurel --
18     A.  I included --
19     MR. TRUEBLOOD:  Hold on.  You're getting into
20  contentions here.  You're asking him to summarize and
21  induce evidence in the case, so I'll instruct him not to
22  answer.  Rifkind v. Superior Court.
23     MR. BERNSTEIN:  I believe that this is going to
24  result in a court order that may result in an
25  evidentiary sanction and a return to the deposition to

Page 64

1  complete it.  I'm trying my best not to have to do that
2  because it's a gigantic inconvenience and cost to
3  everyone involved, sir.
4      MR. TRUEBLOOD:  I'll just comment that I provided
5  you with the case before the deposition began, which is
6  perfectly clear that you cannot ask those types of
7  questions.
8      MR. BERNSTEIN:  It's not --
9      MR. TRUEBLOOD:  I haven't finished.
10     There's no reason for any different role in
11  federal court.  And in state courts it's an unfair
12  question, and you can't ask a witness to summarize and
13  provide you a list of witnesses and provide you a list
14  of documents supporting contention.  You just can't do
15  that.
16     MR. BERNSTEIN:  It's not contention.  I'm asking
17  about what Mr. Galanter wrote to the Bureau, and I'm
18  asking about -- I don't want to argue.  We're just going
19  to have to come back.
20  BY MR. BERNSTEIN:
21     Q.  Have you told me everything that leads you to
22  believe my client broke into the garage, or is there
23  anything more?
24     MR. TRUEBLOOD:  Same instruction.
25     MR. BERNSTEIN:  You're instructing him not to

Page 65

1  answer that?
2      MR. TRUEBLOOD:  Right.
3  BY MR. BERNSTEIN:
4      Q.  Have you now told me everything that leads you
5  to believe my client damaged the gate mechanism?
6      A.  Can I answer?
7      MR. TRUEBLOOD:  Go ahead.
8      THE WITNESS:  Yes, I have.
9  BY MR. BERNSTEIN:
10     Q.  Why did you write that LAW Recovery failed to
11  provide you with the required inventory?
12     A.  Because they didn't.
13     Q.  Where were you residing?
14     A.  800 West First Street, Apartment 2905, Los
15  Angeles, California 90012.
16     Q.  Why do you believe LAW Recovery was aware of
17  that address?
18     A.  Because Access Finance was aware of it, and
19  Access Finance hired LAW Recovery.
20     Q.  Okay.  Any other reason?
21     A.  It wasn't my responsibility to inform LAW
22  Recovery of my address.
23     Q.  Any other reason?
24     A.  No.
25     Q.  Okay.  DG-10 is a Himco Security invoice.  Do

Case 2:23-cv-09466-ODW-SSC    Document 70-7    Filed 03/25/25    Page 18 of 31    Page ID #:566

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024
Pages 66..69

Page 66

1  you see that?
2    A.  Yes.
3    Q.  You see that it's dated October 10, 2022?
4    A.  Yes.
5    Q.  What does this, to your understanding, have to
6  do with the lawsuit?
7    MR. TRUEBLOOD:  Instruct the witness not to answer.
8  Asks for a legal contention.  Rifkind v. Superior Court.
9  BY MR. BERNSTEIN:
10    Q.  Did you produce this to Mr. Trueblood?
11    A.  Yes.
12    Q.  Why?
13    MR. TRUEBLOOD:  Instruct him not to answer.
14  Attorney-client privilege.  Rifkind v. Superior Court.
15  BY MR. BERNSTEIN:
16    Q.  How did you get this document?
17    A.  I think Jan obtained it from Gina or one of
18  the other condominium board members who were dealing --
19  because Himco Security was the company that the board
20  went to for parking gate repairs.  And then she gave it
21  to me.
22    Q.  Did she tell you anything when she gave it to
23  you?
24    A.  Other than here's an invoice for the gate
25  repair, no.

Page 67

1    Q.  Did she send it in an e-mail or a text, or did
2  she physically hand it to you?
3    A.  I think she gave me a copy of it physically.
4    Q.  And did you read the date on it?
5    A.  I may have.
6    Q.  Did you talk to Jan about the date?
7    A.  I don't recall doing that.  I think I just
8  took it and I sent it off to Mr. Trueblood.
9    Q.  DG-16 is a copy of a check, Check No. 010032,
10  payable to Himco Security.
11    Have you seen that before?
12    A.  I'm not sure.
13    Q.  It says "Greenpark II, HOA Trust No. 616."
14    A.  I see that.
15    Q.  Have you heard of that entity?
16    A.  No.
17    Q.  Have you heard of Condominium Administration
18  Company?
19    A.  No.
20    Q.  Did you produce this to Mr. Trueblood?
21    A.  I don't think I did personally.
22    Q.  Is this the first time you're seeing this
23  check?
24    A.  I may have seen this -- I may have seen this
25  previously.  I don't recall.

Page 68

1    Q.  Have you -- do you see where it appears to say
2  "Barbara Freeman" on the bottom right of that check?
3    A.  Hold on one second.  Something is -- could you
4  scroll up a little bit?  I don't see a -- what you're
5  referring to.
6    Q.  Do you see a signature on the bottom right
7  corner of the check?
8    A.  Oh, "Barbara Freeman."
9    Q.  Is that --
10    A.  I'm not familiar with that name.
11    Q.  Okay.  That's my question.
12    I'm going to scroll down to Exhibit D, page
13  DG-38.  They're all numbered on the bottom right by, I
14  believe, Mr. Trueblood.
15    Okay.  Page 38 appears to be a screenshot of a
16  text message with a photo.  At the top in the middle it
17  says "JP" for "Jan" -- or underneath that it says "Jan."
18  Take a look at this and tell me if you recognize it.
19    A.  I recall this, yes.
20    Q.  Under the blurry black and white photo of a
21  gate -- the gate mechanism, it says, "Please ask the
22  sheriff to come out and dust the box for fingerprints as
23  soon as possible."
24    Who wrote that?  You?
25    A.  Jan did.

Page 69

1    Q.  Is this a text between you and Jan?
2    A.  Yes.
3    Q.  She's asking you to ask the sheriff to come
4  out and dust for fingerprints?
5    A.  Yes.
6    Q.  And am I correct that you wrote the word "yes"
7  there?
8    A.  I would -- yeah, that appears to be me.
9    Q.  Underneath that it says, "This is an
10  opportunity for you, but you must move quickly.  If
11  there are people who snatch cars, then they probably
12  have a criminal record."
13    Who wrote that?
14    A.  Jan did.
15    Q.  What was your understanding of what Jan meant
16  when you read this?
17    A.  Exactly what she said.
18    Q.  What's the "opportunity"?
19    A.  To collect fingerprints as soon as possible
20  before they might be erased or obscured or cleaned off.
21    Q.  Is it opportunity to gather evidence for a
22  lawsuit?
23    A.  It's an opportunity.  That probably would
24  include that.
25    Q.  Why is it that Jan didn't call the sheriff?

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024

Pages 70..73

Page 70

1    A.   It's my car, so my responsibility.
2    Q.   So scrolling to the top of this, do you have
3  the text that immediately preceded this that referred to
4  the repossession?
5    MR. TRUEBLOOD:  Assumes facts not in evidence.
6    THE WITNESS:  I don't know.  I may -- I --
7  BY MR. BERNSTEIN:
8    Q.   Is this on your personal cell phone?
9    A.   It would be.
10   Q.   What was the number?
11   A.   (310)880-9454.
12   Q.   Is it still the same number?
13   A.   Yes.
14   Q.   And at that time what was your mobile carrier
15  number?
16   A.   My mobile --
17   Q.   I'm sorry, forgive me.  The name of the
18  company?
19   A.   AT&T.
20   Q.   Sorry?
21   A.   AT&T.
22   Q.   Is it still AT&T?
23   A.   Yes.
24   Q.   Underneath that there's a reference to a
25  voicemail number 11833.m4a.  Do you see that?

Page 71

1    A.   Yes.
2    Q.   It says "audio recording"?
3    A.   Yes.
4    Q.   What is that?
5    A.   Jan may have left me a message.  Sometimes she
6  does that.
7    Q.   So I don't have that audio recording.
8        Did the recording refer to the repossession
9  that you were texting about?
10   A.   I don't know.  I don't recall even listening
11  to --
12   Q.   Do you have the audio recording?
13   A.   Don't know.  I'd be happy to look.
14   Q.   Do you have your phone with you?
15   A.   No, I don't.
16   Q.   You don't have your cell phone with you?
17   A.   I'm happy to look --
18   Q.   Well, how would I know what you find out --
19   A.   -- after the deposition.
20   MR. TRUEBLOOD:  First of all, just for the record,
21  you haven't asked for it.  If you do ask for it, we'll
22  produce it.
23   MR. BERNSTEIN:  Well, I have asked for it, number
24  one.  Number two, I didn't get this document until 7:00
25  p.m. Friday, and we're here on Monday afternoon.  My

Page 72

1  request for production included all documents and audio
2  recordings specifically referring to this repossession.
3    MR. TRUEBLOOD:  No, I don't think so.
4    MR. BERNSTEIN:  I know so.
5  BY MR. BERNSTEIN:
6    Q.   So in any event, are you testifying,
7  Mr. Galanter, that you'll look and send it to
8  Mr. Trueblood?
9    MR. TRUEBLOOD:  It's not for him to say.  If you
10  want to make a request, we'll look at your request; and
11  if it's relevant, we'll produce it.
12   MR. BERNSTEIN:  I've already requested it, Counsel,
13  and I can't complete the deposition without it.
14   MR. TRUEBLOOD:  You have not requested it.
15   MR. BERNSTEIN:  I can't complete the deposition
16  without it.  Plus we'll need some rulings on the Rifkind
17  issues.
18  BY MR. BERNSTEIN:
19   Q.   Then underneath the voicemail that has not
20  been produced, it says, "They removed the chain on the
21  gate so it's impossible to move it by hand."
22        Do you see what I'm referring to?
23   A.   Yes.
24   Q.   Who wrote that?
25   A.   It looks like Jan.

Page 73

1    Q.   Okay.  And then there's nothing further.  Did
2  you reply to her?
3    A.   I don't know.  I may have.
4    Q.   Did you send your counsel just snippets of
5  text messages and not the entire substance of all
6  messages relating to the repossession?
7    MR. TRUEBLOOD:  I'm going to instruct the witness
8  not to answer.  Attorney-client privilege.
9  BY MR. BERNSTEIN:
10   Q.   I'm asking what you did, not what you talked
11  about.  I'm asking about your conduct.
12        Did you not produce the entire texts relating
13  to the repossession?
14   A.   Are you asking me if I deliberately edited
15  texts out that refer to the repossession?  The answer
16  would be no.
17   Q.   Did you inadvertently or intentionally
18  withhold text messages relating to the repossession?
19   A.   I would not deliberately withhold anything
20  related to the repossession.
21   Q.   What about inadvertently?
22   A.   I don't believe so.
23   Q.   This text exchange is dated Friday, September
24  8th.  The repossession occurred on September 5th.  Was
25  the gate -- how did people get in and out if the gate

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024

Pages 74..77

Page 74

1  was broken between September 5th and the repair date?
2      A.  I wasn't there, so I don't know specifically.
3      Q.  Why did Jan -- did Jan tell you why she was
4  saying they removed the chain so it is impossible to
5  move the gate?
6      A.  She told me that's what they saw -- that's
7  what she saw.
8      Q.  Did she tell you why she's informing you of
9  that?
10     A.  No.
11     Q.  Did you reply?
12     A.  I may have.  I may have already replied -- not
13  replied specifically to this because I was probably
14  coming back home on that day, so I would have been
15  speaking to her about it instead of texting her about
16  it.
17     Q.  You came home on --
18     A.  Probably on September -- you know, it's been a
19  year.  I don't recall specifically when -- what date I
20  came back from back East, but it may have been around
21  this date.
22     Q.  You were back East in the United States,
23  correct?
24     A.  Yes.
25     Q.  And your phone worked back East, correct?

Page 75

1      A.  Yes.
2      Q.  Let's go back up to the photos of the gate
3  mechanism which begin on DG-23.  The first one is a
4  black and white image.  It says "DG-23" on the bottom,
5  but it doesn't reflect that it was conveyed via text or
6  via e-mail.
7          Do you recognize this photo?
8      A.  Yes.
9      Q.  How did you get this one?
10     A.  I believe it was texted to me.
11     Q.  Was it in color?
12     A.  Probably.
13     Q.  Same question for the next photo.
14     A.  Yes, I recognize this.
15     Q.  You got it via text?
16     A.  Yes.
17     Q.  Do you know when these photographs were taken?
18     A.  My understanding was around September 5 to 6.
19     Q.  What's your understanding based upon?
20     A.  Conversations with Jan.
21     Q.  Anyone else?
22     A.  No.
23     Q.  Did Jan text you with a statement about when
24  she took the pictures?
25     A.  I don't believe so.

Page 76

1      Q.  You have no personal knowledge of when these
2  photographs were taken, correct?
3      A.  I wasn't there witnessing it.
4      Q.  Moving down through several pictures without
5  any references to text messages, we go to page 27 where
6  it says "September 7th, 2023, 8:06 p.m."  And it looks
7  like this is a text message.  Do you recognize this one?
8      A.  I recognize the photograph.
9      Q.  Okay.  Where were you on September 7th?
10     A.  I was probably back in the Boston area.
11  That's where I was.
12     Q.  When you received these texts, were they also
13  combined with words, communications, from Jan, or did
14  they just appear without the --
15     A.  Not necessarily.  I think she just sent me
16  these photos.
17     Q.  Do you know what the bottom small black and
18  white photographs depict?
19     A.  It looks -- it looks like my photo library on
20  my phone.
21     Q.  Do you know what these depict?  Do you
22  remember or recognize them?
23     A.  The small photographs?
24     Q.  Yeah.
25     A.  No.  Well, I'd have to look more closely.

Page 77

1  They're probably -- if you're familiar with iPhone photo
2  libraries, they display -- you know, you go into a photo
3  and you look down, you've got a number of photos from
4  your library aside from the one that you're looking at,
5  which is the large one.  So --
6      Q.  Yeah, I --
7      A.  These may or may not be relevant to this case.
8      Q.  You don't know right now?
9      A.  I don't know right now.  I can't really see
10  them.  Sorry.
11     Q.  Nor can I.
12          So if you look at the photograph on page
13  DG-30, it depicts a mechanism.  Do you see what I'm
14  referring to?
15     A.  Yes.
16     Q.  And then it looks like the lid is slightly
17  ajar but not significantly.  So maybe -- looking at the
18  photo, maybe 3 inches, more or less.  Do you see where
19  I'm referring to?
20     A.  Yes.
21     Q.  If I go down to 32, it looks like it's much --
22  the lid is farther open.  Do you see what I'm referring
23  to?
24     A.  Well, I don't know if it's farther open, but I
25  see the gap there.

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024                                         Pages 78..81

Page 78

1    Q.   Well, it's a much bigger gap than the last
2  photo I showed you.
3    A.   Well, I'm not sure it is.
4  MR. TRUEBLOOD:  It's a different view.
5  MR. BERNSTEIN:  Okay.
6  THE WITNESS:  Yeah.
7  BY MR. BERNSTEIN:
8    Q.   Moving on to page 33, a series of texts from
9  Jan.  I assume that it's to you.  At the top it says
10 "September 6th, 3:41 p.m."  And then it says "Any
11 updates."
12       Do you see what I'm referring to?
13   A.   Yeah.
14   Q.   Who wrote "Any updates"?
15   A.   Jan.
16   Q.   Did she tell you why?
17   A.   No.  We were having texts back and forth about
18 the missing car.
19   Q.   Did you have texts back and forth on September
20 5th, 2023?
21   A.   September 6th or 5th?
22   Q.   Five.
23   A.   Five.  Probably -- well, I don't know, because
24 we were having phone calls on the 5th.
25   Q.   What's your understanding of what "Any

Page 79

1  updates" means?
2    A.   Just asking me if I had any more information
3  about -- probably about the car or the repossession.
4    Q.   What, if anything, had you done to look into
5  information about the car and repossession?
6    A.   I had spoken to the sheriff's department
7  around that time.  They told me it had been a
8  repossession.
9    Q.   Was that conversation with the sheriff on the
10 5th or the 6th?
11   A.   I think it was -- because of the time
12 difference, I believe it was on the 5th.
13   Q.   Did you write "We're heading to dinner, I'll
14 call you"?
15   A.   Yes, I did write that.
16   Q.   So you were back East, and it's, what, 6:41
17 around that time?
18   A.   Yes.
19   Q.   Okay.  And then Jan wrote, "Okay, call me now.
20 I'm at home."
21       And you, I guess, wrote "15 minutes.  Okay."
22       And then it says "No cameras."
23       Do you see that?
24   A.   Yes.
25   Q.   Is Jan telling you there are no cameras?

Page 80

1    A.   You know, this looks like it's a screenshot.
2  She was having a text exchange with somebody else.
3    Q.   You don't think this was you?
4    A.   Well, it's a screenshot.  And I didn't -- I
5  don't recall writing anything that was in the
6  screenshot.
7    Q.   So let's scroll up to the top of page 33.  It
8  says "JP, Jan" at the top center of the page.  "Any
9  updates."  We've talked about that.
10       And then on the same page where you testified
11 it was you saying "We're heading to dinner," et cetera,
12 there's like a cutoff.  I don't know what it says above
13 the words "No cameras."  Do you think that was not an
14 exchange with Jan and you?
15   A.   No.  This is a screenshot of a text exchange
16 she was having with somebody else.
17   Q.   Who is that?
18   A.   Somebody in the building.  I don't know who --
19 I don't recall who it was.
20   Q.   So do you know who typed "No cameras"?
21   A.   No.
22   Q.   You don't have the full contents of the text
23 message immediately above the words "No cameras"?
24   A.   No, no.  She sent me the screenshot, and that
25 was -- you know, she sent me what she sent me.  I didn't

Page 81

1  have the rest of it.
2    Q.   So where it says, "Okay, I will tell him to
3  ask the sheriffs to check the alley," do you know who
4  that is?
5    A.   That is probably Jan.
6    Q.   Okay.  And you don't know who typed "We must
7  have the gate inspected"?
8    A.   No.  It was probably -- I don't want to
9  speculate.  But other than that, it's somebody she was
10 talking to on the condominium board.
11   Q.   Are you speculating right now?
12   A.   No.  I'm basing it on my knowledge on what was
13 going on at the time and who she was probably speaking
14 to.  So --
15   Q.   Who was she --
16   A.   I can't provide a name.  I don't know other
17 than that.
18   Q.   Was it a man or a woman?
19   A.   I don't know.
20   Q.   Do you know whether you ever talked to that
21 person?
22   A.   I don't know.  I don't know who it is.
23   Q.   Why does she send you the screenshot?
24   A.   To keep me informed, I assume.
25   Q.   And when you received this screenshot, what

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024

Pages 82..85

Page 82

1  did you do?
2      A.  I don't know if I did anything other than
3  following up with what I was following up with.
4      Q.  The next page, DG-34, it has "Jan" again at
5  the top.  I guess it's her saying "Okay, let me know
6  what she says."  Is that your understanding?
7      A.  Could you scroll up some more so I could see?
8      Q.  Up or down?
9      A.  Up.  Let's see.  Down.  Sorry.  Let's see.
10  That would be me.
11      Q.  Which one?
12      A.  "Let me know what she says."
13      Q.  And who are you referring to?
14      A.  That would be me.
15      Q.  Got it.  Thank you.
16          Who are you referring to?
17      A.  I don't know.  Now that I'm looking at this, I
18  still don't know who -- it might have been Gina or it
19  might have been somebody else on the board.  I don't
20  know.  It's probably Gina, but that would be
21  speculating.
22      Q.  So this is another excerpt of texts?  At the
23  top it says, "Okay, let me know what she says."  There
24  must have been, I assume, texts regarding the same topic
25  that were not produced; right?

Page 83

1      A.  I don't know.  I don't know sitting later just
2  looking at this.  I can't tell.
3      Q.  Well, page 34 is, you're sure, a text between
4  Jan and yourself; right?
5      A.  It looks like it, yes.
6      Q.  And that top, you wrote, "Okay, let me know
7  what she says," right?
8      A.  If you could scroll down for a second.
9      Q.  Sure.
10      A.  That would be -- yeah, because she's sending
11  me a photo.  So that would be Jan.
12      Q.  Okay.  What would be Jan?  "Okay, may I call
13  you"?
14      A.  Jan would be sending me the photo, and I would
15  be saying, "30 minutes if that's okay.  Taking shower.
16  Okay."  That would be me.
17      Q.  You're back East?
18      A.  Yes.
19      Q.  Right.  So the dark --
20      A.  The dark would be me.
21      Q.  Right.  And so there must have been a text
22  before "Okay, let me know what she says," right?
23      A.  I don't know.  Scroll up.  Let me see the
24  preceding page.  A little bit more.  I don't know.  We
25  may have had a phone conversation at that point.  Let me

Page 84

1  see the times.  I don't know if there's anything
2  missing.  I know we were having a phone conversation
3  about this and we were also texting.  So --
4      Q.  Have you ever deleted any text messages that
5  referred to the repossession?
6      A.  No.  Absolutely not.
7      Q.  Have you ever deleted any text messages or
8  e-mails that -- between you and Jan that refer to the
9  repossession?
10      A.  No.  I don't know if we -- I don't know if we
11  had any e-mail exchanges.  We usually communicate by
12  text or phone call.
13      Q.  Have you deleted any e-mails or text messages
14  with Laurel that refer to the repossession?
15      A.  No.
16      Q.  How old is Laurel?
17      A.  Thirty-three.
18      Q.  Okay.
19      MR. TRUEBLOOD:  David, can we -- we've been going
20  for an hour.  Can we take a break?
21      MR. BERNSTEIN:  Sure.
22          (Brief recess.)
23  BY MR. BERNSTEIN:
24      Q.  Mr. Galanter, has anyone refreshed your
25  recollection regarding these questions I'm having about

Page 85

1  the text messages and whether they're full and complete
2  exchanges vis-a-vis just partial exchanges?
3      MR. TRUEBLOOD:  Vague and ambiguous.
4      THE WITNESS:  No, nothing at all.
5  BY MR. BERNSTEIN:
6      Q.  Have you looked at anything during the break?
7      A.  No.
8      Q.  You said, I think, that you have an iPhone; is
9  that right?
10      A.  Yes.
11      Q.  When you were gathering evidence relating to
12  this case, did you look into your iCloud account for
13  evidence?
14      A.  I don't think so, because it would have been
15  the same data that's on my phone.  I don't delete text
16  messages.  I actually don't know how to delete text
17  messages, so I don't do that.
18      Q.  Looking at page 34 here, there's a text that
19  says, "Okay, let me know what she says," I'm trying to
20  assess or determine whether there was an exchange via
21  text immediately before this "Okay, let me know what she
22  says" entry.
23      A.  Okay.
24      MR. TRUEBLOOD:  So is there a question?
25      MR. BERNSTEIN:  Yeah.

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024

Pages 86..89

Page 86

1  BY MR. BERNSTEIN:
2      Q.  The question is were there text messages that
3  were not produced?
4      A.  Text messages about what?
5      Q.  The repossession.
6      A.  I don't believe so.
7      Q.  So you see where at the top of the page it
8  says "Okay, let me know what she says"?
9      A.  Yeah.  Yes.
10     Q.  All right.  Your testimony is that you weren't
11 responding to the text when --
12     A.  I don't know.  It's been over a year ago.
13 It's over a year ago.  I may have been responding to the
14 screenshot she sent me.  I just don't recall.
15     Q.  What screenshot are you referring to?
16     A.  The one on the previous page.  I told you
17 there was a screenshot of a text exchange Jan sent me.
18     Q.  When you say "Okay, let me know what she
19 says," how does that refer to a prior text or
20 screenshot?
21     A.  I don't know.  Just looking at this, I can't
22 tell.
23     Q.  All right.
24     A.  All I can do at some point -- it takes time to
25 scroll all the way back through text messages to get to,

Page 87

1  you know, last September to see if there's anything.
2  But --
3      Q.  Well, that's true, but you understand you have
4  filed a lawsuit against my client, and we're asking for
5  these things.
6      A.  I don't know what you're asking for.
7      MR. TRUEBLOOD:  Hold on.  It's argumentative.  It
8  lacks foundation.  It's also untrue that you have
9  requested all text messages.
10     MR. BERNSTEIN:  That's not untrue, Counsel.
11     MR. TRUEBLOOD:  It is.
12     MR. BERNSTEIN:  We've asked for communications
13 relating to the repossession.
14     MR. TRUEBLOOD:  You'll have to show that to me.
15     MR. BERNSTEIN:  Okay.  Let's try to get what we can
16 get done today done today.  But, unfortunately, we'll
17 have to come back on another date.
18 BY MR. BERNSTEIN:
19     Q.  I'm going to scroll down to DG-77.  This is a
20 document that at the top left says "Access Finance."
21 And then there appears to be a series of e-mails.  The
22 top, though, says "Payments on Auto Loan," and then on
23 the right there's a date of August 2nd, 2023 at 3:57
24 p.m.
25         Do you see where I am?

Page 88

1      A.  Yes.
2      Q.  All right.  Do you see at the top where it
3  says "Avi Shraga to Douglas Galanter"?  And it says,
4  "Sir, why are you doing this?"
5      A.  Yeah, I see that.
6      Q.  Do you remember receiving this?
7      A.  No.
8      Q.  Do you know why Mr. Shraga asked you that
9  question?
10     A.  Well, looking at the rest of the page, he's
11 probably asking why I "haven't returned the vehicle
12 today," his words.
13     Q.  Did you have an agreement to return the
14 vehicle?
15     A.  No.
16     Q.  Were you on default on this day?
17     MR. TRUEBLOOD:  Asked and answered.
18     THE WITNESS:  Yeah, I believe so.
19 BY MR. BERNSTEIN:
20     Q.  Okay.  Now, take your time and look through
21 all these -- there's several e-mails on page DG-77 and
22 -78.  I'll scroll up and down however you'd like.  I
23 want to you read them all over because my question will
24 be are these authentic; these are actually e-mails that
25 you sent and received?

Page 89

1      MR. TRUEBLOOD:  You might want to look at your
2  copy, Doug, so you can scroll on your own.
3      THE WITNESS:  Yeah, that would be easier, if you
4  don't mind.
5  BY MR. BERNSTEIN:
6      Q.  No, I don't mind.
7      A.  What page again is that?
8      Q.  It's pages 77 and 78.
9      MR. TRUEBLOOD:  The copy I have may not have Bates
10 numbers.
11     THE WITNESS:  It looks like they do.
12     MR. TRUEBLOOD:  Okay.
13     THE WITNESS:  It looks authentic to me.
14 BY MR. BERNSTEIN:
15     Q.  Okay.  So the entire back-and-forth reflected
16 on DG-77 and DG078 are authentic?
17     A.  It looks like.  Let's see.  I know I wrote the
18 June 15, 2023 one.  I recall Mr. Shraga's response.  I
19 recall the July 11 one.  Yeah, looks authentic to me.  I
20 just don't recall the "Sir, why are you doing this?"
21 But --
22     Q.  I think the earliest one is July 15 at 12:06
23 from Avi Shraga to you, right?
24     A.  It looks like it.  Yes.
25     Q.  All right.  And you're saying, "Please note

Case 2:23-cv-09466-ODW-SSC   Document 70-7   Filed 03/25/25   Page 24 of 31   Page ID #:572
DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024
Pages 90..93

Page 90

1 that I plan to resume payments on the above-referenced
2 loan not later than 7/1/2023."  Right?
3        Do you have a recollection of how long you had
4 been in default at this time?
5    A.  No, I don't.
6    Q.  Was it more than a month?
7    A.  Yeah, I believe so.
8    Q.  More than two?
9    A.  As best as I can recall, maybe two or three
10 months.
11    Q.  Okay.  You continue in your e-mail, "In the
12 meantime please cease your phone calls to my family
13 members, clients, and acquaintances, as they find these
14 calls to be disruptive and harassing."
15        Do you see that?
16    A.  Yes.
17    Q.  All right.  Other than Jan and Laurel, any
18 other family members allegedly receive phone calls from
19 Avi?
20    A.  I'm not sure if the call was from Avi himself,
21 but my sister received a couple phone calls.
22    Q.  But you were referring to Access Finance here,
23 correct?
24    A.  Yes.
25    Q.  What's your sister's name?

Page 91

1    A.  Dorian Brown.
2    Q.  Can you please spell the first name?
3    A.  D-O-R-I-A-N.
4    Q.  What's Ms. Brown's address?
5    A.  She's at 5 Thurlow Street, T-H-U-R-L-O-W, in
6 Georgetown, Massachusetts.
7    Q.  And she told you she received phone calls from
8 Access Finance?
9    A.  Yeah, a number of them.  She didn't
10 specifically say they were from Access Finance, but she
11 did say that they were calls looking for me.
12    Q.  Do you have Dorian Brown's phone number?
13    A.  I would appreciate not to give it to you.
14    Q.  Well, she's a percipient witness, evidently.
15 If you agree not to call her as a witness, I don't need
16 her phone number.
17    A.  Why would you need her phone number if she's
18 my witness?
19    Q.  To speak with her.
20    MR. TRUEBLOOD:  What would calls to Dorian Brown
21 from Access have to do with the case against LAW
22 Recovery?
23    MR. BERNSTEIN:  Well, one of LAW Recovery's
24 contention is that you and your client have conflated
25 calls from Access Finance with alleged calls that never

Page 92

1 occurred from LAW Recovery, and her testimony regarding
2 what was said to her would shed light on that issue.
3    THE WITNESS:  Well, I'll need to discuss this with
4 my counsel to see if I -- I'm very protective of my
5 sister's privacy.
6    MR. BERNSTEIN:  That's fine.  If you don't call her
7 as a witness, I don't need to speak with her.
8    MR. TRUEBLOOD:  We'll let you know.
9 BY MR. BERNSTEIN:
10    Q.  It says, "Please cease your phone calls to my
11 family members," and then it says "clients."  Who is
12 that?
13    A.  Well, I recall that at least one of my clients
14 and friends -- her name is Melody Ishida -- received a
15 couple of phone calls.  She's a CPA.  Her office is in
16 West Los Angeles.  She told me that at least two or
17 three phone calls she received.
18    Q.  Would you please spell Melody's last name for
19 me?
20    A.  I-S-H-I-D-A.
21    Q.  To the best of your recollection with the
22 greatest possible degree of precision, did Melody Ishida
23 tell you about calls that she had received relating to
24 the Honda?
25    A.  She called and said, Some guy was looking for

Page 93

1 you about some collection matter, and who are these
2 people and why are they calling me?
3    Q.  And what did you say?
4    A.  I said, I don't know who's calling you, but
5 I'll look into it.
6    Q.  Did you look into it?
7    A.  I think I did.
8    Q.  And what did you --
9    A.  I think I did, and it sounded like -- you
10 know, that's why I wrote this e-mail.
11    Q.  What did you do to look into it?
12    A.  I think I spoke to her and got her -- got some
13 more information about who -- what the conversation was.
14 But I can't remember any more specifics about it.
15    Q.  Tell me everything you can recall --
16    A.  I told you.  I told you what I can recall
17 right now.
18    Q.  Let me just get the question out.
19        Have you now told me everything you recall
20 regarding what Ms. Ishida told you about calls she had
21 received regarding this debt?
22    A.  I believe so.
23    Q.  Did she tell you how many calls were made?
24    A.  There were at least two, as I recall.
25    Q.  Did you and Melody Ishida exchange texts or

Case 2:23-cv-09466-ODW-SSC   Document 70-7   Filed 03/25/25   Page 25 of 31   Page ID #:573

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024                                Pages 94..97

Page 94

1  e-mails regarding this subject?
2      A.  No.
3      Q.  Did you come up with any hypothesis about how
4  anyone obtained Melody Ishida's phone number?
5      A.  I can only speculate.
6      Q.  What's your speculation?
7      A.  That somebody at either LAW Recovery or Access
8  was digging up trying to find out who my connections
9  were, because they were trying to locate me when all
10  this time I was sitting here at 800 West First Street.
11  But I guess they were looking for me.
12      Q.  You don't know, as you sit here today, whether
13  LAW Recovery or Access made these alleged calls to
14  Melody Ishida, correct?
15      A.  That's correct.
16      Q.  Any other clients?
17      A.  I don't recall any sitting here right now.
18      Q.  Is Ms. Ishida still a practicing CPA in West
19  L.A.?
20      A.  I believe she is, yeah.
21      Q.  And then you say "and acquaintances."  "Please
22  cease your phone calls to my family members, clients,
23  and acquaintances."
24          What acquaintances are you referring to?
25      A.  Well, Melody would also be an acquaintance.

Page 95

1      Q.  Okay.  Why would you refer to her as a client
2  and then separately as an acquaintance?
3      A.  I don't know.  I was trying to be
4  all-inclusive in this e-mail.  I wanted the calls to
5  stop.
6      Q.  Well, when you refer to "clients," you're only
7  referring to one person; is that correct?
8      A.  There may have been others, but I can't recall
9  at this point.
10      Q.  How would you refresh your recollection as to
11  whether there were others?
12      A.  I would have to look through --
13      MR. TRUEBLOOD:  Objection.  Calls for speculation.
14  Lack of foundation.
15      THE WITNESS:  I don't know.
16  BY MR. BERNSTEIN:
17      Q.  You started to say you would have to look
18  through, and your lawyer objected.  What were you going
19  to say?
20      A.  I'm not sure what I would have to do.  I can
21  go back and ask a few people if they recall getting
22  phone -- I don't know.  I did know that my sister was
23  getting calls, my daughter was getting calls, you know,
24  Melody was getting calls.
25  ///

Page 96

1  BY MR. BERNSTEIN:
2      Q.  What acquaintances were getting calls?
3      A.  That's what I recall.  I can't elaborate any
4  further.  I don't remember.
5      Q.  Was there a single acquaintance other than
6  Melody that was getting calls?
7      A.  I don't recall.
8      Q.  Do you think that's something important?
9      MR. TRUEBLOOD:  It's argumentative.  Calls for
10  contention.
11  BY MR. BERNSTEIN:
12      Q.  You're chuckling, but I'm not joking.
13          Do you think it was important to be honest and
14  forthright with Access Finance?
15      A.  I'm not responding to that.
16      Q.  Why?
17      MR. TRUEBLOOD:  It's argumentative.
18      THE WITNESS:  I'm not going to argue with you,
19  Mr. Bernstein.  Ask your questions.
20  BY MR. BERNSTEIN:
21      Q.  You were less than honest when you wrote this
22  e-mail, correct?
23      MR. TRUEBLOOD:  You can answer if you wish.
24      THE WITNESS:  That's not correct.
25  ///

Page 97

1  BY MR. BERNSTEIN:
2      Q.  Continuing on this e-mail that you sent on
3  June 15th, it says, "This is especially problematic when
4  you call my family members' places of employment."
5          You see where I'm referring to?
6      A.  I certainly do.
7      Q.  All right.  How many places of employment do
8  you believe were called?
9      A.  Hot Pilates.  That's it.  That's the big one.
10      Q.  Just one of them, right?
11          Are you claiming that somebody called Jan's
12  place of employment?
13      A.  I think my e-mail speaks for itself really.
14      Q.  The e-mail says --
15      A.  I don't -- I don't know.
16      Q.  Well, you apparently knew when you wrote this,
17  because you put "family members'," S apostrophe, which
18  suggests plural.  You're a lawyer --
19      A.  If you're suggesting --
20      MR. TRUEBLOOD:  Hold on.  There's no question
21  pending.  I'm not going to get into an argument on the
22  record.  Just ask your question.
23      MR. BERNSTEIN:  Right.
24  BY MR. BERNSTEIN:
25      Q.  When you refer to "family members'," S

Case 2:23-cv-09466-ODW-SSC    Document 70-7    Filed 03/25/25    Page 26 of 31    Page ID #:574

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024

Pages 98..101

Page 98

1  apostrophe plural, who other than Laurel were you
2  referring to?
3       A.  I was referring to Laurel.  And I believe, as
4  I'm sitting here thinking about it, that my sister
5  received calls while she was at her place.
6       Q.  And where does your sister work -- or did she
7  at that time?
8       A.  She's self-employed.  She has her own fitness
9  studio back East.
10      Q.  Well, we'll have to come back about that
11 because you're going to have to, with counsel, figure
12 out if you're going to call her as a witness or not.  If
13 you are, I expect to receive her contact information.
14      Moving on, you wrote that "This creates
15 questions and problems for them as it insinuates that
16 they owe money to Access."
17      Do you see that?
18      A.  I do.
19      Q.  Okay.  Now, this is before the repossession by
20 months, right?  This was in June of 2023?
21      A.  That's what it says.
22      Q.  Okay.  And then on June 15th at 12:21 p.m.,
23 Mr. Shraga responded in the middle there where he denies
24 calling family members or your daughter's place of
25 employment.  Do you see that?

Page 99

1       A.  Do you want to scroll down so I can see it --
2  scroll up so I can see it?
3       Q.  Sure.
4       A.  Okay.
5       Q.  Now, do you know when LAW Recovery was asked
6  to repossess the vehicle?
7       A.  I do not.
8       Q.  Okay.  Mr. Shraga denies calling anybody.  He
9  says that it might be a repo agent.  And then he says,
10 "Please call me to discuss your file immediately."
11      Do you see that?
12      A.  Yes.
13      Q.  Did you?
14      A.  I recall calling -- trying to call him
15 sometime around this time, and I got a voicemail or
16 something.  And I didn't receive anything back from him,
17 and I didn't follow up on it.
18      Q.  Did you leave a message?
19      A.  I believe so.
20      Q.  And you never followed up?
21      A.  No.
22      Q.  Mr. Shraga wrote, "We are not willing to wait
23 until July for you to begin making payments again.  You
24 are currently more than six months behind on your
25 account."

Page 100

1       Was that an accurate statement?
2       A.  I'm not sure.  It may have been.
3       Q.  He continues:  "And you have avoided all
4  contact with us for many months."
5       Is that an accurate statement?
6       A.  No.
7       Q.  Did you reply in an e-mail saying that it was
8  inaccurate?
9       A.  I don't believe so.
10      Q.  At the bottom of this e-mail from Mr. Shraga
11 from June 15 says, "As an attorney, you are probably
12 familiar with California Penal Code Section 154."
13 Today, as you sit here, do you know what 154 says?
14      A.  Something about hiding the vehicle and there
15 being a penalty for hiding the vehicle.
16      Q.  It's a felony.
17      Did you look it up when you got this e-mail?
18      A.  Yeah, I probably did.  And I wasn't hiding the
19 vehicle, so I thought it was nonsense.
20      Q.  Well, it was maintained at a location which
21 was not where you lived.
22      A.  That's not true.
23      Q.  You lived at Springpark?
24      A.  I already testified that I did not.
25      Q.  Okay.  At the top there's an e-mail that looks

Page 101

1  like it's dated July 11th, 2023 where you say, "I've
2  been traveling for the past few weeks and apologize for
3  the late response.  I can resume payments today.  I can
4  make two payments per month."
5       Do you see where I'm referring to?
6       A.  Yes.
7       Q.  Did you make those payments?
8       A.  No, I didn't.
9       Q.  Why not?
10      A.  I asked Mr. Shraga, "Please let me know if I
11 can initiate the first payment this afternoon."  Do you
12 see that?
13      And he responded, "You need to return the
14 vehicle today," so I did not make the payments.
15      Q.  Capital One statements were produced, starting
16 with DG-79.  I'm showing you the first page.  Are you
17 generally familiar with these?
18      A.  Am I generally familiar with them?  They're my
19 credit card statements.
20      Q.  All right.  So did you produce all the credit
21 card statements reflecting your claim to damages for
22 loss of use?
23      MR. TRUEBLOOD:  You can rephrase that so it doesn't
24 violate Rifkind.
25 ///

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024

Pages 102..105

Page 102

1 BY MR. BERNSTEIN:
2   Q.  Do these Capital One statements embody 100
3 percent of what you owe, that you're claiming that you
4 owe?
5   A.  For what?
6   Q.  For renting a substitute vehicle.
7   A.  No.
8   Q.  Do you have more?
9   A.  I don't have more statements in my possession.
10   Q.  Why?
11   A.  One of the credit cards that was used
12 initially for the initial rental for the month or two
13 after the repossession was for a credit card that had
14 since been closed.  It was a Citibank card.  And I had
15 thought that I could still access these statements
16 online, but I cannot.  So I am communicating with
17 Citibank to obtain physical copies of those statements.
18 So I should have those pretty soon.  So that's why.
19   Q.  How much are you claiming on the Citibank
20 card?
21   A.  It's probably another 4- or 5,000.  I have to
22 see what's on there.  I'm also trying to get information
23 from Hertz.  That was the company that I initially
24 rented from on those contracts.
25   Q.  Did you try purchasing or leasing another

Page 103

1 vehicle instead of renting?
2   A.  Excuse me?
3   Q.  Did you try purchasing another car or leasing
4 another new car rather than paying nine grand over time
5 for third-party rentals?
6   A.  No.
7   Q.  Why?
8   A.  I chose not to.
9   Q.  Why did you choose not to?
10   A.  Because I chose not to.
11   Q.  That, sir, is not an answer.
12   A.  I have my reasons.
13   Q.  I'm asking what your reasons are.
14   A.  I decided that it was not in my interest to do
15 so.
16   Q.  Is it because your credit situation made it
17 impossible to do so?
18   A.  No.
19   Q.  So you have sufficient credit to lease or buy
20 a new car at this time?
21   A.  I believe so.
22   Q.  Are you up to date with your apartment rental
23 or mortgage?
24   A.  I'm not answering questions about that.
25   MR. TRUEBLOOD:  Objection on privacy.

Page 104

1   MR. BERNSTEIN:  Well, it goes to motivation to
2 bring a lawsuit.  It has very little probable cause, if
3 any.  I'm entitled to that information.
4 BY MR. BERNSTEIN:
5   Q.  So were you behind on your -- was that a
6 mortgage or a rental apartment?
7   A.  I'm not answering any questions about anything
8 like that.
9   Q.  Why not?
10   MR. TRUEBLOOD:  Privacy.
11   MR. BERNSTEIN:  I'm asking your client.
12   MR. TRUEBLOOD:  Privacy, and not relevant to any
13 claim or defense.
14 BY MR. BERNSTEIN:
15   Q.  At the time that this lawsuit was filed, did
16 you need money?
17   A.  Everybody needs money, Mr. Bernstein.
18   Q.  Did you need money to bring your accounts and
19 debts up to date?
20   A.  I'm not answering these questions.
21   MR. TRUEBLOOD:  These are harassing questions that
22 are invading my client's private life.
23   MR. BERNSTEIN:  It goes to motivation to file this
24 lawsuit.
25   MR. TRUEBLOOD:  That's not part of this case.

Page 105

1   MR. BERNSTEIN:  Well, fortunately, you're not the
2 final arbiter of that.
3 BY MR. BERNSTEIN:
4   Q.  Sir, if you're concerned about privacy, can
5 you explain why you produced unredacted credit card
6 bills with lots of charges from various other vendors?
7   MR. TRUEBLOOD:  It's a harassing question.
8 Argumentative.
9 BY MR. BERNSTEIN:
10   Q.  You can answer.
11   A.  I'm not answering these questions.
12   Q.  Why aren't you answering the last question?
13   MR. TRUEBLOOD:  Because they're improper.
14 Harassing, argumentative, and irrelevant.
15   MR. BERNSTEIN:  That's not a grounds to instruct
16 not to answer.
17   MR. TRUEBLOOD:  I haven't instructed --
18 BY MR. BERNSTEIN:
19   Q.  Mr. Galanter, you're an attorney.  You know
20 you need to answer questions.
21   A.  I need to answer proper questions.
22   Q.  You have counsel for that.  He's not
23 instructed you.
24   A.  These are absurd questions.
25   Q.  Well, I respectfully disagree.

Case 2:23-cv-09466-ODW-SSC   Document 70-7   Filed 03/25/25   Page 28 of 31   Page ID #:576

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024
Pages 106..109

Page 106

1      A.  Okay.  We disagree then.
2      **Q.  Well, the credit card statements you produced**
3  **refer to Apple charges, Phillips 66 Gasoline,**
4  **Marketplace, Modern Chinese Playa Vista.  It's**
5  **inconsistent with your claim that you're concerned about**
6  **the privacy of your debt --**
7      MR. TRUEBLOOD:  Don't answer.  There's no question.
8      THE WITNESS:  I'm not answering these questions.
9      MR. BERNSTEIN:  I haven't finished posing the
10 question.
11     THE WITNESS:  What's the question?
12 BY MR. BERNSTEIN:
13     **Q.  The question is other than the Honda, were you**
14 **in arrears in any of your other debts?**
15     MR. TRUEBLOOD:  Objection.  Privacy.  Relevance.
16 BY MR. BERNSTEIN:
17     **Q.  Yes or no?**
18     MR. TRUEBLOOD:  Argumentative.  Harassing.
19 BY MR. BERNSTEIN:
20     **Q.  I need an answer on the record.  If you --**
21     A.  I'm not answering these questions.  You can
22 move on.
23     **Q.  Are you familiar with Business and Professions**
24 **Code 6106?**
25     A.  I don't have that memorized, Mr. Bernstein.

Page 107

1      **Q.  Well, do you recall that the State Bar has**
2  **charged you for offenses involving moral turpitude for**
3  **violation of Business and Professions Code Section 6106?**
4      MR. TRUEBLOOD:  Objection.  Privacy.  Irrelevant.
5  Harassing.
6      THE WITNESS:  I'm not answering any questions
7  pertaining to that proceeding other than to tell you
8  it's been indefinitely abated.  That's all I'm
9  testifying to.
10 BY MR. BERNSTEIN:
11     **Q.  I saw that there's some abatement pending**
12 **outcome of civil litigation.  But my question was do you**
13 **know what the section was.  You said, I guess, you**
14 **didn't know.**
15     **Let me ask this question:  Have those**
16 **proceedings caused you to sustain emotional distress?**
17     MR. TRUEBLOOD:  Same objections.
18     THE WITNESS:  I'm not testifying about those
19 proceedings, Mr. Bernstein.
20 BY MR. BERNSTEIN:
21     **Q.  I'm asking about emotional distress from the**
22 **proceedings, because you've sued my client for emotional**
23 **distress.**
24     MR. TRUEBLOOD:  Same objections.
25 ///

Page 108

1  BY MR. BERNSTEIN:
2      **Q.  Are you refusing to answer?**
3      A.  I am refusing to answer.  I'm not testifying
4  at all about those proceedings or anything relating to
5  them.
6      **Q.  Are you aware -- do you have knowledge of any**
7  **complaints by anybody else against my client?**
8      A.  Not specifically, no.
9      **Q.  What about generally?**
10     A.  I may have heard some things about your
11 client.
12     **Q.  Who has told you information about my client?**
13     MR. TRUEBLOOD:  You can answer if you have anything
14 outside of our attorney-client relationship.
15     MR. BERNSTEIN:  Well, at first we need to lay a
16 foundation.  I just asked who.  I didn't ask what.
17 BY MR. BERNSTEIN:
18     **Q.  Who provided you with information regarding my**
19 **client?**
20     MR. TRUEBLOOD:  You're asking the content of
21 communication by asking it that way, so please exclude
22 from your answer any attorney-client communications.
23 BY MR. BERNSTEIN:
24     **Q.  When you say, sir, that you've heard some**
25 **things, what did you hear?**

Page 109

1      MR. TRUEBLOOD:  Same objection.
2      THE WITNESS:  I've heard that your client plays
3  fast and loose with the law governing repossessions and
4  is willing to breach the peace, trespass, and do other
5  things to achieve repossession that are not countenanced
6  by the law.
7  BY MR. BERNSTEIN:
8      **Q.  Who told you that?**
9      A.  One of the people who mentioned that to me,
10 now that I think about it, is Shane Lawler with the
11 State of California, who told me that they've received
12 other complaints.
13     **Q.  Well, you're a lawyer.  You know a**
14 **complaint -- an allegation doesn't make something true,**
15 **right?**
16     A.  What is that -- so?
17     **Q.  Okay.  Shane Lawler.  Who else?**
18     A.  Other than that, I can't really say.
19     **Q.  Is that because you don't remember or is it**
20 **because you don't want to?**
21     A.  No.  Because it's -- the problem is I can't
22 answer these questions that you're posing to me right
23 now because if I answer -- no matter how I answer them,
24 I might be violating attorney-client privilege.
25 ///

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024

Pages 110..113

Page 110

1  Q.  Fair enough.  I don't want you to do that.

2  A.  So I can't answer it.  If I answer it

3  positively or negatively, it still reveals that it might

4  be attorney-client information, so I can't answer it.

5  Q.  Well, remember that the elements of an

6  attorney-client privilege objection requires a

7  confidential communication.  This doesn't sound like you

8  would consider it to be confidential.

9  A.  I don't know why you say that.

10  Q.  Because the Evidence Code says it.

11  A.  No.  I don't know why you're saying that.

12  Q.  Well, because I'm trying to ask you why you

13  believe my client plays fast and loose with laws

14  governing repossessions other than what a lawyer

15  representing you may have told you.

16  A.  And that's exactly my point, because depending

17  upon how I answer that, I'm revealing a confidential

18  attorney-client communication.  So I really can't answer

19  that.

20  Q.  You can't answer --

21  A.  I would be revealing -- I might be revealing a

22  communication by answering negatively or positively

23  other than a conversation with your attorney have you

24  heard anything.  And if I answered no, it's obviously

25  attorney-client communication, so I can't really answer

Page 111

1  it.

2  Q.  Well, it wouldn't be a confidential

3  communication, but --

4  A.  Well, that's your --

5  MR. TRUEBLOOD:  Let's not have an argument.  Why

6  don't you ask the question, David.

7  BY MR. BERNSTEIN:

8  Q.  The question is, other than Mr. Lawler, who

9  told you anything about my client's reputation?

10  MR. TRUEBLOOD:  I'll instruct you not to answer.

11  Attorney-client privilege.

12  BY MR. BERNSTEIN:

13  Q.  Other than your lawyers, who told you anything

14  about my client's reputation?

15  A.  That's exactly my point, because if I answer

16  "no one," then it's obviously from my attorney.

17  Q.  I'm entitled to that an answer.

18  MR. TRUEBLOOD:  I'll instruct him not to answer.

19  The answer, yes or no, would reveal attorney-client

20  communications.

21  MR. BERNSTEIN:  Nonsense.

22  BY MR. BERNSTEIN:

23  Q.  Do you have any notes, documents, e-mails,

24  text messages that would refresh your recollection

25  regarding the members of the board that you may have

Page 112

1  spoken to in connection with the repossession?

2  A.  No.

3  Q.  Did you have any e-mail communications with

4  board members other than Gomez?

5  MR. TRUEBLOOD:  About what?

6  THE WITNESS:  Gomez?

7  BY MR. BERNSTEIN:

8  Q.  The repossession.  Cindy Gomez.

9  A.  I never had any communications with her.

10  Q.  Okay.  But you've testified -- okay.

11  Did you have any communications in writing --

12  by that I include electronic, you know, electronic

13  communications -- with any of the board members

14  regarding the repossession?

15  A.  No.

16  Q.  Did you have any communications, whether

17  electronic or not, with any residents of the building

18  regarding the repossession?

19  MR. TRUEBLOOD:  Are we talking about oral

20  communications or documents?

21  MR. BERNSTEIN:  Documents.

22  THE WITNESS:  So you mean letters, texts, or

23  e-mails?

24  BY MR. BERNSTEIN:

25  Q.  Or social media posts presumably.

Page 113

1  A.  No.

2  Q.  TikTok.  I don't know.

3  A.  No.

4  Q.  Did you have any telephone conversations with

5  residents of the building regarding the repossession?

6  A.  Not that I recall.  Other than Jan and

7  Laurel -- they reside there -- no.

8  Q.  Did you have any face-to-face communications

9  with residents of the building regarding the

10  repossession other than your ex-wife and daughter?

11  A.  I think I testified to that.  Gina for one.

12  That's the only one I recall.

13  Q.  Okay.  Do you have color photographs of the

14  pictures of the gate mechanism?

15  A.  I believe so.

16  Q.  Other than what you've already told me here

17  today -- excluding what you've already told me, do you

18  have any reason to believe my client called you or your

19  acquaintances?

20  MR. TRUEBLOOD:  I'm going to instruct him not to

21  answer.  It violates Rifkind v. Superior Court.

22  MR. BERNSTEIN:  No, it doesn't.

23  BY MR. BERNSTEIN:

24  Q.  Other than what you've told me today, are you

25  aware of anyone from LAW Recovery calling you regarding

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024

Pages 114..117

Page 114

1  the car?
2      A.  Calling me?
3      Q.  I'll go down the list.
4      A.  No.
5      Q.  Other than what you've already told me, are
6  you aware of anybody calling Jan from LAW Recovery
7  regarding the car?
8      A.  I don't recall that, no.
9      Q.  Other than what you've already told me, are
10  you aware of anybody calling your daughter from LAW
11  Recovery regarding the car?
12      A.  Not other than what I've testified to
13  previously.
14      Q.  Same question for Ms. Ishida.  Other than what
15  you've already told me, are you aware of LAW Recovery
16  calling Ms. Ishida in connection with the car?
17      MR. TRUEBLOOD:  Misstates the record.
18      THE WITNESS:  Nothing other than what I've
19  testified to.
20      MR. BERNSTEIN:  Okay.  We're not able to conclude
21  the deposition because many evidentiary items I've
22  requested have not been produced, including the video,
23  and there have been numerous Rifkind instructions that
24  are in opposite in my view.  We'll have to consult the
25  magistrate.  So we can adjourn for today.

Page 115

1      MR. TRUEBLOOD:  What video?
2      MR. BERNSTEIN:  The video that was embedded in the
3  text message.
4      THE WITNESS:  That wasn't a video.  It was a
5  voicemail.
6      MR. BERNSTEIN:  Okay.  A voicemail.
7      THE WITNESS:  And I don't know if it's relevant or
8  not.  I'm happy to go back to retrieve it, and we'll
9  see.
10      MR. TRUEBLOOD:  Hang on.  I'm just going to state
11  our position for the record.  It hadn't been requested
12  as far as I know.  You can point out to me later off the
13  record where you believe it was requested, and we'll
14  consider that.
15      I have objections to the document demands
16  which I'm going to send to Ms. Gatliff and counsel.  If
17  you can give me your e-mail, I'll send it right now.
18      THE REPORTER:  Can we go off the record?
19      MR. TRUEBLOOD:  Yes.
20      (Discussion held off the record.)
21      MR. TRUEBLOOD:  I'm going to mark as Exhibit 1
22  objections to the notice of deposition, this notice of
23  deposition, including objections to the document demands
24  therein.  And I'll state for the record that we consider
25  the deposition concluded.  And subject to any rulings as

Page 116

1  they may be -- but from our point of view this
2  deposition is over.
3      (Plaintiff's Exhibit 1 was marked for
4      identification and is attached hereto.)
5      MR. BERNSTEIN:  It's not over, but we can adjourn.
6      Anything else?
7      THE REPORTER:  Mr. Trueblood, do you want to order
8  a copy?
9      MR. TRUEBLOOD:  Let me think on that.
10      THE REPORTER:  Okay.
11      (Deposition concluded at 4:28 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 117

1          DECLARATION UNDER PENALTY OF PERJURY
2
3
4          I, DOUGLAS GALANTER, the witness herein,
5  declare under penalty of perjury that I have read the
6  foregoing deposition in its entirety and that the
7  testimony contained therein, as corrected by me, is a
8  true and accurate transcription of my testimony elicited
9  at said time and place.
10
11      Dated this _____ day of _____,
12  2024.
13
14
15
16          _____
17              DOUGLAS GALANTER
18
19
20
21
22
23
24
25

DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.
GALANTER, DOUGLAS on 11/18/2024

Pages 118..119

Page 118

```
 1              REPORTER'S CERTIFICATE

 2

 3          I, Lisette Gatliff, CSR No. 12467, a Certified

 4   Shorthand Reporter within and for the State of

 5   California, do hereby certify:

 6          That prior to being examined, the witness

 7   named in the foregoing deposition solemnly stated that

 8   the testimony given in this deposition would be the

 9   truth, the whole truth, and nothing but the truth;

10          That said deposition was taken before me

11   remotely and was taken down by me in shorthand and

12   thereafter reduced to computerized transcription under

13   my direction and supervision, and I hereby certify the

14   foregoing deposition is a full, true, and correct

15   transcript of my shorthand notes so taken;

16          I further certify that I am neither counsel

17   for, nor related to, any party to said action, nor in

18   any way interested in the outcome thereof.

19

20              Dated this 2nd day of December,

21              2024, at La Habra, California.

22

23              Lisette Gatliff

24

25              Lisette Gatliff, CSR No. 12467
```

Page 119

```
 1   Errata Sheet

 2

 3   NAME OF CASE: DOUGLAS GALANTER vs ACCESS FINANCE, , INC., et al.

 4   DATE OF DEPOSITION: 11/18/2024

 5   NAME OF WITNESS: Douglas Galanter

 6   Reason Codes:

 7       1. To clarify the record.

 8       2. To conform to the facts.

 9       3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25              _____
```