1                UNITED STATES DISTRICT COURT
                 CENTRAL DISTRICT OF CALIFORNIA
2    _____

3    DOUGLAS GALANTER,                )
                                      )
4              Plaintiff,             )
                                      )
5    vs.                              )    NO. 2:23-cv-09466 ODW
                                      )    (SSCx)
6    ACCESS FINANCE, INC., and        )
     LOS ANGELES AUTO WHOLESALERS &   )
7    RECOVERY SERVICES, INC.,         )
                                      )
8              Defendants.            )
     _____
9              DEPOSITION UPON ORAL EXAMINATION
                        Steven McIntosh
10                   November 21, 2024
                         Via Zoom
11                  Pages 1 through 146
     _____
12

13                      Taken Before:

14

                  Erin Blair, RPR, CSR #14590
15
                  Stenographic Court Reporter
16

17

18

19

20

21

22

23

24

25

**Page 2**

```
 1                    APPEARANCES
 2
   FOR THE PLAINTIFF:
 3
   Alec Trueblood
 4 TRUEBLOOD LAW FIRM
   10940 Wilshire Boulevard, Suite 1600
 5 Los Angeles, California 90024
   800-616-9325
 6 alec@hush.com
 7
   FOR THE DEFENDANTS:
 8
   David Bernstein
 9 LAW OFFICE OF DAVID A BERNSTEIN
   7120 Hayvenhurst Avenue, Suite 316
10 Van Nuys, CA 91406-3813
   818-997-8622
11 david@davidbernsteinlaw.com
12
   ALSO PRESENT:
13
   Juan Martinez, Representative for LAW Recovery
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                 I N D E X
 2 Witness      DIRECT   CROSS   REDIRECT   RECROSS
 3 STEVEN MCINTOSH
 4 By Attorney Trueblood   4
 5
 6
 7
 8            E X H I B I T S
 9        (Exhibits were retained by counsel.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1            BE IT REMEMBERED that on November 21, 2024, at
 2 10:00 a.m., via Zoom, appeared the above-named witness
 3 before Erin Blair, California Certified Shorthand
 4 Reporter authorized to administer oaths and
 5 affirmations.
 6
 7            WHEREUPON the following proceedings were had,
 8 to wit:
 9
10
11 Steven McIntosh,            having been first duly
12                               sworn by the Court
13                            Reporter testified as
14                                        follows:
15
16
17               EXAMINATION
18 BY ATTORNEY TRUEBLOOD:
19      Q    Good morning, Mr. McIntosh.  I'm Alec
20 Trueblood.  I'm the counsel for the plaintiff in this
21 case, Douglas Galanter, whose car you were involved in
22 repossessing.  Can you state your full name for the
23 record?
24      A    Steven Michael McIntosh.
25      Q    And is it Steven with a V?
```

**Page 5**

```
 1      A    Yes.
 2      Q    All right.  And have you had your testimony
 3 taken in any lawsuit before?
 4      A    No.
 5      Q    All right.  So I'm just going to tell you some
 6 ground rules so that you get familiar with the process.
 7 You're under oath today, just as if you were in a court
 8 of law.
 9           Do you understand that?
10      A    Yes.
11      Q    Okay.  I'm going to be asking you questions
12 and then you can provide the answer.  Because the court
13 reporter's taking down everything we say, it's
14 important for you to wait until my question's on the
15 record, and then answer; does that make sense?
16      A    Yes.
17      Q    In other words, it's kind of normal in your
18 average conversation to interrupt each other because we
19 know about what they're going to say, but, please wait
20 for my question to be fully on the record before you
21 answer, okay?
22      A    Yes.
23      Q    And there's another reason for doing that,
24 which is that your counsel, Mr. Bernstein, may want to
25 make an objection from time to time my question, to
```

1  give me an opportunity to rephrase it.
2       So if you hear an objection from
3  Mr. Bernstein, just let him make his record, and then
4  answer the question, afterwards; does that make sense?
5       A    Yes.
6       Q    So the normal procedure will be question,
7  possible objection, and then answer.  The only
8  exception would be if Mr. Bernstein instructed you not
9  to answer.
10      Does that make sense?
11      A    Yes.
12      Q    Is there any reason that you can't give your
13 best testimony today?
14      A    No.
15      Q    Have you taken any medication or other
16 substance?
17      A    No.
18      Q    Another important point is that since
19 everything here is verbal, and we're not being
20 recorded, it will be important for you to give me a
21 verbal response to all of my questions and not a shake
22 of the head or uh-uh or huh-uh; does that make sense?
23      A    Yes.
24      Q    I'll try to remind from time to time if that
25 happens.

1       ATTORNEY BERNSTEIN:  Pardon me, Alec, we are
2  being recorded.  I've asked that the recording be
3  extinguished, and I understand the reporter is working
4  on that.  We do object to have an audio recording of
5  the proceeding.
6       ATTORNEY TRUEBLOOD:  That's fine.
7       THE STENOGRAPHER:  Just to be clear, they did
8  shut off the recording.
9       ATTORNEY BERNSTEIN:  Oh, they have?
10      THE STENOGRAPHER:  Yes.
11      ATTORNEY BERNSTEIN:  Oh.  Okay.  Thank you.
12 BY ATTORNEY TRUEBLOOD:
13      Q    Mr. McIntosh, how old are you?
14      A    48.
15      Q    And what's your date of birth?
16      A    August 3, 1976.
17      Q    Where were you born?
18      A    California.
19      Q    Which city?
20      A    Los Angeles.
21      Q    And what's your -- your personal home address?
22      A    My personal home address?
23      Q    Yes.
24      A    I do everything through my PO Box.
25      Q    Well, where do you live?

1       A    I live in Carson.
2       Q    Okay.  What's your address in Carson?
3       A    20218 Belshaw Avenue, Carson, California,
4  90746.
5       Q    B-E-L-S-H-A-W?
6       A    Yes.
7       Q    And how long have you lived there?
8       A    22 years.
9       Q    Okay.  And what's your personal cell phone
10 number as of today?
11      A    (310)678-0882.
12      Q    In September -- well, in August of 2023, did
13 you have that same cell phone number?
14      A    I did.
15      Q    And who's your carrier?
16      A    Sprint.
17      Q    Was Sprint your carrier in August of 2023?
18      A    Yes.
19      Q    Are you an employee of Los Angeles Auto
20 Wholesalers and Recovery Services, Inc?
21      A    Yes.
22      Q    And do you understand that I'm going to refer
23 to Los Angeles Auto Wholesalers and Recovery Services
24 Inc throughout this deposition as LAW Recovery?
25      A    Yes.

1       Q    All right.  When did you become an employee of
2  LAW Recovery?
3       A    2020 -- 4 years ago; I'm not a hundred percent
4  sure of what date.
5       Q    Sometime in the year 2020?
6       A    Yes.
7       Q    Were you in the repossession industry before
8  joining LAW Recovery?
9       A    Yes.
10      Q    Who'd you work for before LAW Recovery?
11      A    I worked for multiple car lots, and I can't
12 think of the name of the repossession company right
13 now.
14      Q    All right.  When did you first get a -- when
15 did you first become a licensed employee of a
16 repossession agency, in your life?
17      A    Maybe 26, 27 years ago.
18      Q    26 years ago?
19      A    At least.
20      Q    All right.  So who do you report to as an
21 employee of LAW Recovery?
22      A    LAW Recovery.
23      Q    I mean, who is your supervisor?
24      A    Juan Martinez.
25      Q    And do you report to anybody else besides Juan

```
1   Martinez?
2       A    To the office.
3       Q    You report to John Serafin?
4       A    Every once in a while.  Not often.
5       Q    What's Mr. Martinez's title at the company?
6       A    Supervisor.
7       Q    Do you report to Misti Benarbachian?
8       A    Yes.
9       Q    What's her title at the company?
10      A    Qualified manager.
11      Q    And is Mr. Serafin the owner of LAW Recovery?
12      A    Misti is the owner of LAW Recovery.  I don't
13  know of the title of --
14           ATTORNEY BERNSTEIN:  Don't speculate.  Don't
15  guess.
16  BY ATTORNEY TRUEBLOOD:
17      Q    So Misti is the owner.  What's Mr. Serafin's
18  relationship to the company?
19           ATTORNEY BERNSTEIN:  Objection.  Foundation.
20  Calls for speculation.
21           ATTORNEY TRUEBLOOD:  Go ahead.
22           ATTORNEY BERNSTEIN:  Also assumes facts not in
23  evidence.
24           ATTORNEY TRUEBLOOD:  You can answer.
25           THE WITNESS:  Can you --
```

```
1   BY ATTORNEY TRUEBLOOD:
2       Q    What's Mr. -- what's John Serafin's
3   relationship to LAW Recovery?
4            ATTORNEY BERNSTEIN:  Same objections.
5            THE WITNESS:  I can't answer that.
6   BY ATTORNEY TRUEBLOOD:
7       Q    Do you believe he's an owner as well as
8   Ms. Benarbachian?
9            ATTORNEY BERNSTEIN:  Same objections.
10           THE WITNESS:  Can't answer that.
11  BY ATTORNEY TRUEBLOOD:
12      Q    You don't know?
13      A    I don't know what title he holds.
14      Q    Is he involved in the management of the
15  company?
16           ATTORNEY BERNSTEIN:  Same objection.
17           THE WITNESS:  I'm sure, yes.
18  BY ATTORNEY TRUEBLOOD:
19      Q    What does he do, that you know of?
20      A    I don't know.
21      Q    What's your title at LAW Recovery?
22      A    Recovery Agent.
23      Q    And does anybody report to you?
24      A    No.
25      Q    Can you describe for me what your job duties
```

```
1   and responsibilities are?
2       A    Repossess vehicles and transport.
3       Q    And tell me, what do you generally do in order
4   to repossess vehicles?
5            ATTORNEY BERNSTEIN:  Objection.  Vague and
6   ambiguous.  Calls for a narrative.  You can answer.
7            THE WITNESS:  Repossess the vehicles.  Pick up
8   the vehicles, make sure that the vehicle is our
9   vehicle, and repossess it.
10  BY ATTORNEY TRUEBLOOD:
11      Q    Are you driving a tow truck?
12      A    Yes.
13      Q    And how do you find the vehicles that you're
14  going to repossess?
15      A    We get addresses sent through our recovery
16  database network.
17      Q    Are you talking about license plate hits?
18      A    No, I'm talking about addresses that have
19  information on the vehicle sent through recovery
20  database network.
21      Q    And do you mean that you review repossession
22  orders that are sent through RDN?
23      A    Yes.
24      Q    And the -- do you get information from other
25  employees of LAW Recovery about where vehicles are,
```

```
1   such as spotters?
2       A    I get information from the office.
3       Q    Are there spotter vehicles that LAW Recovery
4   employs to try to get license plate hits on vehicles
5   that are up for repossession?
6            ATTORNEY BERNSTEIN:  Objection.  Vague --
7   sorry.  Objection.  Vague and ambiguous.  Go ahead.
8            THE WITNESS:  Yes.
9   BY ATTORNEY TRUEBLOOD:
10      Q    And how many spotter vehicles that you know
11  of, are -- that LAW Recovery is using to try and find
12  vehicles?
13      A    Two.
14      Q    Two at the present time, right?
15      A    Yes.
16      Q    So what does a spotter vehicle do?
17           ATTORNEY BERNSTEIN:  Objection.  Foundation.
18  Calls for speculation.  You can answer.
19           THE WITNESS:  Drive around, collect data.
20  BY ATTORNEY TRUEBLOOD:
21      Q    And how does it collect data?
22           ATTORNEY BERNSTEIN:  Objection.  Lacks
23  foundation.  Calls for speculation.
24           THE WITNESS:  There's a camera system
25  installed.
```

1  BY ATTORNEY TRUEBLOOD:
2      Q    All right.  So the spotter vehicle has cameras
3  mounted on it, right?
4      A    Yes.
5      Q    And those -- those cameras are basically on as
6  they're driving around and picking up license plate
7  hits, correct?
8          ATTORNEY BERNSTEIN:  Objection.  Lacks
9  foundation.  Calls for speculation.  It's also
10 irrelevant.
11         ATTORNEY TRUEBLOOD:  Let me rephrase that.
12 BY ATTORNEY TRUEBLOOD:
13     Q    They're picking up -- they're scanning license
14 plates is what those cameras do on the spotter cars,
15 right?
16         ATTORNEY BERNSTEIN:  Objection.  Lacks
17 foundation.  Calls for speculation.  And it's not
18 relevant.
19         ATTORNEY TRUEBLOOD:  Go ahead.
20         THE WITNESS:  Yes.
21 BY ATTORNEY TRUEBLOOD:
22     Q    And how many -- of the two -- going back to
23 September of 2023, how many -- your -- I can represent
24 to you that LAW Recovery has stated in discovery in
25 this lawsuit that there were four to five spotter

1  vehicles at that time; does that sound correct?
2          ATTORNEY BERNSTEIN:  Objection.
3  Argumentative.  Lacks foundation.  Calls for
4  speculation.  And irrelevant.
5          THE WITNESS:  I don't recall.
6  BY ATTORNEY TRUEBLOOD:
7      Q    Well, how many spotter vehicles do you recall
8  the company having in September of 2023?
9          ATTORNEY BERNSTEIN:  Same objections.
10         THE WITNESS:  I don't recall.
11 BY ATTORNEY TRUEBLOOD:
12     Q    More than one?
13     A    Possibly.
14     Q    More than two?
15         ATTORNEY BERNSTEIN:  Same objection.  Asked
16 and answered.  And you're arguing with the witness.
17         THE WITNESS:  I don't recall.
18 BY ATTORNEY TRUEBLOOD:
19     Q    So let's -- can you tell me what your
20 education was, Mr. McIntosh?  You get a high school
21 degree?
22     A    GED.
23     Q    When did you get your GED?
24     A    I don't recall.
25     Q    Approximately how many years ago?

1      A    21.
2      Q    And were you working when you got your GED?
3      A    No.
4      Q    So you said that your first job in the
5  repossession industry was many years ago.  Do you
6  recall what that job was?
7          ATTORNEY BERNSTEIN:  Objection.  Vague.
8          THE WITNESS:  Looking for a car.
9  BY ATTORNEY TRUEBLOOD:
10     Q    Were you working for a company?
11     A    I was looking -- I was working for some small
12 car lots.
13     Q    Okay.  So car dealers?
14     A    Yes.
15     Q    All right.  So from -- when did you start
16 working for car dealers as a repossession man?
17     A    I don't recall.
18     Q    20 years ago?
19     A    20-plus.
20     Q    So sometime in '90s?
21     A    Yes.
22     Q    Do you remember the names of the car lots you
23 worked for?
24     A    No, I don't.
25     Q    And how many years did you work for car lots

1  repossessing vehicles?
2      A    I don't recall.
3      Q    When did you -- when did you first start
4  working for a company that was a licensed repossession
5  agency?
6      A    I don't recall.
7      Q    Well, what companies have you worked for that
8  were licensed repossession agencies?
9      A    LAW Recovery, Fumble Recovery, Track Down Auto
10 Adjusters.
11     Q    Any others?
12     A    I don't recall.
13     Q    What was the order that you worked in those
14 going from earliest to latest?
15     A    The latest is LAW Recovery -- sorry?
16     Q    Before LAW, was it Fumble or was it Track
17 Down?
18     A    I want to say it was Fumble.  Track Down is
19 just one of the companies later on in life.
20     Q    So you first would have worked for Track Down,
21 then Fumble, then LAW?
22     A    No.
23         ATTORNEY BERNSTEIN:  Mischaracterizes the
24 testimony, go ahead.
25         THE WITNESS:  No.

1  BY ATTORNEY TRUEBLOOD:
2      Q    Fumble, and then Track Down, and then LAW?
3      A    Fumble, then LAW.
4      Q    So where is Track Down?
5      A    In between.
6      Q    So first you worked for Fumble, then you
7  worked for Track Down, then you worked for LAW?
8      A    I don't recall.
9      Q    Well, when did you work for Fumble?
10     A    I don't recall the year.
11     Q    How long did you work for Fumble?
12     A    Couple of years.
13     Q    Why did you leave Fumble?
14     A    They was a brother -- brother company to LAW
15  Recovery.
16     Q    Okay.  So are you saying that Fumble Recovery
17  became LAW Recovery?
18     A    No.
19     Q    Was it an affiliate of LAW Recovery?
20          ATTORNEY BERNSTEIN:  Objection.  Calls for
21  speculation.  Lacks foundation.
22          THE WITNESS:  I can't answer that, I don't
23  know.
24  BY ATTORNEY TRUEBLOOD:
25     Q    What approximate years did you work for Fumble

1  Recovery?
2      A    I don't recall.
3      Q    Well, was it in the last five years?  Last 10
4  years?
5          ATTORNEY BERNSTEIN:  Irrelevant.  Asked and
6  answered.  You can answer.
7          THE WITNESS:  I think I answered that already.
8  No.
9  BY ATTORNEY TRUEBLOOD:
10     Q    Well, I'm asking you when.
11     A    I don't recall.
12     Q    Okay.  When did you start working for LAW
13  Recovery; what year?
14          ATTORNEY BERNSTEIN:  Asked and answered.
15          THE WITNESS:  I don't recall.
16  BY ATTORNEY TRUEBLOOD:
17     Q    Why did you leave Fumble Recovery and go to
18  LAW Recovery?
19     A    More work.
20     Q    Were you fired at Fumble Recovery?
21     A    No.
22     Q    Were you ever disciplined or reprimanded at
23  Fumble Recovery?
24     A    No.
25     Q    Have you ever been disciplined or reprimanded

1  while working for LAW Recovery?
2      A    No.
3      Q    Have you ever been cited by the Bureau of
4  Security Investigative Services for anything?
5      A    No.
6      Q    Did -- explain to me when you worked for Track
7  Down Auto Adjusters.
8          ATTORNEY BERNSTEIN:  Objection.  Vague.
9          THE WITNESS:  I don't recall.
10  BY ATTORNEY TRUEBLOOD:
11     Q    But it was in between Fumble Recovery and LAW
12  Recovery, wasn't it?
13     A    Somewhere in there.
14     Q    How long did you work for Track Down Auto
15  Adjusters?
16     A    Not long.
17     Q    How long?
18     A    -- years.
19     Q    How many years?
20     A    Maybe two.
21     Q    Why did you leave Track Down Auto Adjusters?
22     A    I have more work at LAW Recovery.
23     Q    Were you a -- were you repossessing vehicles
24  for Fumble Recovery?
25     A    Yes.

1      Q    Were you repossessing vehicles for Track Down
2  Auto Adjusters?
3      A    Yes.
4      Q    Were you -- were you let go from Track Down
5  Auto Adjusters?
6      A    No.
7      Q    Were you ever disciplined or reprimanded at
8  Track Down Auto Adjusters?
9      A    No.
10     Q    Were you ever licensed as a repossession
11  employee of Fumble Recovery?
12     A    Yes.
13     Q    Were you licensed as an employee of Track Down
14  Auto Adjusters?
15     A    Yes.
16     Q    When you're looking for a vehicle, how do the
17  spotters -- what do the spotters do to assist you in
18  that regard?
19          ATTORNEY BERNSTEIN:  Objection.  Lacks
20  foundation.  Vague and ambiguous.  Calls for
21  speculation.
22          THE WITNESS:  They'll spot the car and call
23  the office.  And the office will call me and send me
24  out to where the vehicle has been spotted.
25

Page 22

```
 1   BY ATTORNEY TRUEBLOOD:
 2      Q    All right.  Do the spotters visually spot cars
 3   as well as get license plate hits?
 4           ATTORNEY BERNSTEIN:  Objection.  Lacks
 5   foundation.  Calls for speculation.  You can answer.
 6           THE WITNESS:  Yes.
 7   BY ATTORNEY TRUEBLOOD:
 8      Q    Who are the -- you said there were two spotter
 9   vehicles now.  Who operates those vehicles?
10      A    I don't recall.
11      Q    You don't know the names?
12           ATTORNEY BERNSTEIN:  Let me just get the
13   objection in, that it's -- it's irrelevant.  There's
14   privacy issues.  It's not reasonably calculated to lead
15   to anything discoverable and admissible.  But you can
16   answer.
17           THE WITNESS:  I'm not sure of their names.
18   BY ATTORNEY TRUEBLOOD:
19      Q    You don't even know their first names?
20      A    Of the guys now?
21      Q    Yes.
22           ATTORNEY BERNSTEIN:  Same objections.
23           THE WITNESS:  Of the guys now?  One guy's name
24   is Cameron.
25
```

Page 23

```
 1   BY ATTORNEY TRUEBLOOD:
 2      Q    Yes?
 3      A    And the other guy's name is Pierre.  I don't
 4   know either last name.
 5      Q    So let's go back to September 2023.  Do you
 6   know somebody named Thomas Hillman?
 7      A    Yes.
 8      Q    And who is Mr. Hillman?
 9      A    He was a spotter.
10      Q    For LAW Recovery at that time?
11      A    Yes.
12      Q    So what did Mr. Hillman do for his work, as
13   far as you know?
14           ATTORNEY BERNSTEIN:  Objection.  Vague and
15   ambiguous.  Lacks foundation.  Calls for speculation.
16   You can answer.
17           THE WITNESS:  Drove a spotter car.
18   BY ATTORNEY TRUEBLOOD:
19      Q    So he was spotting vehicles, either visually
20   or using the camera system?
21           ATTORNEY BERNSTEIN:  Same objections.
22           THE WITNESS:  Yes.
23   BY ATTORNEY TRUEBLOOD:
24      Q    Was Mr. Hillman involved in your repossession
25   of Douglas Galanter's vehicle?
```

Page 24

```
 1      A    No.
 2      Q    Was he a spotter that somehow assisted in
 3   finding that vehicle?
 4           ATTORNEY BERNSTEIN:  Objection.  Same
 5   objections.
 6           THE WITNESS:  No.
 7   BY ATTORNEY TRUEBLOOD:
 8      Q    Was he present when you entered the garage and
 9   repossessed Mr. Galanter's vehicle?
10      A    No.
11      Q    Who was present, other than you?
12      A    Me.
13      Q    At the time that you repossessed
14   Mr. Galanter's vehicle?
15      A    Me.
16      Q    Was there anyone else present?
17      A    No.
18      Q    Was Anthony Villarreal a spotter for LAW
19   Recovery in September of 2023?
20      A    I don't recall a Anthony.  I can't even
21   pronounce the name.
22      Q    You've never met an Anthony Villarreal, or
23   Tony?  Can I get an answer?
24      A    I said no.
25      Q    Have you ever talked to John Serafin about
```

Page 25

```
 1   this lawsuit or the allegations in it?
 2      A    Yes.
 3      Q    How many times?
 4      A    Possibly twice.
 5      Q    Okay.  So when were those times?
 6      A    I don't recall the date.
 7      Q    Approximately.
 8      A    I approximately don't recall the date.
 9      Q    Was it this year?
10      A    Yes.
11      Q    All right.  So were these phone calls or
12   in-person meetings?
13      A    Phone calls.
14      Q    Did he call you on the first one or did you
15   call him?
16      A    He called me.
17      Q    And tell me about the discussion.  What was
18   said?
19      A    David's going to be giving me a call about a
20   case.
21      Q    Did you know David beforehand?
22      A    I know of David.
23      Q    Had you met him before?
24      A    No, I haven't.
25      Q    Did you discuss the case with Mr. Serafin?
```

1      ATTORNEY BERNSTEIN:  Objection to the extent
2  that the question asks you to testify about
3  communications that involve counsel, me.  Don't answer
4  anything that might involve communications between me
5  and you.  Other than that, you may answer.
6      THE WITNESS:  I don't recall.
7  BY ATTORNEY TRUEBLOOD:
8      Q   So Mr. Bernstein was not on the phone call
9  between you and Mr. Serafin, the first phone call, was
10  he?
11      A   I don't recall.
12      Q   You don't recall?
13      A   I don't recall.
14      Q   You don't recall who was on the line?
15      ATTORNEY BERNSTEIN:  Asked and answered,
16  twice.
17      THE WITNESS:  I don't recall.
18  BY ATTORNEY TRUEBLOOD:
19      Q   What did Mr. Serafin say to you in that first
20  conversation?
21      A   That I would be getting a phone call from
22  David, our attorney.
23      Q   Did you two discuss the allegations of this
24  lawsuit that there -- that you had allegedly entered a
25  secured area to repossess Mr. Galanter's vehicle?

1      A   Yes.
2      Q   Tell me everything you discussed about that.
3      A   You have a repossession that I picked up on
4  September 5.  I asked him for the last six of the VIN
5  number.  I looked it up, I didn't recall the
6  repossession at the time.  I told him I didn't recall
7  the repossession at the time.  I looked into the -- at
8  the pictures, I looked into the repossession notes, and
9  I remembered the vehicle.  I told him, yeah, I picked
10  it up, what's wrong.
11      ATTORNEY BERNSTEIN:  That's it.  You've
12  answered.
13      ATTORNEY TRUEBLOOD:  No, you're cutting him
14  off.  Please finish.
15      ATTORNEY BERNSTEIN:  Well, he's finished his
16  answer.
17      ATTORNEY TRUEBLOOD:  Don't interrupt the
18  witness.  He was in the middle of an answer, and you
19  interrupted him and told him he was finished.
20      ATTORNEY BERNSTEIN:  He answered the question.
21  Go ahead.
22      THE WITNESS:  He -- I told him I repossessed
23  the vehicle, and I picked it up.  He said, was there
24  any incidents?  I said, nope.  He said, okay, David
25  will be giving you a call.

1  BY ATTORNEY TRUEBLOOD:
2      Q   Did he ask you how you got into the garage?
3      A   No, he didn't.
4      Q   Did you tell him?
5      A   I don't recall.
6      Q   Did Mr. Serafin tell you there was a lawsuit
7  pending?
8      A   No.  Mr. Serafin told me that David would be
9  giving me a call, and I would be told more.
10      Q   All right.  Since then -- I don't want you to
11  say anything about what you said, but since then, how
12  many times have you talked with Mr. Bernstein?
13      ATTORNEY BERNSTEIN:  So I'm going to instruct
14  him not to answer on attorney-client privilege.  It's
15  also --
16      ATTORNEY TRUEBLOOD:  I'm not ask -- I'm not
17  asking --
18      ATTORNEY BERNSTEIN:  Sorry -- sorry, Counselor
19  -- pardon me.  It's -- sorry.  Pardon me.  It's not
20  reasonably calculated.  And it's irrelevant.  I'm
21  instructing him.
22      ATTORNEY TRUEBLOOD:  Okay.  To be clear, I'm
23  asking him about the number of times, not the substance
24  of the communication.  So there's no privileged
25  information being requested here.

1      ATTORNEY BERNSTEIN:  Same objection.  Same
2  instruction.
3  BY ATTORNEY TRUEBLOOD:
4      Q   Your second conversation with Mr. Serafin,
5  Mr. McIntosh; when was that?
6      A   I don't recall.
7      Q   Was it this year?
8      A   It was this year.
9      Q   Was it in the last few weeks?
10      A   No.
11      Q   Last few months?
12      A   Yes.
13      Q   Tell me everything you recall about that
14  conversation.
15      A   He asked me, did I talk to David.  I said,
16  David gave me a phone call --
17      ATTORNEY BERNSTEIN:  Wait, stop.  Don't say
18  anything about what you and I talked about.  You can
19  answer other than that.
20      THE WITNESS:  Yes.  I told him David gave me a
21  call.
22  BY ATTORNEY TRUEBLOOD:
23      Q   Did you discuss the facts of this case?
24      A   Yes.
25      Q   What did you say in that regard?

1    A    I said that I came -- I pulled up to the
2   address, I found the car.  The gate was closed, I took
3   pictures of the vehicle.  I waited down the alley,
4   someone came outside, drove outside of the gate, I
5   drove in, and I repossessed the vehicle.
6       Q    So you told him that you arrived, the gate was
7   closed, right?
8       A    Yes.
9       Q    And then you told him you waited in the alley?
10      A    Yes.
11      Q    And then you told him that someone -- someone
12  else arrived?
13      A    Someone drove out.
14      Q    Someone drove out.  And you drove in?
15      A    Yes.
16      Q    So someone drove out, and you drove in before
17  the gate closed?
18      A    Yes.
19      Q    Did you talk to anybody who let you into the
20  garage?
21      A    No.
22      Q    Did anybody give you permission to enter the
23  garage verbally?
24      A    No.
25      Q    How did you get out of the garage?

1    A    I opened up the vehicle, used the gate opener,
2   drove out.
3       Q    Which gate opener?
4       A    The gate opener that was in the vehicle.
5       Q    And you were alone?
6       A    Yes.
7       Q    There was nobody assisting you with this
8   repossession?
9       A    No.
10      Q    So there was no resident of the building that
11  ever gave you permission to enter, was there?
12      A    No.
13      Q    And you said in your first conversation with
14  Mr. Serafin that you didn't recall the repossession,
15  right?
16      A    No.
17      Q    You just told me that you didn't recall the
18  repossession when Mr. Serafin first called you, right?
19          ATTORNEY BERNSTEIN:  Objection.
20  Mischaracterizes prior testimony.  And argumentative.
21  You can answer.
22          THE WITNESS:  When he called me and asked me
23  about it, you right, I didn't remember which vehicle he
24  was talking about.
25

1   BY ATTORNEY TRUEBLOOD:
2       Q    Okay.  Then you -- you did something to
3   locate -- to identify the vehicle, right?
4       A    Yes.
5       Q    And you read the repossession report or log?
6       A    Yes.
7       Q    And that refreshed your recollection?
8       A    Yes.
9       Q    So in that first conversation with
10  Mr. Serafin, did you tell him how you got into the
11  garage?
12      A    No.
13      Q    Why didn't you tell him that in the first
14  conversation?
15      A    He didn't ask me.
16      Q    Have you had any conversations with Juan
17  Martinez about this case?
18      A    Yes.
19      Q    How many?
20      A    I don't recall.
21      Q    Did Mr. Martinez ever ask you how you got into
22  the garage of -- to repossess Mr. Galanter's vehicle?
23      A    No.
24      Q    Did you ever tell anyone -- did you ever tell
25  Mr. Martinez that you had obtained permission from a

1   resident at the building to enter the garage?
2       A    No.
3       Q    Did you ever tell anyone at LAW Recovery that
4   you had obtained permission from a resident of the
5   building to enter the garage?
6       A    No.
7       Q    Was the person who drove the vehicle into the
8   garage where Mr. Galanter's vehicle was located a
9   female or a male?
10      A    I don't know.  When I pulled in, they were
11  pulling out.  I didn't -- we didn't pass one another.
12  They were pulling out to a different angle, and I
13  pulled in.
14      Q    Okay.  So did you sit in the alley with
15  your -- with your vehicle running?
16      A    Yes.
17      Q    And you were waiting for someone to leave the
18  garage?
19      A    No, I was waiting -- looking for another car
20  on my RDN and the garage opened up.
21      Q    Yeah.  But you were parked in this alley
22  because you wanted to repossess Mr. Galanter's vehicle,
23  weren't you?
24      A    Well, yes, that too.
25      Q    So you were waiting with your engine running,

Page 34

1  and then was it your intention to enter the garage when
2  someone left?
3       A    If the -- if it "arised", yes.
4       Q    All right.  So you saw your opportunity,
5  someone left, and you drove into the garage before the
6  gate closed?
7            ATTORNEY BERNSTEIN:  Asked and answered.  Go
8  ahead.
9            THE WITNESS:  Yes.
10 BY ATTORNEY TRUEBLOOD:
11      Q    How many times did you talk to Mr. Martinez
12 about the Galanter repossession?
13           ATTORNEY BERNSTEIN:  Asked and answered.
14           THE WITNESS:  I don't recall.
15 BY ATTORNEY TRUEBLOOD:
16      Q    More than twice?
17      A    Yes.
18      Q    Okay.  So tell me everything you recall about
19 those conversations?
20      A    He called me and told me, have I spoken with
21 David.
22           ATTORNEY BERNSTEIN:  Don't say anything about
23 what I may have said to Mr. Martinez or you.  But go
24 ahead.
25           THE WITNESS:  I told him, yes.  He said, do I

Page 35

1  remember what happened at the repossession.  I said,
2  there's nothing that happened at the repossession.
3  BY ATTORNEY TRUEBLOOD:
4       Q    Did you tell Mr. Martinez that -- what you
5  just told me, that you had waited at the alley, and
6  then entered the garage after someone drove out?
7       A    I may have.  I don't recall.
8       Q    Well, didn't he ask you that?
9       A    I may have.  I don't recall.
10      Q    And what was Mr. Martinez's commentary or
11 response when you told him?
12      A    Was there any incident?  No incident, was my
13 response.  I repossessed the vehicle and left.
14      Q    So that was one conversation with
15 Mr. Martinez.  Were there other -- you said there were
16 others.  So tell me about the other conversation -- or
17 conversations.
18           ATTORNEY BERNSTEIN:  Objection.  Vague.
19           THE WITNESS:  Just -- we're having a -- he let
20 me know that we were having a -- we were being brought
21 up in a lawsuit, and that I will be more than likely
22 being subpoenaed in.
23 BY ATTORNEY TRUEBLOOD:
24      Q    Did Mr. Martinez tell you that one allegation
25 in the lawsuit is that you entered a secured area to

Page 36

1  repossess the vehicle?
2       A    I don't recall.
3       Q    Were you ever trained at any of your
4  repossession-related jobs that entering a secured area
5  to repossess a vehicle is illegal?
6       A    That's not illegal.
7       Q    Okay.  So you were never trained that, right?
8            ATTORNEY BERNSTEIN:  Let me object.
9  Mischaracterizes the testimony.  Vague and ambiguous.
10 BY ATTORNEY TRUEBLOOD:
11      Q    Why do you say it's not illegal?
12      A    It's not illegal to enter a property if you
13 don't -- do not touch a gate or damage anything.
14      Q    And why do you believe that?
15      A    It's the law.
16      Q    Well, who told you it was the law?
17      A    Years of training.
18      Q    And -- training at LAW, or training at other
19 companies?
20      A    Training at LAW.
21      Q    Okay.  So what training do you specifically
22 recall from LAW that entering a secured area without
23 touching anything is legal?
24           ATTORNEY BERNSTEIN:  Objection.  Incomplete
25 hypothetical.

Page 37

1            ATTORNEY TRUEBLOOD:  Go ahead.
2            THE WITNESS:  If the gate is locked, do not
3  touch it.  We cannot tamper to to un -- unloosen or
4  damage a locked gate.  If the gate is opened, you
5  have -- if the pizza man can gain entry, you can gain
6  entry.
7  BY ATTORNEY TRUEBLOOD:
8       Q    Were you trained at LAW that it is legal and
9  permissible for you to wait for someone to leave a
10 garage in a vehicle and then drive in while the gate's
11 still open?
12      A    Yes.
13      Q    And who trained you on that particular point?
14      A    Different recovery agents.
15      Q    Who would that be?
16      A    I don't recall.  We've had a lot.
17      Q    Did Ms. Benarbachian ever train you on that
18 point?
19      A    No.
20      Q    Did Mr. Serafin ever train you on that point?
21      A    No.
22      Q    Did Mr. Martinez ever train you on that point?
23      A    No.
24      Q    Then how did you find that out?
25      A    Older repossession agents.

1    Q    You don't recall the names?
2    A    I don't.
3    Q    Have you ever -- well, tell me about your
4  training at LAW.  What training did you receive?
5    A    What type of training to be a repossessor?
6    A    Yeah.
7    A    I was trained to be a repossessor.
8    Q    What kind of training?
9    A    Repossess vehicles.
10   Q    All right.  So you're talking about in the
11 field training?
12   A    Yes.  Towing, recovery.
13   Q    All right.
14   A    Repossessing.
15   Q    Was there a period of time where you were
16 working with somebody in a training period?
17   A    Years ago.
18   Q    Okay.  But there was a period of time where
19 somebody was training you on how to be a LAW Recovery
20 repossession man, right?
21   A    There was a period of time when I was being
22 trained how to be a repossessor.
23   Q    Okay.  And who was training you?
24   A    I don't recall.
25   Q    How long did your training last?

1    A    I'm still training to this day.
2    Q    Okay.  Who do you train with today?
3    A    Anyone who can give me positive knowledge on
4  repossessions.
5    Q    Do you recall the name of anybody who's
6  training you today?
7    A    Is that a question of -- am I still learning?
8    Q    Yeah.  Let me put it this way, Mr. McIntosh:
9  When you first joined the company, how long a period
10 did you train with somebody before you were essentially
11 allowed to do repossessions on your own?
12   A    Maybe two and a half months.
13   Q    Have you ever received any kind of handbook or
14 manual from anyone at LAW Recovery, explaining to you
15 how to be a repossessor?
16   A    Yes.
17   Q    All right.  And what was the -- when did you
18 receive that?
19   A    I just had a, 2024, handbook --
20   Q    Okay.
21   A    -- the last couple of weeks.
22   Q    All right.  And before that 2024 handbook, had
23 you ever received a manual or handbook from anyone at
24 LAW Recovery about how to be a repossessor?
25   A    Not how to be a repossessor, but, yes.  Every

1  year.
2    Q    You're saying that every year, you get handed
3  a handbook?
4    A    If not every year, every other year.  But for
5  the most part, every year we get a handbook.
6    Q    Did you get a handbook in 2023?
7    A    Yes.
8    Q    What was it called?
9    A    I don't recall.
10   Q    Who issued the handbook?
11   A    CAL-R.
12   Q    What is that?
13   A    California Associated License Recovery.
14   Q    And who handed you the book in 2023?
15   A    It was at the desk at the office; no one
16 handed it to me.
17   Q    Did you go read it of your own volition?
18   A    Yes.
19   Q    You read the whole thing?
20   A    Yes.
21   Q    Did you read it carefully?
22   A    Repeatedly.
23   Q    Did you have any questions?
24   A    I still have questions.
25   Q    What questions do you have?

1    A    Different things on different laws that have
2  changed.
3    Q    When you read the -- approximately when did
4  you read the 2023 handbook?
5    A    I don't recall.
6    Q    Was it before or after Mr. Galanter's
7  repossession?
8    A    Before.
9    Q    Did you read the portion of the handbook that
10 governs the rules for entering secured areas?
11   A    I'm sure I did, yes.
12   Q    Did you have any questions about that portion
13 of the handbook for anyone?
14   A    No.
15   Q    So you didn't ask any questions?
16   A    No.
17        ATTORNEY BERNSTEIN:  Asked and answered.
18 BY ATTORNEY TRUEBLOOD:
19   Q    So what I hear you saying, Mr. McIntosh, is
20 that somebody trained you that it is permissible to
21 enter a secured area if the gate opens and another
22 driver goes out before the gate closes, but you don't
23 recall who that was; is that fair?
24        ATTORNEY BERNSTEIN:  Objection.  It's an
25 incomplete hypothetical.  Assumes facts not in

1   evidence.  And it's argumentative.  As well as asked
2   and answered.
3            ATTORNEY TRUEBLOOD:  You can answer.
4            THE WITNESS:  Yes.
5   BY ATTORNEY TRUEBLOOD:
6       Q    Did Juan Martinez ever ask you how you gained
7   entry into the garage to repossess Mr. Galanter's
8   vehicle?
9       A    Yes.
10      Q    When was that?
11      A    I don't recall.
12      Q    How did you respond?
13      A    I told him how I got inside the vehicle, and
14  what I did after I picked up the vehicle.
15      Q    Can you relate to me what you told
16  Mr. Martinez?
17      A    Someone came outside of the -- pulled out of
18  the garage, I pulled in.  I then got inside -- into the
19  vehicle, grabbed the gate remote, hooked up to my
20  vehicle, took my pictures, used the gate clicker to
21  pull out of the garage.
22      Q    Can you give me an estimate of when you told
23  Mr. Martinez this?
24      A    I don't recall.
25      Q    Was it this year?

1       A    Yes.
2       Q    Were you in person or on the phone with
3   Mr. Martinez?
4       A    On the phone.
5       Q    On the day of the repossession of
6   Mr. Galanter's vehicle, how long did you wait in the
7   alley before the car came of the garage, giving you the
8   opportunity to go in?
9       A    Maybe 10 minutes, possibly 15.  I'm not a
10  hundred percent sure.
11      Q    But when you first arrived, you took some
12  pictures of the outside of the building, and the
13  vehicle inside the garage, from the outside, right?
14      A    Yes.
15      Q    Okay.  And then you uploaded those to the RDN
16  system, right?
17      A    I uploaded the pictures once I was gone with
18  the vehicle.
19      Q    All right.  We'll get to that later.
20           When the vehicle that was inside the garage
21  went out, did you try to drive into the garage as
22  quickly as you could before the gate closed?
23      A    Yes.
24      Q    And you've probably seen a number of gates in
25  your -- in your -- well, strike that.

1       Q    Did you speak to anybody in the vicinity of
2   the building where you repossessed Mr. Galanter's
3   vehicle on the day of the repossession?
4       A    I want to say, yes.
5       Q    Who did you speak to?
6       A    I don't know who he was.
7       Q    Who -- what did he say?
8       A    What are you doing?
9       Q    Was this before or after you repossessed the
10  vehicle?
11      A    It was after the vehicle was on top of my --
12  on my truck.
13      Q    So he said what are you doing, and how did you
14  respond?
15      A    Picking up a vehicle.
16      Q    Was this a male?
17      A    Yes.
18      Q    Was it somebody who just walked up to the side
19  of your vehicle?
20      A    I'm sorry?  I didn't hear you.
21      Q    Was it somebody who just walked up to your --
22  to the side of your tow truck?
23      A    Yes.
24      Q    And you were in -- you were in the driver's
25  seat?

1       A    I was getting back into my truck.
2       Q    What did this man look like?
3       A    Brown skin, male, Black.
4       Q    About how old?
5            ATTORNEY BERNSTEIN:  I didn't hear that
6   question.
7   BY ATTORNEY TRUEBLOOD:
8       Q    About how old was this person?
9       A    Maybe mid-30s.
10      Q    How tall was he?
11      A    I don't know.
12      Q    Well, approximately how tall?
13      A    Maybe five, seven, eight.
14      Q    About five, seven, or eight.  About
15  approximately what weight?
16      A    220 pounds, 200 pounds.  Somewhere in there.
17      Q    Did he have any facial hair?
18      A    Yes.
19      Q    What did he have?
20      A    Facial hair.
21      Q    Mustache, beard?
22      A    Goatee, like.
23      Q    Did he give you a name?
24      A    No.
25      Q    And he said, what are you doing here?

1    A    He's like -- yes.
2    Q    Like, he was suspicious?
3    A    Yes.
4    Q    And you said I'm -- what did you say?
5    A    Towing this vehicle.
6    Q    And then what did he say?
7    A    Oh.
8    Q    Did he say, you can't do that here?
9    A    No.
10   Q    About how long was your conversation?
11   A    Five seconds.
12   Q    And then did he walk away or what happened?
13   A    Yes.
14   Q    And other than this male person you just
15   described, did you speak with anybody in the vicinity
16   of the building where you repossessed Mr. Galanter's
17   vehicle?
18   A    No.
19   Q    And I'm talking that whole time -- the whole
20   time you were there, you didn't talk to anybody else,
21   right?
22   A    Right.
23   Q    Has anyone ever accused you of unlawfully
24   entering a secured area to repossess a vehicle other
25   than this case?

1    A    No.
2    Q    What about on the Better Business Bureau
3    website or everyone informally?
4    A    No.
5    Q    Have you ever been convicted of a crime?
6    A    No.
7    Q    Have you ever been arrested?
8         ATTORNEY BERNSTEIN:  Objection.  Privacy.  Not
9    reasonably calculated.  Instruct not to answer.
10   BY ATTORNEY TRUEBLOOD:
11   Q    Have you ever been sued?
12   A    No.
13   Q    Have you ever sued anyone?
14   A    No.
15   Q    So have you told me everything you recall
16   about your conversations with Juan Martinez about the
17   Galanter repossession?
18   A    All I can remember, yes.
19   Q    Have you told me everything you can recall
20   about your conversations with John Serafin about the
21   Galanter repossession?
22   A    All that I remember.
23   Q    Have you spoken with anyone else besides
24   Mr. Martinez or Mr. Serafin about the Galanter
25   repossession, other than Mr. Bernstein?

1    A    Yes.
2    Q    Who have you spoken to?
3    A    Misti.
4    Q    All right.  And how many times have you spoken
5    with Misti about the repossession?
6    A    Not so much about the repossession.
7    Q    About the lawsuit?
8    A    About having talked with the lawyer.
9    Q    Okay.  So how many conversations have you had
10   with Misti?
11   A    Maybe two.
12   Q    Can you tell me what occurred in those
13   conversations?
14   A    Can I say David's name?
15        ATTORNEY BERNSTEIN:  Sorry.  May I have that
16   question, again, please?
17   BY ATTORNEY TRUEBLOOD:
18   Q    Excluding anything you said that Mr. Bernstein
19   may have told you, or that you told Mr. Bernstein, can
20   you tell me what you discussed with Misti?
21   A    Have I spoken with David?
22   Q    Mm-hmm.  So you told her you had spoken with
23   David, right?
24   A    Yes.
25   Q    And did you say anything else?

1    A    He will call me.
2    Q    So was that it?  Was it a very short
3    conversation?
4    A    Yes.
5    Q    Was it only one conversation with Misti?
6    A    A couple.
7    Q    Okay.  Tell me about the other conversation?
8    A    They went along the same lines.
9    Q    Her just asking you if you had spoken with
10   David?
11   A    Yes.
12   Q    And you saying, yes?
13   A    Yes.
14   Q    And that was it?
15   A    Yes.
16   Q    Have you now told me everything that you
17   recall about your conversations with Misti Benarbachian
18   about the Galanter repossession?
19   A    As I can recall.
20   Q    Is there anyone else you spoke to about this
21   repossession other than Mr. Bernstein?
22   A    No recollections.
23   Q    Did you ever take the certified collateral
24   recovery specialist certification course?
25   A    Yes.

1    Q    When did you first take that?

2    A    A couple years back.  I don't recall which

3    year.

4    Q    Were you certified?

5    A    Yes.

6    Q    Who were you certified by?

7    A    The name of the company that you just said.

8    Q    The CAL-R company?

9    A    No.  The -- you just asked me have I taken the

10   certification through -- you said their name.  I don't

11   recall their name.

12   Q    Okay.  What did you have to do to get that

13   certificate?

14   A    Just a lot of questions and answers.  What to

15   do and how to do.

16   Q    So you took some tests?

17   A    Yes.

18   Q    Did you watch some videos or did you attend a

19   course?

20   A    Watched videos, answered questions.  Never had

21   to take a course.

22   Q    Okay.  So you watched videos at home or at the

23   office?

24   A    Yes, at home.

25   Q    And then you took an online test?

1    A    Yes.

2    Q    Was any part of the course concerning entry

3    into secured areas or garages?

4    A    Yes.

5    Q    Tell me about what you learned from the course

6    in that regard.

7    A    We would not enter a locked gate.  If it's

8    located -- inside of a gate that's open.

9    Q    So the residence of the building, I'm going to

10   represent to you, are going to testify that they --

11   that after you did your repossession, that they found

12   the gate at the building broken and off the tracks.

13   If that wasn't you, how -- do you have any

14   idea how that happened?

15       ATTORNEY BERNSTEIN:  Objection.  Foundation.

16   Calls for speculation.

17       THE WITNESS:  No idea.

18   BY ATTORNEY TRUEBLOOD:

19   Q    So that's just a coincidence as far as you're

20   concerned?

21       ATTORNEY BERNSTEIN:  Objection.

22   Argumentative.  You don't have to answer that.

23       ATTORNEY TRUEBLOOD:  He has to answer that.

24       THE WITNESS:  No idea.

25

1    BY ATTORNEY TRUEBLOOD:

2    Q    But if that happened that would just be a

3    coincidence, wouldn't it?

4        ATTORNEY BERNSTEIN:  Objection.  Asked and

5    answered.  Instruct not to answer.

6        ATTORNEY TRUEBLOOD:  You can't instruct not to

7    answer on those grounds.

8        ATTORNEY BERNSTEIN:  I just did, Counsel.  He

9    answered the question.  The question was argumentative.

10       ATTORNEY TRUEBLOOD:  That's not a grounds to

11   instruct, as you know.

12   BY ATTORNEY TRUEBLOOD:

13   Q    All right.  So you took this course to get the

14   certification.  Was there any coverage in the course

15   about whether you could enter a -- a parking garage by

16   doing what you did, which was enter after another car

17   left and the gate was still open?

18       ATTORNEY BERNSTEIN:  Objection.  Vague and

19   ambiguous.  Go ahead.

20       THE WITNESS:  No.

21   BY ATTORNEY TRUEBLOOD:

22   Q    So where did you get this notion that you

23   could enter a garage as another car was passing out and

24   the gate was still open?

25   A    The gate was open.

1    Q    But where did you get this notion that this

2    was proper?

3    A    The gate was open.  The rules state if the

4    gate is open, you can enter.

5    Q    What rules?

6    A    The -- entering the property.

7    Q    Okay.  So -- actually -- I'm not asking you

8    what the rule is.  You've told me what you believe the

9    rule to be.

10       But what I'm asking you is:  Where did you get

11   that idea of what the rule was?

12   A    I don't recall.

13   Q    Did any of the people who trained you at LAW

14   Recovery tell you that?

15   A    I don't recall.

16   Q    Have you received any training on what a

17   breach of the peace is?

18   A    Yes.

19   Q    What's your understanding of what a breach of

20   the peace is?

21   A    If someone says, stop, no, you leave the

22   vehicle.

23   Q    Anything else?

24   A    -- peaceful repossession.

25   Q    Anything else that would be considered a

1    breach of the peace?
2       A    Breaking and entering.
3       Q    So were you trained that breaking a gate, or
4    disturbing a gate to get entry into a secured area
5    would be a breach of the peace?
6       A    Yes.
7       Q    And who trained you on that?
8       A    Someone over my years of repossession.
9       Q    Do you remember who?
10      A    I don't.
11      Q    Did you ever see any written materials on
12   that?
13      A    Yes.
14      Q    What have you seen?
15      A    I believe I just answered that.  But I think
16   that I said, that if you break -- if you tamper with a
17   gate -- go through a locked gate, you're breaking and
18   entering.
19      Q    So if you took -- were you trained that if you
20   took a gate off its tracks, that would be breaking and
21   entering?
22      A    Yes.
23      Q    Were you trained that disturbing the motor
24   housing on a gate in order to gain entry would be
25   breaking and entering?

1       A    Yes.
2       Q    Have you been trained on the requirements of
3    the Fair Debt Collection Practices Act?
4       A    I want to say yes.  I'm not familiar with
5    the -- if you can explain exactly what it is, I can
6    answer that correct.
7       Q    Well, do you have any knowledge of what it is
8    today?
9            ATTORNEY BERNSTEIN:  Objection.  Incomplete
10   hypothetical.  Vague and ambiguous.
11           ATTORNEY TRUEBLOOD:  Did we get an answer
12   there?
13           THE WITNESS:  I'm not a hundred percent sure.
14   BY ATTORNEY TRUEBLOOD:
15      Q    Okay.  So currently, you're licensed as a
16   repossession employee under -- attached to LAW
17   Recovery's license, RA-1413; is that correct?
18      A    Yes.
19      Q    And your repossession employee license number
20   is 513360, right?
21      A    Yes.
22      Q    According to the BSAS website, that was issued
23   March 6, 2023.  Did you have previous licenses that
24   were issued before March 6, 2023?
25      A    Yes.

1       Q    So you've had them over the years since you
2    began work at LAW Recovery?
3       A    Yes.
4       Q    Did you have that --
5            ATTORNEY BERNSTEIN:  We've been going over an
6    hour -- go ahead with your question, and then I'm going
7    to propose a break.
8            ATTORNEY TRUEBLOOD:  Yeah, let's take a break
9    here.  Five minutes.
10           ATTORNEY BERNSTEIN:  All right.
11           ATTORNEY TRUEBLOOD:  Okay.
12           ATTORNEY BERNSTEIN:  Off the record.
13      (Off the record from 11:05AM to 11:10AM.)
14   BY ATTORNEY TRUEBLOOD:
15      Q    Mr. McIntosh, on the day of the repossession
16   of Mr. Galanter's vehicle -- when the vehicle -- when
17   the other vehicle drove out of the garage, you saw that
18   vehicle, right?
19      A    Yes.
20      Q    What color was it?
21      A    I want to say gray.
22      Q    Was it -- what kind of vehicle was it?
23      A    I don't recall.
24      Q    Was it a sedan?
25      A    Yes.

1       Q    Was it a late model or older model?
2       A    Late.
3       Q    Do you remember the make?
4       A    I don't.
5       Q    Do you remember the color of the interior?
6       A    No.
7       Q    Was there anything distinctive about it?
8       A    No.
9       Q    Was it a Japanese make, or German make, or
10   some other make?
11           ATTORNEY BERNSTEIN:  Objection.  Foundation.
12   Go ahead.
13           THE WITNESS:  It was a foreign vehicle.
14   BY ATTORNEY TRUEBLOOD:
15      Q    Was it a larger vehicle or a smaller sedan?
16      A    Regular-sized sedan.
17      Q    So not the largest size, not the smallest
18   size, but somewhere in between?
19      A    Yes.
20      Q    What kind of gray was it?  Was it dark gray or
21   light gray?
22      A    Gray -- it was gray.
23      Q    Was it light gray or dark gray?
24      A    I don't recall.
25      Q    In other words, was the color closer to black

1  or closer to, like, a -- closer to white?
2     A   Closer to the color of the vehicle that was
3  picked up.
4     Q   Okay.  Similar to the one that you
5  repossessed?
6     A   Yes.
7     Q   And you don't recall whether the driver was
8  female or male?
9     A   I don't.
10    Q   Was there anyone else in the vehicle besides
11 the driver?
12    A   I can't -- I couldn't tell you that.
13    Q   So once the -- once this gray vehicle left the
14 building, you drove in with your tow truck, inside the
15 garage, to the space where Mr. Galanter's vehicle was
16 parked?
17    A   No, I pulled inside the gate.
18    Q   Pulled inside the gate.  Did you pull inside
19 the gate or did you go to where the vehicle was parked?
20    A   I stopped at -- right inside of the gate.
21    Q   Why did you do that?
22    A   So if for whatever reason I needed to pull
23 out, I could just pull out.
24    Q   In other words, your tow truck was blocking --
25 was triggering the sensors for the gate, thus keeping

1  the gate open, right?
2     A   Yes.
3     Q   So did you leave your tow truck on --
4     A   Yes.
5     Q   -- while parked underneath the sensors?
6     A   Yes.
7     Q   And then what did you do?
8     A   I walked to the vehicle.  VINed the vehicle --
9  when I say VIN, I mean checked the VIN number of the
10 vehicle.  And I proceeded to gain entry into the
11 vehicle.  I put the vehicle in neutral, backed it out,
12 pushed it back, grabbed the gate opener.  Backed my
13 vehicle -- my tow truck up to it, hooked it up, took
14 pictures, and left.  And pulled out.
15    Q   Okay.  So were you kind of halfway in the
16 garage when you were parked underneath the gate
17 sensors?
18    A   No.
19    Q   You were all the way in the garage?
20    A   Inside, yes.
21    Q   But it was still sufficient that the gate
22 sensors would be triggered?
23    ATTORNEY BERNSTEIN:  Objection.  It calls for
24 speculation.  Lacks foundation.  It's incomplete
25 hypothetical.

1  BY ATTORNEY TRUEBLOOD:
2     Q   Well I want to -- I'll try to rephrase it.
3        So when you drove into the garage, you were --
4  were you completely on the property of the -- of that
5  building, or was part of your tow truck also in the
6  alleyway?
7     A   No, it was completely inside of the gate.
8     Q   Okay.  But nevertheless, being completely
9  inside the gate, it was -- your tow truck was blocking
10 the sensor so the gate would remain open?
11    ATTORNEY BERNSTEIN:  Objection.  Lacks
12 foundation.  Calls for speculation.  Mischaracterizes
13 prior testimony.  And asked and answered.
14    ATTORNEY TRUEBLOOD:  Go ahead.
15    THE WITNESS:  Possibly.
16 BY ATTORNEY TRUEBLOOD:
17    Q   Well, what's your best recollection of
18 where -- you know, how far your tow truck was in the
19 building -- was on the property at the time that you
20 were, you know, parked underneath the gate?
21    A   I was in --
22    ATTORNEY BERNSTEIN:  -- sorry.  Wait.  Same
23 objections.  Mischaracterizes prior testimony.  Go
24 ahead.
25    THE WITNESS:  I was inside the property.

1  BY ATTORNEY TRUEBLOOD:
2     Q   Okay.  So I want to be clear, so that we're on
3  the same page here:  My understanding is you drove in,
4  and you stopped your tow truck at a place that would
5  keep the gate open, correct?
6     ATTORNEY BERNSTEIN:  Objection.
7  Mischaracterizes --
8     ATTORNEY TRUEBLOOD:  I'm asking.  I'm asking.
9     ATTORNEY BERNSTEIN:  Let me get my objection
10 on the record, Counsel.  The objection is it
11 mischaracterizes prior testimony.  It's asked and
12 answered.  It lacks foundation.  And calls for
13 speculation.
14    ATTORNEY TRUEBLOOD:  Go ahead.
15    THE WITNESS:  Yes.
16 BY ATTORNEY TRUEBLOOD:
17    Q   Okay.  And then -- then you descended from
18 your tow truck and you went to -- to Mr. Galanter's
19 vehicle, right?  On foot?
20    A   Yes.
21    Q   And then what did you do once you reached
22 Mr. Galanter's vehicle on foot?
23    A   I gained entry into the vehicle.
24    Q   And how did you do that?
25    A   With tools.

1    Q    Did you use a jimmy?

2    A    I'm not familiar with what a jimmy is.

3    Q    It's a flat piece of metal that opens the

4    lock.

5    A    No, sir.

6    Q    How did you get inside?

7    A    Specialty tools for recovery.

8    Q    What were those specialty tools?

9    A    Tools for gaining entry into a vehicle.

10   Q    I know, but what were they, what did they look

11   like?

12   A    They're a long reach bar, and a wedge.

13   Q    So explain to me how you used those tools to

14   open the vehicle.

15   A    You put the wedge in between the window and

16   the door, or the door and the door beam.  You pump it

17   up, you stick the long reach bar in, you unlock the

18   vehicle.

19   Q    All right.  And then once you unlock the

20   vehicle, you put it in neutral?

21   A    Yes.

22   Q    Then did you go back to your tow truck?

23   A    No.  I pushed the vehicle back.

24   Q    Towards your tow hook?

25   A    Yes.

1    Q    Okay.  And then you went back to your vehicle?

2    A    Yes.

3    Q    And what did you do once you got inside

4    your -- your tow truck?

5    A    I lifted the vehicle up, and I pressed the

6    button on the gate remote, and I drove out.

7    Q    Well, why did you have to press the button on

8    your gate remote if you were already blocking the gate

9    sensors?

10   A    Because I backed my vehicle up into the car.

11   Q    So you went out from under the gate sensors,

12   and the gate closed as you were backing up your tow

13   truck to the car, right?

14        ATTORNEY BERNSTEIN:  Objection.  Lacks

15   foundation.  Calls for speculation.  And argumentative.

16        THE WITNESS:  The gate was closing, and I hit

17   the button so it wouldn't -- all the way close, so it

18   wouldn't stay open.  So I hit the button and it opened

19   up, and I drove off.

20   BY ATTORNEY TRUEBLOOD:

21   Q    Okay.  So if I got it right, you're underneath

22   the gate sensors, you descended from your vehicle, you

23   pushed Mr. Galanter's vehicle towards your tow

24   apparatus.  Then you get back in your two truck, back

25   up a little bit, towards Mr. Galanter's vehicle, and

1    the gate begins to close, right?

2         ATTORNEY BERNSTEIN:  Objection.  Calls for

3    speculation.  Lacks foundation.  It's compound.  Vague

4    and ambiguous.  And it mischaracterizes prior

5    testimony.

6    BY ATTORNEY TRUEBLOOD:

7    Q    Is that how it happened?

8    A    Somewhat.

9    Q    So what would you say was wrong with what I

10   said?

11        ATTORNEY BERNSTEIN:  Same objections.  Vague

12   and ambiguous.

13        THE WITNESS:  I backed up to the vehicle, I

14   picked up the vehicle, and I pulled out.

15   BY ATTORNEY TRUEBLOOD:

16   Q    Okay.  So when you -- when you're backing up

17   to the vehicle, that's when the gate begins to close,

18   right?

19   A    Yes.

20   Q    And that's when you hit the button on the

21   remote that you found inside Mr. Galanter's vehicle?

22   A    Yes.

23   Q    And that made the gate -- did that make the

24   gate go back up?

25        ATTORNEY BERNSTEIN:  Mischaracterizes prior

1    testimony.  Lacks foundation.  Calls for speculation.

2         THE WITNESS:  Made the gate open back up.

3    BY ATTORNEY TRUEBLOOD:

4    Q    Yeah?

5    A    It was never closed all the way.

6    Q    Yeah, but it had come down partially as you

7    were backing up, right?

8    A    It had opened -- it had closed some, and then

9    it had opened again.

10   Q    When you pressed the button?

11   A    Yes.

12   Q    And then at that point you were able to drive

13   your vehicle, your tow truck with Mr. Galanter's car,

14   outside into the alley, right?

15   A    Yes.

16   Q    And did the gate shut behind you?

17   A    Yes.

18   Q    How did you -- well, strike that.

19        What caused you to be at Mr. -- at the

20   building where Mr. Galanter's vehicle was parked on

21   that day?

22   A    I had a repossession order for the vehicle,

23   and I went to the address, and I located my vehicle.

24   Q    Was there -- was there something that

25   triggered your interest in going to the address on

1 that morn -- on that day?

2    A    No, it was just everyday work.

3    Q    So you were making like a regular pass to see

4 if the vehicle was able to be repossessed?

5    A    No, I'm doing my job.  I'm running the

6 accounts.

7    Q    Well, what I'm getting at, Mr. McIntosh, is

8 did somebody call you and say, you know, please, go to

9 this address on Spring Park to get the Galanter vehicle

10 that day?

11    A    No.

12    Q    Did somebody send you a message that prompted

13 you to go there?

14    A    No.

15    Q    Did you get -- was there a license plate hit

16 that was obtained that prompted you to go there?

17    A    No.

18    Q    Do you do any tows at LAW Recovery that are

19 based on the car being illegally parked?

20    A    No.

21    Q    Do you know of any of the other repo men at

22 LAW Recovery who do tows based on illegal parking?

23    A    No.

24    Q    So LAW Recovery has told us in this lawsuit,

25 under oath, that there are about 25 to 30 repossessions

1 per day that the company does.  Does that sound correct

2 to you?

3         ATTORNEY BERNSTEIN:  Objection.  Lacks

4 foundation.  Calls for speculation.  You can answer if

5 you know.

6         THE WITNESS:  It's possible.

7 BY ATTORNEY TRUEBLOOD:

8    Q    Does that -- based on your observation, does

9 that sound like a correct range?  25 to 30 repos per

10 day?

11    A    I can't give an honest answer to that.  It's

12 possible.

13    Q    Well, how many do you do a day?

14    A    Every day varies.

15    Q    What's the range that you do on a day?

16    A    Three to six.

17    Q    And how many other repo men are there

18 currently at LAW Recovery that have the same job as

19 you?

20         ATTORNEY BERNSTEIN:  Objection.  Lacks

21 foundation.  Calls for speculation.

22         THE WITNESS:  I don't know the number.

23 BY ATTORNEY TRUEBLOOD:

24    Q    But it's -- more than one though, isn't it?

25    A    Yes.

1    Q    Do you know Robert Smith?

2    A    I know a couple of Robert Smiths.

3    Q    He was a repo man at LAW Recovery?

4    A    Yes.

5    Q    Was he one of the ones that trained you?

6    A    I'm not going to say trained.  I'm going to

7 say, we speak on repossessions.

8    Q    All right.  But he's currently a -- does the

9 same job as you at LAW Recovery, doesn't he?

10    A    He repossess vehicles.

11    Q    And he was with the company when you joined?

12    A    No.

13    Q    No.  Was he with the company in September of

14 2023?

15    A    No.

16    Q    When did he join?

17    A    A couple of months back.

18    Q    Okay.  Do you know James Prior who works for

19 LAW Recovery, or Jim Prior?

20    A    Jim Prior, yes.

21    Q    And was he also a repossession man?

22    A    He's -- he was being trained to be a

23 repossessor.

24    Q    Was he working for the company in September of

25 2023?

1         ATTORNEY BERNSTEIN:  Speculation.

2         THE WITNESS:  I don't know.

3 BY ATTORNEY TRUEBLOOD:

4    Q    As far as you know, was he just hired in the

5 last few months?

6    A    I don't recall when he got hired.

7    Q    Do you know Alberto Ramirez?

8    A    Alberto -- Albert -- yes.

9    Q    And who is he?

10    A    He is a repossessor.

11    Q    For LAW Recovery, right?

12    A    Yes.

13    Q    Was he working in September of 2023?

14    A    Yes.

15    Q    And LAW Recovery also employs a Benny

16 McIntosh; is that a relation to you?

17    A    Yes.

18    Q    Who is that?  What's the relation?

19    A    My younger brother.

20    Q    And when did Benny begin working for LAW

21 Recovery?

22    A    A couple years back.

23    Q    Was he working in September of 2023?

24    A    I think so, yes.

25    Q    Had you had talked to Benny about this lawsuit

1  or the allegations in it?
2      A    No.
3      Q    Do you know a Justin Land?
4      A    Justin Land.  I know -- we have a couple of
5  Justins.  I'm not sure of the last name.
6      Q    All right.  But one of the Justins is a repo
7  man, isn't he?  A repossessor?
8      A    I don't know.
9      Q    Well, what Justins do you know?
10     A    How do you describe without -- I don't know if
11  Justin made it to a repossessor or not.
12     Q    Okay.  Is Tim Howard is a repossession -- a
13  repossessor at LAW Recovery?
14     A    He was -- I'm not sure if he's still there.
15     Q    He's still there?
16     A    I'm not sure, he fell ill.
17     Q    And Hector -- was Hector Acuna a repossession
18  man at LAW Recovery?
19     A    I think he's new.
20     Q    Okay.  How about Reginald, Reggie Anderson?
21     A    Yes.
22     Q    Was he working in September of 2023?
23     A    Yes.
24     Q    And he's still with the company?
25     A    Yes.

1      Q    And how about Jonathan Parks, was he a repo --
2  a repossessor in September of 2023?
3      A    Yes, I think so.
4      Q    And he's still with the company?
5      A    Yes.
6      Q    And how about Ibrahim Abdullah, was he working
7  in September of 2023 as a repossessor?
8      A    No.
9      Q    Go ahead?
10     A    No.
11     Q    When was he hired, if you know?
12     A    A couple of months back.
13     Q    And are Robert Smith and James prior -- are
14  they still working for the company?
15     A    Robert Smith is still working for the company.
16     Q    But not Mr. Prior?
17     A    I don't think so.
18     Q    Do you know why Mr. Prior left?
19     A    No, I do not.
20     Q    Do you know the names of any of the spotters
21  that are currently working for the company?
22          ATTORNEY BERNSTEIN:  Objection.  Relevance.
23  Privacy.
24          ATTORNEY TRUEBLOOD:  Go ahead.
25          THE WITNESS:  Pierre, Cameron.

1  BY ATTORNEY TRUEBLOOD:
2      Q    All right.  Do you know if they're employed as
3  employees or as contractors by LAW Recovery?
4      A    I don't think we have contractors.
5      Q    So they would all be employees, as far as you
6  know?
7          ATTORNEY BERNSTEIN:  Objection.  Calls for
8  speculation.  Foundation.  Not relevant.
9          THE WITNESS:  I don't know.
10  BY ATTORNEY TRUEBLOOD:
11     Q    Who owned the vehicle that you used to tow
12  Mr. Galanter's vehicle, you or someone else?
13     A    LAW Recovery.
14     Q    And have you ever met a Thomas Hillman who was
15  a spotter for LAW Recovery?
16     A    I think so.
17     Q    When was he a spotter?
18     A    I don't recall.
19     Q    Was he a spotter in September of 2023?
20     A    I don't recall.
21     Q    Was there -- did any spotter who was working
22  for LAW Recovery do any sort of work that you know of
23  with respect to the repossession of Mr. Galanter's
24  vehicle?
25     A    No.

1      Q    Did you ever get any camera hits on
2  Mr. Galanter's vehicle that was relayed to you by a
3  spotter or by the office?
4      A    No.
5      Q    How did you first learn about the fact that
6  Mr. Galanter's vehicle was up for repossession?
7      A    It came through RDN.
8      Q    And what came through RDN?
9      A    The repossession order.
10     Q    Did you get an alert of some kind?
11     A    No.  I'm able to go in RDN.
12     Q    All right.  So is it part of your regular work
13  routine to check the repossession orders to see what's
14  up for repossession?
15     A    Yes.
16     Q    And this repossession order, I'll represent to
17  you, came through about July 17 of 2023.  Did you read
18  it at that time?
19     A    No.
20     Q    When did you first read it?
21     A    When I seen it on the -- the RDN.
22     Q    When did you see it on the RDN?
23     A    That -- earlier that day.
24     Q    September 5, 2023?
25     A    Yes.

1    Q    That was the first time you saw the
2  repossession order?
3    A    That's the first time I saw that repossession
4  order.
5    Q    Had you ever been to Spring Park Avenue where
6  the vehicle was located before that day?
7    A    No.
8    Q    Had some other driver, to your knowledge?
9         ATTORNEY BERNSTEIN:  Foundation.  Speculation.
10        THE WITNESS:  No.
11 BY ATTORNEY TRUEBLOOD:
12   Q    So -- so you looked at the repossession order
13 that -- about what time that day on September 5, 2023?
14   A    8:39 a.m.
15   Q    And, and you saw in that repossession order
16 that the vehicle might be located at Spring Park
17 Avenue?
18   A    I saw that -- yes.
19   Q    So that's why you went to Spring Park Avenue?
20   A    I went to Spring Park Avenue because I was
21 running my area at the time.
22   Q    Which included Spring Park Avenue?
23   A    Yes.
24   Q    Did you review the RDN system to see if there
25 had been any activity by other drivers with respect to

1  this particular vehicle?
2    A    I don't recall.
3    Q    Would that be part of your normal practice, to
4  review the log or the history to see what other drivers
5  had seen or attempted to do with respect to a vehicle?
6    A    Sometimes.
7    Q    Did you make any phone calls that are in any
8  way connected to this repossession order before you
9  repossessed the vehicle?
10   A    No.
11   Q    Did you receive any phone calls that are in
12 any way connected to this repossession order before you
13 repossessed the vehicle?
14   A    No.
15   Q    So the office never called you and said, we
16 have a license plate hit?
17        ATTORNEY BERNSTEIN:  Objection.  Asked and
18 answered.  Argumentative.  You can answer.
19        THE WITNESS:  No.
20 BY ATTORNEY TRUEBLOOD:
21   Q    Do you happen to have Thomas Hillman's phone
22 number?
23   A    No.
24   Q    It's not on your phone?
25   A    No.

1    Q    I want to ask you a bit about this RDN system.
2  Do you have a computer console in your tow truck
3  that's --
4    A    No.
5    Q    -- connected to the RDN?
6    A    No.
7    Q    Is it -- explain to me how the RDN system is
8  accessed?
9    A    Through my phone.
10   Q    So you have an app on your phone?
11   A    Yes.
12   Q    And generally speaking, what can you see on
13 the RDN system?
14   A    Can I answer -- reanswer that last question?
15   Q    Sure.
16   A    It's not an app.  It's literally logging into
17 recovery database network.
18   Q    Through a website?
19   A    Yes.
20   Q    Okay.  So you log into the website and then
21 you can see certain information on the website, right?
22   A    Yes.
23   Q    And just tell me, what kind of information is
24 available?
25   A    The repossession order.

1    Q    Anything else?
2    A    The repossession order, notes from the client,
3  priority from the client.  Updates.
4    Q    Okay.  So as -- the RDN system, is it
5  accessible by the client, that is, the creditor?
6    A    I don't exactly know how the office part
7  works.  I would think so.  Possibly yes.
8    Q    But it's part of your job to submit updates
9  into the RDN system, correct?
10   A    Yes.
11   Q    And those updates are then available to the
12 creditor who's ordered the repossession, right?
13        ATTORNEY BERNSTEIN:  Objection.  Foundation.
14 Calls for speculation.  You can answer.
15        THE WITNESS:  Yes.
16 BY ATTORNEY TRUEBLOOD:
17   Q    Does the RDN system record any license plate
18 reading hits that are obtained?
19        ATTORNEY BERNSTEIN:  Same objection.
20        THE WITNESS:  I don't think RDN records, but I
21 don't know.
22 BY ATTORNEY TRUEBLOOD:
23   Q    Well, explain to me how the license plate
24 reading works, you know, in the course of your job to
25 repossess a vehicle?

1      ATTORNEY BERNSTEIN:  Objection.  Vague and
2  ambiguous.  Lacks foundation.  Calls for speculation.
3      THE WITNESS:  I don't scan license plates.
4  I'm a repossessor.  Literally, I go look for the car.
5  BY ATTORNEY TRUEBLOOD:
6      Q     Okay.  But on occasion, you get some
7  notification from someone that a car that's in your
8  area or that's not in your area has been located
9  through a license plate reading hit, correct?
10     A     I get a call from the office.
11     Q     Yeah.  So explain to me how that generally
12  works.
13     ATTORNEY BERNSTEIN:  Objection.  Vague.
14     THE WITNESS:  The office will call me and say,
15  hey, we got a car over here on such and such street.
16  Can you make it to it.
17  BY ATTORNEY TRUEBLOOD:
18     Q     Okay.  And is it your understanding that the
19  office is getting the license plate reading information
20  from the spotter vehicles?
21     ATTORNEY BERNSTEIN:  Foundation.  Speculation.
22     THE WITNESS:  I'm not sure how they get it.
23  BY ATTORNEY TRUEBLOOD:
24     Q     But one of those methods is through the
25  spotter vehicles you testified earlier, right?

1      A     Yes.
2      Q     And in the course of your job, do you ever
3  have occasion to talk directly to the spotters?
4      A     Yes.
5      Q     And tell me when that happens.
6      ATTORNEY BERNSTEIN:  Objection.  Vague.
7      THE WITNESS:  When we see one another.
8  BY ATTORNEY TRUEBLOOD:
9      Q     Okay.  But if you're out in the field working,
10  do you ever call them up on the phone?
11     A     No.
12     Q     Do they ever call you about a license plate
13  reading hit?
14     A     They call the office.
15     Q     But not you?
16     A     No.
17     Q     So the office would call you on your cell
18  phone, right?
19     A     Yes.
20     Q     To your knowledge, does the RDN system notify
21  the creditor of license plate reading hits?
22     ATTORNEY BERNSTEIN:  Objection.  Vague and
23  ambiguous.  Lacks foundation.  You can answer.
24     THE WITNESS:  I don't know how that works.
25

1  BY ATTORNEY TRUEBLOOD:
2      Q     Do you know if the creditor gets notice of the
3  license plate reading hits as well as you?
4      ATTORNEY BERNSTEIN:  Objection.  Foundation.
5      THE WITNESS:  I don't know how the camera --
6  how they give notification.
7  BY ATTORNEY TRUEBLOOD:
8      Q     Do you perform any repossessions that are
9  commercial trucks like semis or agricultural vehicles?
10     A     No.
11     Q     Have you ever witnessed any -- ever heard of
12  any repossession man for LAW Recovery repossessing
13  semis or agricultural vehicles?
14     ATTORNEY BERNSTEIN:  Objection.  Relevance.
15  Foundation.
16     THE WITNESS:  I don't recall.
17  BY ATTORNEY TRUEBLOOD:
18     Q     You've never heard that, right?
19     ATTORNEY BERNSTEIN:  Same.
20     THE WITNESS:  I don't recall.
21  BY ATTORNEY TRUEBLOOD:
22     Q     Are you aware of which -- of what clients are
23  the biggest clients for LAW Recovery?  The most -- the
24  ones that give the most repossession orders?
25     ATTORNEY BERNSTEIN:  Objection.  Privacy.

1  Foundation.  Calls for speculation.  That's a yes or no
2  question.
3      THE WITNESS:  No.
4  BY ATTORNEY TRUEBLOOD:
5      Q     Well, who are the lenders that you've done the
6  most repossessions for while working for LAW Recovery?
7      ATTORNEY BERNSTEIN:  Objection.  Privacy.  Not
8  reasonably calculated to lead to the discovery of
9  admissible evidence.  Lacks foundation.  What's the
10  relevance, Counsel?
11     ATTORNEY TRUEBLOOD:  You've denied a request
12  for admission that you're a debt collector, so you've
13  opened this up.
14     ATTORNEY BERNSTEIN:  What does that have to do
15  with the largest customer?
16     ATTORNEY TRUEBLOOD:  Because we're going to
17  find out who these customers are, and establish that
18  you do repossessions for a living, since you've denied
19  it.
20     ATTORNEY BERNSTEIN:  We don't deny doing
21  repossessions.
22     ATTORNEY TRUEBLOOD:  You deny you're a debt
23  collector.
24     ATTORNEY BERNSTEIN:  That has nothing to do
25  with the largest collector.  I instruct not to answer

1  on privacy grounds.
2          ATTORNEY TRUEBLOOD:  The definition of debt
3  collector is someone whose principal -- an agents -- a
4  company whose principal purpose is the repossession of
5  collateral.  You've denied that.
6          ATTORNEY BERNSTEIN:  We've denied we're a debt
7  collector under these facts.
8          ATTORNEY TRUEBLOOD:  So I'm entitled to ask
9  these questions.
10          ATTORNEY BERNSTEIN:  I don't agree.
11          ATTORNEY TRUEBLOOD:  You can't instruct on
12  relevance.
13          ATTORNEY BERNSTEIN:  Privacy.  Financial
14  privacy.  It's not -- and it's not relevant.
15          ATTORNEY TRUEBLOOD:  You're instructing the
16  witness?
17          ATTORNEY BERNSTEIN:  Yes.
18          ATTORNEY TRUEBLOOD:  We're going to have an
19  issue on that.
20          ATTORNEY BERNSTEIN:  We can talk further.  I'm
21  very open to further conversations.
22          ATTORNEY TRUEBLOOD:  Well, I -- I urge you to
23  look at request for admission number one and your
24  denial of that request.
25          ATTORNEY BERNSTEIN:  Our -- A, number one, to

1  my recollection, is: admit that LAW Recovery is a debt
2  collector.
3          ATTORNEY TRUEBLOOD:  Under the FDCPA.
4          ATTORNEY BERNSTEIN:  Right.  I'm aware of the
5  response.
6          ATTORNEY TRUEBLOOD:  You've denied it, so I
7  have the right to ask about it.
8          ATTORNEY BERNSTEIN:  You may have the right to
9  ask about, quote, it, close quote, but the largest
10  customer of LAW Recovery is not relevant and it's
11  private.
12  BY ATTORNEY TRUEBLOOD:
13      Q    Have you ever done a repossession for LAW
14  Recovery that was something other than a vehicle that
15  was -- which was security for a consumer auto loan?
16          ATTORNEY BERNSTEIN:  Objection.  Incomplete
17  hypothetical.  Lacks foundation.  Calls for
18  speculation.  And it's a legal conclusion.
19          ATTORNEY TRUEBLOOD:  Go ahead.
20          THE WITNESS:  What does that mean?
21  BY ATTORNEY TRUEBLOOD:
22      Q    Well, you're doing repossessions for lenders,
23  right?
24      A    I'm doing repossessions for LAW Recovery.
25      Q    Right, but LAW Recovery is doing repossessions

1  for lenders; they have clients, right?
2          ATTORNEY BERNSTEIN:  Objection.  Foundation.
3  Calls for speculation.  Relevance.
4  BY ATTORNEY TRUEBLOOD:
5      Q    The person that -- the entity that appears on
6  the repossession orders is a lender, normally, isn't
7  it?
8          ATTORNEY BERNSTEIN:  Same objections.
9          THE WITNESS:  Like the bank?
10          ATTORNEY TRUEBLOOD:  Yeah, the bank.
11          Right, right.  The bank.
12          THE WITNESS:  Yes.
13  BY ATTORNEY TRUEBLOOD:
14      Q    So you're doing repossessions for banks, as an
15  employee of LAW Recovery, right?
16          ATTORNEY BERNSTEIN:  Objection.
17  Mischaracterizes prior testimony.  And it's
18  argumentative.  He said he worked for LAW Recovery.
19          ATTORNEY TRUEBLOOD:  Go ahead.
20          ATTORNEY BERNSTEIN:  Does possessions for LAW
21  Recovery.
22          ATTORNEY TRUEBLOOD:  Go ahead.
23          THE WITNESS:  Yes.
24          ATTORNEY TRUEBLOOD:  Stop coaching the
25  witness, please.  You can answer, sir.

1          ATTORNEY BERNSTEIN:  Same objections.
2          THE WITNESS:  Yes.
3  BY ATTORNEY TRUEBLOOD:
4      Q    And what's your understanding of -- well, what
5  are the type of vehicles that you're repossessing?  Are
6  you repossessing any commercial vehicles, or is it all
7  personal automobiles?
8          ATTORNEY BERNSTEIN:  Objection.  Calls for
9  speculation.  Lacks foundation.  It's vague and
10  ambiguous.  It's overbroad.  It's irrelevant.  You can
11  answer.
12          THE WITNESS:  Commercial vehicle is a pickup
13  truck with a cab on it, so, yes.
14  BY ATTORNEY TRUEBLOOD:
15      Q    So occasionally, you'll repossess a pickup?
16      A    Yes.
17      Q    But you don't know whether they're
18  commercial -- whether used for business or used for
19  personal use, do you?
20      A    No.
21      Q    And about what percentage of your
22  repossessions are pickups?
23      A    I don't know.
24      Q    Would it be safe to say that the majority of
25  repossessions that you've done for LAW Recovery were

1  vehicles that were not commercial vehicles and not
2  pickups?
3          ATTORNEY BERNSTEIN:  Objection.  Foundation.
4  Calls for speculation.  Vague and ambiguous.
5          THE WITNESS:  Yes.
6  BY ATTORNEY TRUEBLOOD:
7      Q    Does LAW Recovery accept assignments from
8  repossession forwarding companies?
9          ATTORNEY BERNSTEIN:  Objection.  Vague.
10  Foundation.
11         THE WITNESS:  I don't know.
12  BY ATTORNEY TRUEBLOOD:
13     Q    Do you know what a repossession forwarding
14  company is?
15     A    Yes.
16     Q    What do you call them in your day-to-day
17  business?
18     A    Repossession orders.  I'm looking at the
19  repossession order.  I'm not looking at the bank or the
20  financial institute.
21     Q    But sometimes on the repossession order, it's
22  a bank who issued it, and other times it's a
23  repossession forwarding company, right?
24     A    Possibly, yes.
25     Q    What is a repossession forwarding company?

1          ATTORNEY BERNSTEIN:  Foundation.  Calls for
2  speculation.
3          THE WITNESS:  Far as I know, someone who
4  forwards a repossession order from one institute
5  through another institute.
6  BY ATTORNEY TRUEBLOOD:
7      Q    And do you know the names of any of those
8  entities?
9          ATTORNEY BERNSTEIN:  Objection.  Vague.
10         THE WITNESS:  No.
11  BY ATTORNEY TRUEBLOOD:
12     Q    Did you know a -- an employee of LAW Recovery
13  named Sergio Batres, B-A-T-R-E-S?
14     A    Yes.
15     Q    Is he still with the company?
16     A    No.
17     Q    When did he leave?
18     A    I don't recall.
19     Q    Was he a repossessor?
20     A    Yes.
21     Q    Was he with the company in September of 2023?
22     A    I don't recall.
23     Q    Did you know a repossessor named Marco
24  Rodriguez who used to work for LAW Recovery?
25     A    Yes.

1      Q    When did he leave the company?
2      A    I don't recall.
3      Q    Was he working in September of 2023?
4      A    I don't recall.
5      Q    Do you know when the last time you saw
6  Mr. Batres was?
7      A    I think we may have passed one another in the
8  streets at night.  But to give you a date, I don't --
9      Q    Was it this year?
10     A    Yes, I think it was the beginning of this
11  year.
12     Q    How old was he, approximately?
13     A    I don't know.
14     Q    Well, was he in his 30s, 40s, 50s?
15     A    I don't know, it's hard to tell.
16     Q    No, I'm just asking what his age range?
17         ATTORNEY BERNSTEIN:  Asked and answered,
18  twice.
19         THE WITNESS:  I don't know.  Some people look
20  like they're 50, but they're 30.
21  BY ATTORNEY TRUEBLOOD:
22     Q    So you know he's 15 or 60?
23     A    He's over -- he's the legal age.
24     Q    All you know is he's over 18?
25     A    I don't know his age.  I can't give you a

1  correct --
2      Q    I'm just asking you for an estimate of his
3  age; that's all I'm asking.
4          ATTORNEY BERNSTEIN:  Asked and answered about
5  five times.
6          THE WITNESS:  I don't know, sir.
7  BY ATTORNEY TRUEBLOOD:
8      Q    About how old is Marco Rodriguez?
9      A    I don't know.
10     Q    Were either of those men, Mr. Batres, or
11  Mr. Rodriguez fired?
12         ATTORNEY BERNSTEIN:  Calls for speculation.
13  Lacks foundation.
14         THE WITNESS:  That's above my pay grade.
15  BY ATTORNEY TRUEBLOOD:
16     Q    Did you ever hear that they were fired?
17         ATTORNEY BERNSTEIN:  Same objections.
18         THE WITNESS:  No.
19  BY ATTORNEY TRUEBLOOD:
20     Q    One of the LAW Recovery employees that
21  appeared on the paperwork is somebody named Jazmine
22  with a Z.  Do you know her last name?
23     A    Jazmine with a Z is I think -- nope -- maybe
24  Gonzalez, I'm not a hundred percent sure.
25     Q    And what is her title?

1    A    Secretary.
2    Q    She's an office worker?
3    A    Yes.
4    Q    What does she do?
5    A    Office work.
6    Q    What kind of office work?
7         ATTORNEY BERNSTEIN:  Objection.  Foundation.
8    Speculation.
9         THE WITNESS:  I'm a field agent.  She's the
10   office.
11   BY ATTORNEY TRUEBLOOD:
12   Q    All right.  And who is Juan "Mirawato"?
13   A    Excuse me, who?
14   Q    Do you know an employee of LAW Recovery named
15   Juan "Mirawato"?
16   A    I don't.
17   Q    Do you know an employee of LAW Recovery with
18   the first name of Jacklyn?
19   A    I do.
20   Q    And what's her last name?
21   A    I don't know.
22   Q    Is she an office worker?
23   A    Yes.
24   Q    What does she do, to your knowledge?
25   A    Office work.

1    Q    What does that mean?
2    A    I'm a field agent --
3         ATTORNEY BERNSTEIN:  Objection.  Lacks
4    foundation.  Calls for speculation.  Go ahead.
5         THE WITNESS:  I'm a field agent, she's an
6    office worker.
7    BY ATTORNEY TRUEBLOOD:
8    Q    So I want to be clear on something,
9    Mr. McIntosh:  LAW Recovery has stated that Thomas A.
10   Hillman was a spotter who assisted you, or may have
11   assisted you with this repossession, but you're saying
12   he did not, correct?
13        ATTORNEY BERNSTEIN:  That's argumentative.
14   And mischaracterizes the evidence.  But you can answer.
15        THE WITNESS:  I don't recall Thomas being
16   there, so no.
17   BY ATTORNEY TRUEBLOOD:
18   Q    Okay.  How long have you known Thomas?
19   A    Spotters are spotters.  I don't even really
20   remember Thomas.
21   Q    So -- but you did not receive a call from the
22   office about a license plate reading hit as to this
23   vehicle, did you?
24        ATTORNEY BERNSTEIN:  Asked and answered.
25   Argumentative.  Go ahead.

1         THE WITNESS:  No.
2    BY ATTORNEY TRUEBLOOD:
3    Q    And you didn't speak with Mr. Hillman about
4    anything concerning Mr. Galanter's vehicle, correct?
5    A    No.
6    Q    Are you paid a salary by LAW Recovery or are
7    you paid on some other basis?
8         ATTORNEY BERNSTEIN:  Objection.  Privacy.
9    Irrelevant.  What's the relevance?
10        ATTORNEY TRUEBLOOD:  It's relevant.  You can't
11   instruct on relevance.
12        ATTORNEY BERNSTEIN:  I'm asking you what the
13   relevance is.  I'm objecting on privacy.
14        ATTORNEY TRUEBLOOD:  Well, the relevance is
15   whether there are incentives to repossess more
16   vehicles.
17        ATTORNEY BERNSTEIN:  I don't see why that --
18   or how that is relevant, or why privacy assessment
19   would allow you to have that information.
20        ATTORNEY TRUEBLOOD:  Well, I'm not asking the
21   amount.  I'm asking merely whether he's on salary or
22   paid by the repo.
23        THE WITNESS:  I'm on salary.
24   BY ATTORNEY TRUEBLOOD:
25   Q    Okay.  So you're not -- are you paid any extra

1    for doing-- for completing a repossession job?
2         ATTORNEY BERNSTEIN:  Same objections.
3         THE WITNESS:  I can answer?
4         ATTORNEY BERNSTEIN:  Yes.
5         THE WITNESS:  No, I'm on salary.
6    BY ATTORNEY TRUEBLOOD:
7    Q    Okay.  But if you do -- if you reach a certain
8    number of repossessions in a given period of time, are
9    you paid more?
10        ATTORNEY BERNSTEIN:  Privacy.
11        THE WITNESS:  Certain cars pay more.
12   BY ATTORNEY TRUEBLOOD:
13   Q    Are you paid -- what cars pay more?
14   A    I don't know, but if there's a car that has
15   extras on it, they'll pay extras to us, sometimes.
16   Q    Right, but I'm not talking about what they --
17   I'm not talking about what the creditors pay LAW
18   Recovery, I'm talking about what LAW Recovery pays you;
19   do you understand?
20        ATTORNEY BERNSTEIN:  Objection.  Privacy.  Not
21   reasonably calculated.
22   BY ATTORNEY TRUEBLOOD:
23   Q    Do you understand the difference?
24   A    Yes, I understand.
25   Q    Okay.  So what I'm asking you is:  Are you

1  paid any extra on a given paycheck because of either
2  the number of cars you repossessed or the type of car?
3      A    No.
4      Q    So you don't get a bonus if you reach a
5  certain number of repossessions in a month?
6          ATTORNEY BERNSTEIN:  Objection.  Privacy.
7  Asked and answered.
8          ATTORNEY TRUEBLOOD:  Go ahead.
9          THE WITNESS:  No.
10 BY ATTORNEY TRUEBLOOD:
11     Q    Do you use your cell phone in connection with
12 your work?
13     A    No.
14     Q    Well, you do talk to the office when they give
15 you a license plate reading hit, don't you?
16     A    I do talk to the office on my cell phone, yes
17 I do.
18     Q    Yeah, okay.  So just tell me in general the
19 circumstances that you use your telephone for at work?
20     A    I use the telephone to call the police
21 department.
22     Q    Yes?
23     A    I use my telephone if I need to make a call.
24     Q    Yes?
25     A    I use any telephone -- I use my telephone for

1  some pictures.
2      Q    Uploading pictures?
3      A    No, not uploading.  Just having pictures.  If
4  there's a problem, I use my cell phone.
5      Q    When you took the pictures at the building
6  where you repossessed Mr. Galanter's vehicle, how did
7  you take the pictures?
8      A    On my other cell phone.
9      Q    You have more than one?
10     A    Yes.
11     Q    Do they have different numbers?
12     A    Yes.
13     Q    So what was the number on your other cell
14 phone?
15     A    I don't know the number.  It's just for RDN,
16 and -- like, I don't receive phone calls or nothing on
17 it, I don't know the number of it.
18     Q    Which -- who is the carrier?
19     A    Sprint.
20     Q    Did you have that cell phone in September of
21 2023?
22     A    No.  I lost that phone.
23     Q    Did you have a phone in -- a second phone in
24 September of 2023?
25     A    Yes.

1      Q    But you lost it?
2      A    Yes.
3      Q    What was the number to that second phone in
4  September of 2023?
5      A    It's the same number, I just don't know it.
6      Q    Were you also with Sprint in September of
7  2023?
8      A    Yes.
9      Q    All right.  So you used your phone to -- in
10 your work to communicate with the office as you're out
11 in the field, correct?
12     A    Yes.
13     Q    And you use it -- your phone to take and
14 upload pictures to RDN, right?
15         ATTORNEY BERNSTEIN:  Mischaracterizes prior
16 testimony.
17         THE WITNESS:  No.
18 BY ATTORNEY TRUEBLOOD:
19     Q    How do you upload the pictures?
20     A    From my other phone.
21     Q    Yeah, I'm talking about your second phone now.
22     A    Oh, I'm sorry.
23     Q    Yeah.  So you use that phone to take pictures
24 and then upload them to RDN, right?
25     A    Yes.

1      Q    And you also use your phone to access RDN to
2  look at the history of the account and to give updates,
3  right?
4          ATTORNEY BERNSTEIN:  Objection.  Vague.
5          THE WITNESS:  Yes.
6  BY ATTORNEY TRUEBLOOD:
7      Q    Do you use the mails in your job?
8      A    I'm sorry?
9      Q    Do you use the U.S. Mail in your job?
10     A    I don't.
11     Q    Does LAW Recovery use the U.S. Mail in its
12 work?
13         ATTORNEY BERNSTEIN:  Objection.  Foundation.
14 Calls for speculation.
15         THE WITNESS:  Above my pay grade.
16 BY ATTORNEY TRUEBLOOD:
17     Q    You don't know?
18     A    I don't know.
19     Q    Some of -- some of LAW Recovery's clients,
20 that is the banks or finance companies, are located
21 outside of California; is that correct?
22         ATTORNEY BERNSTEIN:  Objection.  Foundation.
23 Calls for speculation.
24         THE WITNESS:  Yes.
25         ATTORNEY BERNSTEIN:  Don't guess.

1  BY ATTORNEY TRUEBLOOD:
2      Q     And you communicate by giving updates to those
3  out-of-state clients if you're working on one of their
4  jobs, don't you?
5          ATTORNEY BERNSTEIN:  Objection.  Incomplete
6  hypothetical.  Vague and ambiguous.  Lacks foundation.
7          THE WITNESS:  Yes.
8  BY ATTORNEY TRUEBLOOD:
9      Q     How many different yards does LAW Recovery
10  have?
11     A     I'm not sure.
12     Q     More than one?
13     A     Yes.
14     Q     More than two?
15     A     I'm not sure.
16     Q     Do you use e-mail in your work?
17     A     Yes.
18     Q     Explain to me how you use e-mail.
19     A     Every once in a while, a close will come
20  through in e-mail, saying that an account is closed.
21     Q     And that comes directly from a bank or a
22  lender?
23     A     It's from LAW Recovery.
24     Q     Do you use e-mails to communicate with any
25  out-of-state entities in your work?

1          ATTORNEY BERNSTEIN:  Objection.  Foundation.
2  Speculation.
3          THE WITNESS:  I don't really use my e-mail.
4  BY ATTORNEY TRUEBLOOD:
5      Q     Okay.  But do you -- have you ever used --
6  explain to me how you use your e-mail other than
7  receiving close orders from LAW Recovery?
8      A     If someone e-mails me, I look at the e-mail,
9  but for the most part, it's -- e-mail is just closed.
10  I don't use e-mails.
11     Q     Do you use the facsimile in your work?
12     A     I'm sorry?  One more time, the what?
13     Q     Do you use faxes in your work?
14     A     I don't.
15     Q     Were you aware that other companies other than
16  LAW Recovery had -- had orders out for Mr. Galanter's
17  vehicle?
18     A     I wasn't.
19         ATTORNEY BERNSTEIN:  We've been going about
20  another hour.
21         ATTORNEY TRUEBLOOD:  Yeah, I'm going to go
22  about 15 -- it's only been 40 minutes, but I'm going to
23  go about another 15, and then we'll break for lunch.
24         ATTORNEY BERNSTEIN:  How long in total do you
25  believe you have?

1          ATTORNEY TRUEBLOOD:  A couple of hours.
2          ATTORNEY BERNSTEIN:  A couple more hours?
3          ATTORNEY TRUEBLOOD:  Probably.
4  BY ATTORNEY TRUEBLOOD:
5      Q     What vehicle were you using on the day of the
6  repossession of Mr. Galanter's vehicle?
7      A     Chevy tow truck.
8      Q     Do you know the model?
9      A     Chevy.
10     Q     Yeah, but like -- Chevy, I know that's the
11  make.  But what was the model?
12     A     3500, possibly.  '07 Chevy -- Silverado.
13     Q     Okay.  Was that vehicle equipped with a video
14  camera?
15     A     No.
16     Q     Are any of the tow vehicles you drive for LAW
17  Recovery equipped with a video camera?
18     A     Some.
19     Q     But this one wasn't?
20     A     That one wasn't.
21     Q     Why wasn't it?
22         ATTORNEY BERNSTEIN:  Objection.  Vague and
23  ambiguous.  Argumentative.  Calls for speculation.
24         ATTORNEY TRUEBLOOD:  Go ahead.
25         ATTORNEY BERNSTEIN:  He answered.

1  BY ATTORNEY TRUEBLOOD:
2      Q     Did you say I don't know?
3      A     I don't know.
4      Q     The other ones that are equipped with video,
5  where are the cameras located?
6          ATTORNEY BERNSTEIN:  Objection.  Foundation.
7          THE WITNESS:  In the window.
8  BY ATTORNEY TRUEBLOOD:
9      Q     Back window, front window?
10     A     Front window.
11     Q     And the back, or just the front?
12     A     Front window.
13     Q     So there's no video pointed towards the back?
14     A     Yes, but it's mounted in the front, but
15  pointed toward the front end.
16     Q     Have you ever been trained by anyone at LAW
17  Recovery or told anyone why there's video on their
18  trucks?
19     A     For our safety and the debtors.
20     Q     So if it's video for your safety, do you have
21  an explanation why there was no video on your specific
22  tow truck on the day of the repossession of
23  Mr. Galanter's vehicle?
24     A     I want to say we just got the truck out of the
25  shop again.  I'm not a hundred percent sure.

1    Q    Well, had the shop altered the video or
2    stopped the video?
3    A    No, the truck was done.  I'm not a hundred
4    percent sure why.
5    Q    Did you check for video?
6    A    No.
7    Q    Did someone at LAW Recovery check to see if
8    there was video of this repossession?
9         ATTORNEY BERNSTEIN:  Objection.  Foundation.
10        THE WITNESS:  I don't know.
11   BY ATTORNEY TRUEBLOOD:
12   Q    Has anyone ever told you that?
13   A    No.
14   Q    Are you aware of any video of this
15   repossession of Mr. Galanter's vehicle in any way?
16   A    No.
17   Q    Was any video erased?
18   A    No.
19   Q    Have you told me everything that you and this
20   African-American man who you spoke to out in the
21   alleyway outside of the building where Mr. Galanter's
22   vehicle said to each other?
23   A    Yes.
24   Q    Where did he appear from?  Where did he --
25   what side of the alley did he come from?

1    A    I don't know.
2    Q    Did he drive up in a car?
3    A    I didn't see a car.
4    Q    He was walking?
5    A    Yes.
6    Q    All right.  I'm going to go about 10 minutes
7    and then take a lunch break, if that's okay with you?
8         ATTORNEY BERNSTEIN:  It's noon now.  My
9    preference is to break now, if we're going to have
10   another two hours.
11        ATTORNEY TRUEBLOOD:  Well, I just want to
12   finish -- I'd like to finish in 10 minutes.
13        ATTORNEY BERNSTEIN:  I hear you.  I'm not
14   going to make a big argument about it.  Go ahead.
15   Unless the reporter needs a break, I guess, is the
16   other issue.
17        ATTORNEY TRUEBLOOD:  You need a break, Madam
18   Reporter?
19        THE STENOGRAPHER:  I can go for 10 more
20   minutes.
21        ATTORNEY TRUEBLOOD:  Okay.
22        ATTORNEY BERNSTEIN:  He's trying to share a
23   screen.  He's going to show you something, I think.
24        THE WITNESS:  All right.
25

1    BY ATTORNEY TRUEBLOOD:
2    Q    Okay.  I'm going to show you what I'm going to
3    mark as Exhibit 1, which is two repossession orders, or
4    versions of repossession orders.  Consisting of two
5    pages, with of Bates numbers Galanter -- LAW Recovery
6    Galanter 25 and LAW Recovery Galanter 26.
7         ATTORNEY BERNSTEIN:  They're not visible,
8    currently.
9         ATTORNEY TRUEBLOOD:  You can't see them?
10        ATTORNEY BERNSTEIN:  No, there's -- I see your
11   file folder, actually.  There's a very tiny, very
12   small, illegible one on the far right of our screen.
13        ATTORNEY TRUEBLOOD:  Okay.
14        ATTORNEY BERNSTEIN:  I see --
15        ATTORNEY TRUEBLOOD:  All right.  So what I'm
16   going to do is e-mail it to you, so you can open it on
17   your own screen.
18        ATTORNEY BERNSTEIN:  -- I have to open it on
19   my email.
20        ATTORNEY TRUEBLOOD:  Okay.  That's on its way.
21        ATTORNEY BERNSTEIN:  So I don't have it as of
22   right now.
23        ATTORNEY TRUEBLOOD:  Okay.
24        ATTORNEY BERNSTEIN:  There it is.  One second.
25   Let me see if I can open this.  All right.  So I'm

1    showing the witness the first page, half of the first
2    page.
3         ATTORNEY TRUEBLOOD:  Well, show him the whole
4    thing, if you will.
5         ATTORNEY BERNSTEIN:  Well, so there's page 1.
6    And there's page 2.  It's two different documents, see
7    them?
8         THE WITNESS:  Yes.
9         ATTORNEY BERNSTEIN:  All right.  I got them.
10   BY ATTORNEY TRUEBLOOD:
11   Q    All right.  Can you confirm for me what these
12   are, Mr. McIntosh?
13   A    The first one is a repossession assignment.
14   Q    Yes?
15   A    The second is an order to repossess sheet.
16   Q    What's the difference?
17   A    They're both repossession orders.
18   Q    Okay.  When you access the RDN system on the
19   day of the repossession and saw the repossession order,
20   which page were you looking at, or were you looking at
21   both?
22        ATTORNEY BERNSTEIN:  Or neither.  Assumes
23   facts not in evidence.
24        THE WITNESS:  Yeah, neither.
25

Page 106

1  BY ATTORNEY TRUEBLOOD:
2      Q    It was neither?
3      A    Yeah.  It shows different --
4      Q    What did you see on the day you pulled up the
5  repossession order?
6      A    Open repossession order, with the information.
7  Not open repossession order, but open account.
8      Q    Okay.  Did the -- but it was neither of these
9  pages?
10     A    At the time.
11     Q    Did you see an address where the vehicle
12 supposedly was?
13     A    Yes.
14     Q    What was that address?
15     A    6755 Spring Park.
16     Q    South Spring Park?
17     A    Yes.
18     Q    Did you see any notation about a place called
19 Hot Pilates at 8604 Sunset Boulevard?
20          Sorry, I couldn't hear you?
21     A    No.
22     Q    Did you ever call Hot Pilates?
23     A    No.
24     Q    Did you ever call Laurel Galanter,
25 Mr. Galanter's daughter?

Page 107

1      A    No.
2      Q    Did you ever -- did you see any notation about
3  who -- who lived at 6755 South Spring Park?
4      A    No.
5      Q    Was there any indication that that was not
6  Mr. Galanter's address, but rather somebody else's
7  address?
8      A    No.
9      Q    Did you learn that after the repossession?
10     A    I learned that when John called and said that
11 I will be talking with David.
12     Q    And he told you at that time that 6755 South
13 Spring Park was not Mr. Galanter's address, correct?
14          ATTORNEY BERNSTEIN:  He being not counsel,
15 right?
16          ATTORNEY TRUEBLOOD:  Serafin.  Serafin.
17          THE WITNESS:  John didn't tell me that.  I
18 spoke with Mr. --
19          ATTORNEY BERNSTEIN:  If you're talking about
20 what we talked about --
21          THE WITNESS:  What we talked about.
22          ATTORNEY BERNSTEIN:  Don't testify about
23 attorney-client privilege.  Objection.  Instruct not to
24 answer.
25

Page 108

1  BY ATTORNEY TRUEBLOOD:
2      Q    Okay.  Well, let me just ask you this way:
3  Did you learn from Mr. Serafin that 6755 South Spring
4  Park was an address other than Mr. Galanter's?
5      A    No.
6      Q    Okay.  Did anyone other than -- did anyone
7  other than your counsel tell you that?
8      A    No.
9      Q    But you know that today, right?
10          ATTORNEY BERNSTEIN:  Objection.  Instruct not
11 to answer.  Same issues that your client raised
12 recently at his depo.  Attorney-client privilege.
13 BY ATTORNEY TRUEBLOOD:
14     Q    But on the day of the repossession, you were
15 unaware that 6755 South Spring Park Avenue was -- was
16 not the address of Mr. Galanter?
17     A    Yes.
18     Q    And you -- did you learn at any time during
19 September of 2023 that 6755 South Spring Park was not
20 Mr. Galanter's address?
21     A    No.
22     Q    Okay.  Let's take our lunch break there.
23 Let's come back about 1:15.
24          ATTORNEY BERNSTEIN:  What time is it now?
25 Okay.

Page 109

1          ATTORNEY TRUEBLOOD:  Okay.  Thank you.
2          ATTORNEY BERNSTEIN:  Thank you.
3          (Off the record from 12:10PM to 1:15PM.)
4  BY ATTORNEY TRUEBLOOD:
5      Q    Mr. McIntosh, you understand you're still
6  under oath, we're after the lunch break?
7      A    Yes.
8      Q    Thank you.  Is Thomas Hillman currently
9  working for LAW Recovery?
10          ATTORNEY BERNSTEIN:  Foundation.  Asked and
11 answered.
12          THE WITNESS:  No.
13 BY ATTORNEY TRUEBLOOD:
14     Q    He's an ex -- he's no longer working for them?
15     A    No.
16     Q    When did he leave?
17     A    I don't know.
18     Q    Approximately?
19     A    Sometime between last year and this year.  I
20 don't know.
21     Q    Okay.  Do you know why he left?
22     A    I do not.
23     Q    I think you stated earlier that you had -- you
24 were performing about three repossessions per day for
25 LAW Recovery currently; is that correct?

1      ATTORNEY BERNSTEIN:  Objection.  That
2  mischaracterizes the prior testimony.
3      ATTORNEY TRUEBLOOD:  I want to make sure I've
4  got that right.
5      THE WITNESS:  Yes.
6  BY ATTORNEY TRUEBLOOD:
7      Q   All right.  So --
8      A   Did you say three -- three to five?  Or --
9      ATTORNEY BERNSTEIN:  No, he just said three.
10     THE WITNESS:  Hold on.  It varies from three
11 to --
12 BY ATTORNEY TRUEBLOOD:
13     Q   Three to five?
14     A   Yeah.
15     Q   All right.  Were you doing any more or any
16 fewer repossessions in September of 2023 than you are
17 now, per day?
18     A   I'm not sure.
19     Q   Any reason to believe that you were doing
20 more -- more or less than three to five per day back in
21 September of 2023?
22     A   No.
23     Q   All right.  I'm going to mark a new exhibit,
24 which is going to be Exhibit Number 2.  And I'm sending
25 this to counsel now.

1      All right.  This exhibit is entitled progress
2  report.  It has Bates numbers LAW Recovery Galanter
3  number 37 through 41.
4      Let me know when you have that up on your
5  screen, Mr. McIntosh.
6      ATTORNEY BERNSTEIN:  Not yet.  Okay.
7  BY ATTORNEY TRUEBLOOD:
8      Q   Okay.  Take a look at this, just scroll
9  through it.  And can you tell me what this is, if you
10 know?
11     A   It says a progress report.
12     Q   Right.  But is this -- what is a progress
13 report?
14     A   I'm not sure.  I'm not office.
15     Q   Okay.  Is this -- is this -- you mentioned
16 that you had looked at some kind of a history of this
17 particular account.  Was this what you looked at?
18     A   No.
19     Q   All right.  Does this look to you like the
20 history -- a history of the repossession starting at
21 the bottom and going to the top?
22     ATTORNEY BERNSTEIN:  Objection.  Foundation.
23 Calls for speculation.  Go ahead.
24     THE WITNESS:  I haven't ever seen this page.
25

1  BY ATTORNEY TRUEBLOOD:
2      Q   Okay.  Let me look at page 40, at the bottom,
3  the entry dated August 11, 2023.  Do you see that?
4      ATTORNEY BERNSTEIN:  One moment, please.  I
5  can't see the -- 40.  Okay.  What's the entry?
6      ATTORNEY TRUEBLOOD:  August 11, 2023.
7      ATTORNEY BERNSTEIN:  Right here.  Do you see
8  it?
9      THE WITNESS:  Yes, I see it.
10 BY ATTORNEY TRUEBLOOD:
11     Q   Okay.  So I'm going to represent to you that
12 this was produced by your employer as a record of this
13 particular repossession assignment.  And I wanted to
14 direct you to that entry on August 11th.
15     Was that an entry that you made into the RDN?
16     A   No.
17     Q   Do you know who made that entry?
18     A   I don't.
19     Q   Did you ever visit 8604 West Sunset Boulevard?
20     A   No.
21     Q   The entry below it is dated July 19, 2023; do
22 you see that?
23     A   Yes.
24     Q   And it appears to be a record of a visit to
25 6755 Spring Park Avenue, where you repossessed the

1  vehicle ultimately.  And the note, though it's hard to
2  read, says, collateral not present, apartment including
3  underground secured parking through alleyway.  Vehicle
4  not seen at the present.
5      Did you write that entry?
6      A   No.
7      Q   Was that another one of the drivers, if you
8  know?
9      ATTORNEY BERNSTEIN:  Foundation.  Speculation.
10     THE WITNESS:  I don't know.
11 BY ATTORNEY TRUEBLOOD:
12     Q   Did you -- when you looked into the RDN system
13 on the morning of the repossession, as you testified,
14 did you see either of these two entries?
15     A   I didn't.
16     Q   And then the next entry up is dated August 29,
17 2023.  And it says, no unit spotted at Sycamore camera
18 hit, no street parking at night.
19     Was that you who made that entry?
20     A   No.
21     Q   All right.  Then we get to the day of the
22 repossession, September 5, 2023, at 11:45 a.m.  Do you
23 see that next entry?
24     A   Yes.
25     Q   And then at that time there are four photos

1  uploaded.  Do you see that?
2      A    Yes.
3      Q    Was that you uploading those photos?
4      A    Yes.
5      Q    All right.  So did you arrive at the building
6  at 6755 Spring Park Avenue on the date of the
7  repossession at 11:45 a.m. approximately?
8      A    Considering the time stamp, yes.
9           ATTORNEY BERNSTEIN:  Do you have an
10 independent recollection?
11          THE WITNESS:  Independent recollection?
12 BY ATTORNEY TRUEBLOOD:
13     Q    Okay.  Do you have any reason to disagree with
14 the time stamp here?
15     A    No.
16     Q    All right.  And then when you arrived around
17 11:45, you saw that the gate to the building was closed
18 and that the collateral was parked inside, right?
19          ATTORNEY BERNSTEIN:  Objection.  Asked and
20 answered.
21          THE WITNESS:  Yes.
22 BY ATTORNEY TRUEBLOOD:
23     Q    And then you -- I assume you took these four
24 photos here, at 11:45 from outside the building, you
25 know, either the outside of the building or looking

1  into the parking garage from outside; is that correct?
2      A    Yes.
3      Q    Okay.  And then the next -- the next entry is
4  at 11:46, and it says, address occupied, will continue
5  recovery efforts.  Unit present in parking structure on
6  first floor of given address, photos of unit uploaded
7  to photo and docs.
8           Did you author that entry?
9      A    Yes.
10     Q    And so were you sending that to your office or
11 the creditor or to whom?
12     A    To the office.
13     Q    Okay.  So you took your pictures and then you
14 made this entry, right?
15     A    Yes.
16     Q    All right.  Then the next entry in the log is
17 at 11:56 a.m., and it says, Steven spotted unit, he is
18 working on securing the unit.
19          Who made that entry?
20          ATTORNEY BERNSTEIN:  Foundation.  Speculation.
21          THE WITNESS:  I would think the office.
22 BY ATTORNEY TRUEBLOOD:
23     Q    Do you know who in the office?
24     A    No.
25     Q    All right.  And then at 11:59 an update is

1  made.  Do you see that, the next entry?
2      A    Yes.
3      Q    Did you make that update at 11:59?
4      A    Yes.
5      Q    What was the content of your update?
6      A    I'm not sure.
7      Q    Had you recovered the vehicle by 11:59?
8      A    I think yes.
9      Q    Okay.  And then, within that update on -- at
10 11:59, there's a notation that says, update deleted by
11 daytime LPR1 user at 12 p.m. on September 5, 2023.  So
12 did you delete your update of 11:59 at 12 p.m.?
13     A    I don't recall.
14     Q    All right.  The next -- next entry is at
15 September 5, 2023, at 1:24 p.m.  Do you see that; that
16 it says vehicle hooked?
17     A    Yes.
18     Q    Did you author that entry, vehicle hooked?
19     A    Yes.
20     Q    So you had the car at 11:59 and then you -- at
21 what time did you bring the car outside the garage?
22     A    Right after that.  Right after I got the car.
23     Q    Okay.  And then were you out there for a
24 while, until 1:24, when you made this update?
25     A    No.  I think I was driving to the yard to drop

1  the car.
2      Q    Okay.  Well, if you look at the entry starting
3  at 1:32 p.m., you'll see a bunch of photos that were
4  uploaded?
5      A    Yes.
6      Q    And I'll represent to you that those photos
7  were of your tow truck with the car attached outside --
8  just outside the building.  So if that's true, can you
9  -- does that refresh your recollection as to what
10 happened between 12 noon and 1:24?
11     A    That's what time I uploaded the pictures.
12     Q    And were you taking the pictures between 12
13 noon and 1:24 from outside the building?
14     A    Well, I took the pictures from 12 noon.  But I
15 uploaded them within the next hour and a half.  So when
16 I -- can I speak?
17          ATTORNEY BERNSTEIN:  Yeah.
18          ATTORNEY TRUEBLOOD:  Go ahead.
19          THE WITNESS:  I get to the yard --
20          ATTORNEY BERNSTEIN:  Let's wait for the next
21 question.
22          THE WITNESS:  Okay.
23          ATTORNEY TRUEBLOOD:  Well no, let him finish
24 his question.
25          THE WITNESS:  So I'll download all of any

1  pictures within -- once I get to the yard.
2  BY ATTORNEY TRUEBLOOD:
3      Q    Okay.  So when did you take the photos of
4  the -- of your tow truck hooked up to the vehicle just
5  outside the building where you had repossessed it?
6      A    I think it was, like, 12 o'clock, 12:05.
7      Q    Okay.  When you wrote the update at 1:24 with
8  vehicle hooked, where were you?
9      A    Inside.
10     Q    Inside where?
11     A    Hold on.  I think -- I think I may have been
12 on the phone with the company, with the office, and may
13 have let them know that the vehicle was hooked.
14 Because I don't generally put vehicle hooked.
15     Q    Okay.  Could it have been that you -- at
16 1:24 p.m. you were still outside the building, with the
17 vehicle hooked to your tow truck?
18     A    No.  No.
19     Q    So where do you think you were when you wrote
20 this entry, vehicle hooked?
21     A    I'm telling you that I think someone in the
22 office may have put vehicle hooked.
23     Q    Oh.  So you don't think it was you who wrote
24 vehicle hooked?
25     A    No.

1      Q    You think you made a phone call, and then they
2  noted it in the log?
3      A    I would be on the phone with the company
4  saying vehicle hooked, while I'm doing the rest of my
5  job.
6      Q    So do you think you were driving at that time?
7      A    Possibly.
8      Q    Back to the yard?
9      A    Possibly.  Or checking other accounts while I
10 still had the vehicle on the back of the truck.
11     Q    All right.  The next entry is at 1:25, and it
12 says, repossession initiated vehicle, is on hook.
13     Who made that entry if you know?
14     A    Someone in the office.
15     Q    And the next entry is September 5, 2023, at
16 1:26 p.m.  And it says, Sutton, comma, Terry, your
17 agent has marked this vehicle as repossessed on the
18 website.  Please verify the recovery details and notify
19 your client.
20     Who is Terry Sutton?
21     ATTORNEY BERNSTEIN:  Foundation.
22     THE WITNESS:  Terry is someone who used to
23 work with me.
24 BY ATTORNEY TRUEBLOOD:
25     Q    Well, in what capacity?

1      A    Calling in a car while I was driving, giving a
2  -- getting PD on the line, so I can talk to them.
3      Q    Was Terry with you in the truck?
4      A    No.
5      Q    So why is Terry's name here?
6      A    I'm not sure.
7      Q    Well, is this Terry Sutton's entry?
8      ATTORNEY BERNSTEIN:  Objection.  Foundation.
9      THE WITNESS:  I'm not sure.
10     ATTORNEY BERNSTEIN:  Calls for speculation.
11 BY ATTORNEY TRUEBLOOD:
12     Q    When you say it was someone you used to work
13 with, what did he do for you?
14     A    Terry would call PD for me if I was busy
15 repossessing vehicles.  If I was looking for something
16 else, Terry would call them and get them on the line
17 because sometimes it takes 30, 40 minutes to get
18 through.
19     Q    Was -- did Terry work in the office or did he
20 work out in the field with you?
21     A    Terry didn't really work for the company like
22 that.
23     Q    Okay.  But I mean, regardless of who he worked
24 for, was he physically with you or near you, or was he
25 back somewhere else?

1      A    He wasn't there.
2      Q    He was what?
3      A    He was not there.
4      Q    Where was he?
5      A    A phone call away.
6      ATTORNEY BERNSTEIN:  Foundation.  Speculation.
7      THE WITNESS:  Sorry.
8  BY ATTORNEY TRUEBLOOD:
9      Q    Go ahead?
10     ATTORNEY BERNSTEIN:  Give me a chance to
11 object.
12     THE WITNESS:  Apologize.
13     ATTORNEY BERNSTEIN:  If you know where he is,
14 fine.  Otherwise, object.  Lacks foundation.  Calls for
15 speculation.
16 BY ATTORNEY TRUEBLOOD:
17     Q    Go ahead.  Do you know where Terry was on this
18 day?
19     A    I don't.
20     Q    Looking at this entry, do you -- was it Terry
21 who wrote it?
22     A    Well, the computer has different people's
23 e-mails and everything, so I don't know who wrote it
24 exactly.
25     Q    Did you -- did you have communications with

1 Terry Sutton on this day, September 5, 2023?

2    A    I don't recollect.

3    Q    But Terry Sutton is somebody who doesn't work

4 for the company, but who assists you on repos?

5    A    Yes.

6    Q    So he'll make calls for you?

7    A    Yes.

8    Q    Does he do the police reports for you while

9 you're doing something else?

10   A    Sometimes.

11   Q    Is -- do you pay him for that work?

12   A    It's not necessarily a pay, it's just looking

13 out.

14   Q    But you -- you'll compensate him for the work

15 he does?

16   A    Yes.

17   Q    But he's not an employee of LAW Recovery, and

18 never has been?

19   A    He tried out before -- and as a yard guy, and

20 no he's not.

21   Q    So he used to be a yard guy, but he's no

22 longer?

23   A    Right.  Yes.

24   Q    Was he a yard guy in September of 2023 or had

25 he left at that point?

1    A    He had left at that point.

2    Q    Was Terry Sutton ever licensed with the BSIS

3 to your knowledge?

4    A    No, I don't know.

5    Q    So to the best of your recollection, what --

6 what involvement did Terry Sutton have with this

7 particular repossession?

8         ATTORNEY BERNSTEIN:  Objection.  Foundation.

9 Calls for speculation.

10        THE WITNESS:  Just assisting me in anything

11 that I needed.

12 BY ATTORNEY TRUEBLOOD:

13   Q    And you don't -- do you recall specifically

14 what he might have done?

15   A    No.

16   Q    But you do recall he was doing something?

17        ATTORNEY BERNSTEIN:  Objection.

18 Mischaracterizes prior testimony.

19        THE WITNESS:  I'm not a hundred percent sure

20 on that date what he was -- if I had him do anything.

21 BY ATTORNEY TRUEBLOOD:

22   Q    There's no reason for Terry's name to appear

23 on this log if he's not involved, is there?

24        ATTORNEY BERNSTEIN:  Objection.

25 Argumentative.  Lacks foundation.  Calls for

1 speculation.

2         THE WITNESS:  I don't know how the computer

3 stuff works.

4 BY ATTORNEY TRUEBLOOD:

5    Q    Do you have any explanation for how Terry

6 Sutton's name appears on this entry if he wasn't

7 involved in the repossession of Mr. Galanter's vehicle?

8         ATTORNEY BERNSTEIN:  Same objections.

9         THE WITNESS:  No.

10 BY ATTORNEY TRUEBLOOD:

11   Q    Okay.  Do you know where Terry lives?

12   A    At the present time, no.

13   Q    Is he a friend outside of work?

14   A    Yes.

15   Q    Do you have his phone number?

16   A    I don't, no.

17   Q    Do you have your phone with you?

18   A    Yes.

19   Q    Can you look it up for me?

20   A    One second, I'm sorry.

21   Q    It's all right.

22   A    I found it.

23   Q    Okay.  Go ahead.

24   A    Oh, you need it?

25   Q    Yeah, please.

1    A    323.

2    Q    Yes?

3    A    495.

4    Q    Yes?

5    A    9039.

6    Q    Thank you.  Do you need to see it, or --

7    A    No, no, that's fine.

8    A    Sorry.

9    Q    Okay.  So then -- did you talk to Terry about

10 this repossession?

11   A    No.

12   Q    Was he physically present when you drove in

13 the garage?

14   A    No.

15   Q    Was he ever physically present at the site of

16 the repossession of Mr. Galanter's vehicle?

17   A    No.

18   Q    So then the next entry here is five photos

19 that were uploaded at 1:32 p.m.; do you see that?

20   A    Yes.

21   Q    Are those the photos -- are those photos that

22 you uploaded when you got to the yard?

23   A    I think so.

24   Q    Is it possible that Terry --

25   A    Yes.

1    Q    Is it possible that Terry Sutton uploaded
2  those photos?
3         ATTORNEY BERNSTEIN:  Foundation.  Calls for
4  speculation.
5         THE WITNESS:  No.
6  BY ATTORNEY TRUEBLOOD:
7    Q    And why do you say that?
8    A    Because I have the photos on my phone.
9    Q    Okay.  So you would have uploaded those when
10 you got to the yard around 1:32 p.m.
11        And then the next entry says, at 13:37 p.m.,
12 says C/R created by agent and automatically
13 transferred; do you know what that means?
14   A    Condition report created by me and
15 automatically transferred.
16   Q    Did you author the condition report?
17   A    Yes.
18   Q    And then you uploaded it?
19   A    Yes.
20   Q    Okay.  And then the next entry is again from
21 Terry Sutton, and it says, your agent updated the
22 recovery details.  Do you know what Mr. Sutton was
23 updating?
24   A    I'm not sure.  I'm not even sure it was him
25 because the hour -- that's another hour away.

1    Q    Okay.  Where would you look -- if -- to find
2  the recovery details that were being sent in this
3  particular entry?
4    A    I don't know, I'm not office.  You would have
5  to talk to someone in the office.
6    Q    Okay.  So then -- there's a bunch of photos
7  that are uploaded at six -- at 4:16 p.m. on
8  September 5, 2023.  Were those photos that you took?
9    A    No, I think those might have been the yard
10 guy.
11   Q    Okay.  Is that Juan Murato?
12   A    I don't know who is working the yard.
13   Q    Do you know a yard guy named Juan?
14   A    I don't know who Juan Murato is.
15   Q    Okay.  Do you know a yard guy named Juan?
16   A    I don't know a yard guy named Juan.
17   Q    Is this progress report from the RDN system?
18   A    I don't know.
19   Q    Do you know what part of the city Terry Sutton
20 lives in?
21   A    He lives in south central LA.
22   Q    Approximately how old is he?
23   A    Maybe 32, 30.  I'm not sure.
24   Q    Is he -- what race is he?
25   A    Black.

1    Q    Okay.
2         All right.  I'm going to send the next
3  exhibit, which is Exhibit 3.  This is a document
4  entitled picture report produced by LAW Recovery, and
5  it has Bates numbers LAW Recovery Galanter 44 through
6  46.
7         ATTORNEY BERNSTEIN:  I don't have it yet.
8         ATTORNEY TRUEBLOOD:  Yeah.
9         ATTORNEY BERNSTEIN:  I clicked on the wrong
10 button, so now we're -- now we're stuck.  Hold on a
11 second.  We're having a technical issue here.  I
12 clicked on the wrong button.
13        ATTORNEY TRUEBLOOD:  Okay.
14        ATTORNEY BERNSTEIN:  Let's see.  Here we go.
15 BY ATTORNEY TRUEBLOOD:
16   Q    Do you have a look at that, Mr. McIntosh?
17        ATTORNEY BERNSTEIN:  Here we go.
18        THE WITNESS:  Yes.
19 BY ATTORNEY TRUEBLOOD:
20   Q    Okay.  So if you look at the first four photos
21 in the picture report, moving across, and then one line
22 down, are those the photos that you took from outside
23 the building when you arrived around 11:45 a.m. on
24 September 5, 2023?
25   A    Yes.

1    Q    And the gate was closed.  Do you see that in
2  the fourth picture?
3    A    Yes.
4    Q    Okay.  About how long did you wait outside the
5  gate before the car came out of the garage, and you
6  were able to drive in?
7    A    10 or 15 minutes.
8    Q    In that fourth picture there, that shows the
9  gate, there's a gray car; do you see that?
10   A    Yes.
11   Q    Whose car is that?
12   A    The fourth picture?
13   Q    Yeah.
14   A    That's the Honda, the -- Mr. Galanter's --
15   Q    No, I'm counting -- the first three are
16 across, and then the next one is -- at the left on the
17 second line.  It shows the gate, and then it shows a
18 gray car, dark gray car?
19   A    I don't know.
20   Q    Could that be the gray sedan that you referred
21 to earlier that drove out of the garage?
22   A    No, sir.
23   Q    So you have no idea whose car that is?
24   A    No.
25   Q    Is that Terry Sutton's car?

**Page 130**

1    A    No, sir.

2    Q    Is that Thomas Hillman's car?

3    A    No, sir.

4    Q    Was that car parked or was that car driving?

5    A    The car was driving.

6    Q    All right.  And then we established earlier

7    that you took some photos that you uploaded when --

8    when you got to the yard, and those are five photos.

9    Hang on a minute.

10         So are the five photos that you took outside

11   the garage in the alleyway the ones that start after

12   the four we just looked at?  And all contain a gray

13   Honda.

14   A    Yes.

15   Q    And you took those photos in the alleyway on

16   your own cell phone, right?

17   A    Yes.

18   Q    But you didn't upload them until you got to

19   the yard?

20   A    Yes.

21   Q    And then the rest of the photos in this

22   picture report were all taken at the yard, correct?

23   A    I'm trying to see the rest of the pictures

24   right now.  I don't recollect.  I think not.  I think

25   they were took on-scene, too.

**Page 131**

1    Q    Okay.  Which ones do you think were on the

2    scene?

3    A    The interior pictures, because I did gain

4    access into the car.

5    Q    Okay.  So on what page do the yard pictures

6    begin?

7    A    Pages?

8    Q    It's got a numbered page there.

9    A    On the next page.

10        ATTORNEY BERNSTEIN:  45?

11        THE WITNESS:  40 -- yeah, just --

12   BY ATTORNEY TRUEBLOOD:

13   Q    Page 45?

14   A    Yes.

15   Q    All right.  And what picture is the one that

16   starts the pictures from the yard?

17   A    The door VIN number.

18   Q    Okay.  So the entire page 45 was all taken at

19   the yard, right?

20   A    Yes.

21   Q    And the ones previous to that were taken by

22   you?

23   A    Yes.

24   Q    On page 44.  On page 44, right?

25   A    Yes.

**Page 132**

1    Q    Okay.  And let me -- take a look at the third

2    picture on page 44, going across on the top line.  It's

3    a picture of the Honda, inside the garage; do you see

4    that?

5    A    Yes.

6    Q    That was taken from outside, but you kind of

7    pushed your cell phone through the bars to take a

8    picture?

9         ATTORNEY BERNSTEIN:  Objection.

10   Argumentative.

11        THE WITNESS:  I don't recollect.

12   BY ATTORNEY TRUEBLOOD:

13   Q    Well, in the sequence, there's that picture of

14   the car parked, and then the next picture is from

15   outside the garage; do you see that?

16   A    Yes.

17   Q    Does that indicate to you that you just pushed

18   your cell phone through the bars to get a better

19   picture?

20        ATTORNEY BERNSTEIN:  Objection.

21   Argumentative.

22        THE WITNESS:  I didn't push myself through

23   the --

24   BY ATTORNEY TRUEBLOOD:

25   Q    No.  I mean you -- it looks to me like you

**Page 133**

1    placed your cell phone close enough to the bars so that

2    you wouldn't take a picture of the bar, you would just

3    get a clean picture of the car; is that correct?

4         ATTORNEY BERNSTEIN:  Objection.  Counsel is

5    testifying.  It's argumentative.  Mischaracterizes

6    prior testimony.

7    BY ATTORNEY TRUEBLOOD:

8    Q    Go ahead.

9    A    I don't recollect.

10   Q    Had you seen this picture report before today?

11   A    Yes.

12   Q    When did you see it?

13   A    I don't -- I can't tell you a specific date.

14   Q    Well, who gave it to you?

15   A    When I was asked about the vehicle, and I

16   looked at the VIN number, that's when I seen the

17   pictures of it.

18   Q    And when who asked you?

19   A    When John asked me about the -- John Serafin

20   asked me about the account, I had no recollection.  But

21   he gave me the last six of the VIN number, I went to

22   the pictures, and that's when I --

23   Q    Okay.  So if I'm -- just to -- well, never

24   mind.  I'm going to strike that.

25        Let's move on to the next exhibit, which is

Page 134

1    Exhibit Number 4.  I'm going to send that to your
2    counsel.
3            And Exhibit 4 is a notice of seizure and
4    personal property inventory dated September 5, 2023,
5    bearing Bates number LAW Recovery Galanter 50.
6    A    Yes.
7    Q    Do you recognize that document?
8    A    Yes.
9    Q    What is that?
10   A    It's a notice of seizure of personal property
11   inventory.
12   Q    As to Mr. Galanter, right?
13   A    Yes.
14   Q    Did you -- is that your signature at the
15   bottom?
16   A    Yes.
17   Q    Did you sign on September 5, 2023, at
18   4:48 p.m.?
19   A    Yes.
20   Q    And did you then upload the document into the
21   system?
22        ATTORNEY BERNSTEIN:  Objection.  Vague.
23   BY ATTORNEY TRUEBLOOD:
24   Q    Did you upload this document into any computer
25   system?

Page 135

1    A    I handed it to the office workers -- one of
2    the office workers.
3    Q    Okay.  Did you print it out before you signed
4    it?
5    A    No, it was already printed out for me.
6    Q    Where did you find -- where did you find it?
7    A    It was printed out for me and handed to me.
8    Q    Who handed it to you?
9    A    One of the office workers inside the office.
10   Q    Who was that?
11   A    I don't recall.  Possibly Jazmine.
12   Q    Do you know how the office workers determined
13   the address for the debtor that goes on the notice of
14   seizures?
15   A    I do not.
16   Q    Did you look at the address before you signed,
17   for the debtor?
18   A    I think, yeah.  I think so.  I don't recall.
19   Q    So you signed it, and then you -- did you give
20   it back to Jazmine?
21   A    Yes.  I may have left it on her desk.
22   Q    What's the usual procedure for what happens to
23   a notice of seizure after you sign it?
24        ATTORNEY BERNSTEIN:  Objection.  Vague.
25   Foundation.  Go ahead.

Page 136

1        THE WITNESS:  We either leave it on the desk
2    or hand it to one of the office workers.
3    BY ATTORNEY TRUEBLOOD:
4    Q    And what's your understanding of what happens
5    to that document after?
6        ATTORNEY BERNSTEIN:  Same objections.
7        THE WITNESS:  I have no understanding of it.
8    BY ATTORNEY TRUEBLOOD:
9    Q    Do you have any understanding that it gets
10   mailed?
11        ATTORNEY BERNSTEIN:  Same objection.
12        THE WITNESS:  I have no understanding of it.
13   BY ATTORNEY TRUEBLOOD:
14   Q    Do you have any knowledge as to whether this
15   particular notice of seizure was mailed by LAW
16   Recovery?
17   A    I don't know.  That's office.
18   Q    Okay --
19   A    -- information.
20   Q    -- so when you handed the paper to Jazmine, it
21   was not in an envelope, correct?
22   A    No.
23   Q    And whose job is it to -- if you know -- to
24   place the notice of seizure into an envelope?
25        ATTORNEY BERNSTEIN:  Objection.  Foundation.

Page 137

1        THE WITNESS:  Office.
2    BY ATTORNEY TRUEBLOOD:
3    Q    But you don't know who?
4    A    No.
5    Q    And whose job is it, if you know, to mail the
6    envelope after the notice of seizure has been placed in
7    it?
8        ATTORNEY BERNSTEIN:  Same objection.
9        THE WITNESS:  Office.
10   BY ATTORNEY TRUEBLOOD:
11   Q    Do you know -- have you ever mailed a letter
12   for LAW Recovery or in connection with your job?
13   A    No.
14   Q    Do you know if LAW Recovery has a franking
15   machine or does it use sticky stamps?
16   A    I don't know what a franking machine is.
17   Q    It's one of those -- like, a meter machine.
18   Like a mail meter machine, where you stamp the
19   envelope?
20   A    I don't know.
21   Q    Did you have any conversation with Access
22   Finance about Mr. Galanter's vehicle at any time?
23   A    No.
24   Q    Okay.  Why don't we stop there?  I have to do
25   my phone call.  It will be a few minutes, then we can

1  -- maybe 15 minutes, we can come back on.

2          (Off the record from 1:55PM to 2:14PM.)

3  BY ATTORNEY TRUEBLOOD:

4      Q    Okay.  I'm going to send another exhibit to

5  you, Exhibit 5.

6          And Exhibit 5 is a repossession notification

7  with Bates number LAW Recovery Galanter 24.

8          ATTORNEY BERNSTEIN:  Okay.

9  BY ATTORNEY TRUEBLOOD:

10     Q    Okay.  Mr. McIntosh, did you -- did you author

11 the repossession notification that's here?

12     A    No, sir.

13     Q    Do you recognize this?

14     A    No, sir.

15     Q    Did you issue a repossession notification

16 yourself after you repossessed the vehicle?

17     A    No, sir.

18     Q    So was this document, to your knowledge,

19 created by the office?

20     A    Yes.

21     Q    If you could take a look at Exhibit 2, which

22 is the progress report, again?

23         ATTORNEY BERNSTEIN:  I may not have that up

24 anymore, Counsel, which means I have to go searching

25 it.

1          ATTORNEY TRUEBLOOD:  Okay.  It's called -- the

2  title of the file is progress report.

3  BY ATTORNEY TRUEBLOOD:

4      Q    But while your counsel is finding that,

5  Mr. McIntosh:  When you prepared the personal property

6  inventory, was it you who pulled the items -- the

7  personal property out of the car?

8      A    I didn't pull the property out of the car.  I

9  just took an acknowledgment of what was in the car and

10 documented it.

11     Q    Okay.  So were you looking at bags of stuff

12 when you were making the inventory?

13     A    Yes.

14     Q    Did someone else do the inventory or did you

15 write -- handwrite the inventory?

16     A    I handwrote the inventory.

17     Q    Okay.  Let's go look at that again, which is

18 Exhibit 4, called notice of seizure.

19     A    We went back to --

20         ATTORNEY BERNSTEIN:  We went back to the

21 progress report, Counsel.

22 BY ATTORNEY TRUEBLOOD:

23     Q    Sorry, I'm going to go back to the notice of

24 seizure for a moment, then we'll do the progress

25 report.

1          ATTORNEY BERNSTEIN:  I didn't keep these open,

2  so...

3          ATTORNEY TRUEBLOOD:  No, but you should have

4  the e-mail.

5          ATTORNEY BERNSTEIN:  Right, but I have about

6  40 e-mails, and I'm working off of a laptop.  Goodness.

7  Just a second.

8          What number -- what exhibit is it?

9          ATTORNEY TRUEBLOOD:  Exhibit 4.

10         ATTORNEY BERNSTEIN:  Okay.

11 BY ATTORNEY TRUEBLOOD:

12     Q    Okay.  So I just want to ask you:  You see the

13 handwritten materials -- the handwritten area that

14 says, after the following items were recovered from the

15 above vehicle?

16         ATTORNEY BERNSTEIN:  Hang on, we lost it.

17 Just a second.

18         THE WITNESS:  Yes.

19 BY ATTORNEY TRUEBLOOD:

20     Q    Okay.  Can you read that to me?

21     A    It's hard to make out, but I see hard drive,

22 charger, pillow, shoes, gate clicker, plastic bags,

23 flip-flops.  Maybe hat, towels, spray wax, mixed

24 papers -- miscellaneous papers.

25     Q    Okay.  So --

1      A    Phone -- phone -- phone something charger.

2      Q    Okay.  Is that your handwriting?

3      A    Yes.

4      Q    All right.  And was all of this -- were all of

5  these items in a single plastic bag?

6      A    They were all in the vehicle.

7      Q    And did you put them in the bag?

8      A    I didn't put them in the bag.

9      Q    Who did that?

10     A    The lot guy.

11     Q    Who?

12     A    One of the lot guys.

13     Q    Do you know who?

14     A    I don't.

15     Q    So were you handed the bag or were you -- what

16 were you handed in order to make this inventory?

17     A    I had him grabbing the stuff out of the car.

18 As he was doing it, I was writing everything down.  And

19 we placed it in the plastic bags, bagged and tagged it.

20 And then they were going to put it in the inventory.

21     Q    Okay.  So did you walk the bag and the notice

22 of seizure over to the office?

23     A    I walked the notice of seizure over to the

24 office.  The bag was already wrapped with the number

25 that goes on the bag to let them know where the bag was

Page 142

1  going to.
2     Q    And then you delivered the notice of seizure
3  to, you think, Jazmine?
4     A    Yes.
5     Q    Okay.  So let's look at Exhibit 5, which is
6  the repo -- I'm sorry, Exhibit 3, which is the -- I'm
7  sorry.  Exhibit 2, which is the progress report.
8           ATTORNEY BERNSTEIN:  Go ahead.
9  BY ATTORNEY TRUEBLOOD:
10    Q    Okay.  So going back to that entry at --
11  not -- on 9/5/2023 at 12 p.m., where it says, update
12  deleted by daytime LPR1.  Do you see that?
13    A    Yes.
14    Q    Do you have -- as you sit here today, do you
15  have any explanation for why you deleted your update?
16    A    As I stated earlier, I think that was the
17  office that deleted it.  I'm not sure that I'm even
18  capable of deleting an update.
19    Q    Well, it says daytime LPR1, user.  What does
20  that mean to you?
21    A    I don't -- it doesn't mean nothing to me, I
22  don't know.
23    Q    Well, you testified earlier that it was indeed
24  you who deleted this.  So do you know why?
25    A    I believe that -- I don't have a way of

Page 143

1  deleting.
2     Q    Well, you stated you did.  So somebody deleted
3  it, right?
4           ATTORNEY BERNSTEIN:  You are arguing with the
5  witness.  It is what it is.
6  BY ATTORNEY TRUEBLOOD:
7     Q    As you sit here today, do you know whether you
8  deleted it or somebody else?
9     A    I have no recognition -- recollection on
10  deleting anything.
11    Q    Are you denying that you deleted it?
12           ATTORNEY BERNSTEIN:  Objection.
13  Argumentative.  Asked and answered.
14           THE WITNESS:  I'm saying, I don't have no
15  recollection of deleting anything.
16  BY ATTORNEY TRUEBLOOD:
17    Q    So it could have been you, but it could have
18  been somebody else; is that fair?
19    A    I'm saying I don't have no recollection of
20  deleting anything.
21    Q    Are the spotter vehicles that LAW Recovery
22  uses owned by LAW Recovery?
23           ATTORNEY BERNSTEIN:  Say that again?  I missed
24  the question.  Please.
25

Page 144

1  BY ATTORNEY TRUEBLOOD:
2     Q    Are the spotter vehicles that LAW Recovery
3  uses owned by LAW Recovery?
4           ATTORNEY BERNSTEIN:  Objection.  Foundation.
5           THE WITNESS:  I don't know.
6  BY ATTORNEY TRUEBLOOD:
7     Q    And do you have -- you don't -- do you have a
8  phone number on your phone for Thomas Hillman?
9     A    I do not.
10    Q    How long did you stay at the property on
11  Spring Park after you had hooked the vehicle before you
12  left the yard?
13    A    I would say long enough to take my pictures
14  and make sure that the vehicle was secure.
15    Q    So about how many -- how long was that?
16    A    I don't know.  Maybe seven, eight minutes.
17           ATTORNEY BERNSTEIN:  Okay.
18           ATTORNEY TRUEBLOOD:  Okay.  I don't have any
19  further questions.
20           ATTORNEY BERNSTEIN:  No questions.
21           ATTORNEY TRUEBLOOD:  All right.
22           ATTORNEY BERNSTEIN:  Thank you.
23           (Proceedings concluded at 2:25PM.)
24
25

Page 145

1           I, _____, do hereby declare under
2  penalty of perjury under the laws of the State of
3  California that I have read the foregoing transcript;
4  that I have made such corrections as noted herein, in
5  ink, initialed by me, or attached hereto; that my
6  testimony contained herein, as corrected, is true and
7  correct.
8           Executed this _____ day of _____,
9  20___, at _____, _____.
10
11
12
13                    _____
                             Witness Signature
14
15
16
17
18
19
20
21
22
23
24
25

